# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ARENA ENERGY, LP, *et al.*,[1] | ) Case No. 20-34215 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| ARENA ENERGY, LP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proc. No. 20-_____ |
| | ) |
| W&T OFFSHORE, INC. and 31 Group, LLC, | ) |
| | ) |
| Defendants. | ) |

### Arena Energy, LP's Verified Original Complaint and
### Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction

1.       Plaintiff Arena Energy, LP ("Arena"), a debtor and debtor in possession in the above-captioned cases, brings this Original Complaint against defendants 31 Group, LLC ("31 Group") and W&T Offshore, Inc. ("W&T") for breach of confidentiality agreement, tortious interference with contract, and conversion of Arena's confidential information.

2.       Arena and 31 Group entered into a May 22, 2020 Confidentiality Agreement, which 31 Group breached by sharing Arena's confidential information with W&T, one of Arena's direct competitors. W&T sought access to Arena's confidential information but W&T itself refused to sign a substantially similar Confidentiality Agreement with Arena and, instead, W&T tortiously interfered with the Arena/31 Group Confidentiality Agreement, secretly obtained improper and

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Arena Energy, LP (1436); Arena Energy 2020 GP, LLC (N/A); Arena Energy GP, LLC (7454); Arena Exploration, LLC (1947); Sagamore Hill Holdings, LP (8266); and Valiant Energy, L.L.C. (7184). The location of the debtors' service address is: 2103 Research Forest Drive, Suite 400, The Woodlands, Texas 77380.

1

unauthorized access to Arena's confidential information, and converted Arena's property. W&T has refused to return and refused to destroy its improperly made copies of Arena's confidential information. Arena seeks a TRO to address W&T's wrongful and tortious conduct, the irreparable harm that W&T caused and continues to cause, and to restore the last peaceable status quo before W&T engaged in its misconduct.

## I.
## Parties

3.      Arena Energy, LP is a Delaware limited partnership and has its principal office at 2103 Research Forest Drive, Suite 400, The Woodlands, Texas 77380.

4.      W&T is a Texas corporation, has its principal place of business in Houston, Texas, and may be served with process by serving its registered agent in the State of Texas, CT Corporation System, 1021 Main Street, Suite 1150, Houston, TX 77002. Arena also will serve a copy of its filings on W&T's counsel at White & Case LLP and at Locke Lord LLP.

5.      31 Group is a Delaware corporation, has its principal place of business in Rockwall, Texas, and may be served with process by serving it in the State of Texas at 3021 Ridge Rd., Suite A208, Rockwall, TX 75032. Arena also will serve a copy of its filings by email on 31 Group's president Ken Goggans  at energy@31grp.com.

## II.
## Jurisdiction and Venue

6.      The Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b). This adversary proceeding concerns debtor Arena's confidential information, which Arena provided to 31 Group under the Confidentiality Agreement as part of a sales process leading to this bankruptcy proceeding. 31 Group breached the Confidentiality Agreement and provided the confidential information to W&T. W&T refused (on multiple occasions, including after the commencement of these cases) to relinquish the confidential information to Arena in

response to Arena's demand and refused to sign a confidentiality agreement to protect it. 31 Group's breach of the Confidentiality Agreement and W&T's conversion of Arena's confidential information relates to this title 11 proceeding because W&T is using the confidential information to bid on Arena's assets, and W&T's wrongful use of the confidential information for competitive purposes could diminish the value of the estate.

7.     The Court has authority to enter a final judgment in this core proceeding under 28 U.S.C § 157.

8.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and 1409. 31 Group agreed in Confidentiality Agreement § 19 that "Venue for any dispute between the Parties shall exclusively rest with any state or federal court located in Harris County, Texas." Ex. 1 at 5.

9.     Arena confirms its consent, pursuant to Bankruptcy Rule 7008, to the entry of a final judgment by the Court in connection with this Complaint.

10.     Arena seeks relief pursuant to §§ 105 and 542(a) of the Bankruptcy Code and Bankruptcy Rules 7001(1), 7001(7), and 7065.

III.
Facts

A.     Arena Energy, LP's History in the Gulf of Mexico and Competition with W&T

11.     In 1999, Todd Stone, Michael Minarovic, and Bryan Nelson founded Arena. The three founding members had worked for years as geological and petroleum engineers for various oil and gas exploration and production companies operating in the Gulf of Mexico and sought to build their own company to pursue opportunities the major oil companies failed to recognize.

12.     Over the next 20 years, Arena became a tremendous success story. Arena used cutting edge geological and geophysical mapping and petroleum engineering, proprietary exploration and drilling methods, and unique data to identify promising exploration and production

opportunities in the Gulf of Mexico, often in fields previously explored but left behind by the major oil companies. Over the past five years, Arena has been among the most active drillers in the Gulf. Of the ~180 wells drilled on the Shelf in the Gulf of Mexico during this time, Arena drilled ~132 of them.

13.     W&T has directly and aggressively competed with Arena in the Gulf for years. Like Arena, W&T actively explores and produces in the Gulf of Mexico. Over the last five years, W&T has drilled ~14 wells on the Shelf in the Gulf and, like Arena, is among the most active drillers in the Gulf.

14.     W&T often competes with Arena in areas where Arena drills. W&T has sought to purchase assets from Arena, some of which Arena still owns. Arena has purchased assets that W&T has relinquished to obtain drilling opportunities that Arena intended to pursue that W&T may not have known about.

B.     Initiation of the Evercore sales process and creation of the virtual data room

15.     In 2020, the combination of Arena's capital structure, the COVID-19 global pandemic and economic recession, and the fall in oil prices sparked by the Russia-Saudi price war and other factors forced Arena to consider a potential sale of its assets and, potentially, bankruptcy.[2] Arena engaged Evercore Group L.L.C. to initiate a sales process to market Arena's assets.

---

[2] As described in other pleadings filed in connection with these chapter 11 cases, in light of the possibility that certain insiders of Arena may submit a bid for Arena's assets, the Transaction Committee of the Board of Directors of Arena Energy GP, LLC (which consists of two disinterested, independent directors) was delegated the sole and exclusive ability to conduct Arena's marketing process.  Management (including any management affiliated with the Plan Sponsor San Juan Offshore, LLC) did not direct or have any role in the Transaction Committee's sale process. *See* Horton Decl. para. 23, Dkt. # 17, *In re Arena Energy, LP et al.*, No. 20:34215, In the United States Bankruptcy Court for the Southern District of Texas.

16.     To ensure that potential bidders had a comprehensive understanding of Arena's assets, Arena uploaded a vast amount of confidential and proprietary information to a virtual data room, including Arena's most competitively sensitive information and data. A list of all documents and data in the data room is attached as Exhibit 8. The virtual data room included:

- Geological and geophysical information,

- Well logs, engineering, drilling, and wellbore information and reports,

- Materials reflecting restricted and highly valuable seismic data,

- Drilling strategy and methodology,

- Drilling results,

- Cashflow forecasts,

- Reserve studies,

- Maps,

- Field studies,

- Financial and tax information and analyses,

- Leases, licenses, concessions, permits and contracts,

- Production, price, and reserves information, and

- Agreements for production transportation, treating, processing, and marketing regarding Arena's properties

17.     The virtual data room's highly sensitive competitive information includes a confidential memorandum that lays out Arena's drilling strategy. This is Arena's secret sauce, its Coca Cola® recipe, the key strategy that gives Arena its competitive advantage. Combined with the virtual data room's information about where and how Arena has scored some of its biggest successes in the Gulf, this confidential memorandum would provide Arena's competitors (like W&T) with a blueprint to imitate Arena's unique and Gulf-leading drilling strategy.

18.     Over the past two decades and with the input of some of the finest geologists and developers in the Gulf, Arena's founding partners and geologists developed Arena's methodology and the tools to implement it. Arena has spent years and millions of dollars creating its strategy, which allowed it to become among the most successful Shelf drillers in the Gulf. Arena has remained a private company in part to protect this very information from disclosure. Armed with Arena's strategic memorandum and information about its results, a competitor could narrow Arena's competitive advantage and shortcut years of work and millions of dollars in development work.

19.     Arena's virtual data room also contains documents reflecting critically sensitive seismic lines and other derivative data, including subsurface and isopach maps. Arena is one of only a few companies with access to OGO and NESI seismic data, which cost millions of dollars and took years to acquire. Arena devoted substantial time and money to reprocess seismic data and focus and refine it. This confidential and proprietary information allows Arena to target plays in the Gulf that other oil and gas producers cannot find with less sophisticated data. It would be extremely difficult for Arena's competitors to replicate Arena's work without the information in the virtual data room, without significant expenditures of time and money. Even with the expenditures of time and money, there is no guarantee the competitors would get the same or similar results.

20.     If Arena's competitors like W&T could acquire and utilize Arena's reprocessed OGO and NESI seismic data *without the critical restrictions imposed by the Confidentiality Agreement that W&T refused to sign* then Arena's competitive advantage would evaporate. Competitors like W&T would gain unauthorized and improper critical information they would not otherwise have about the fields and locations that Arena has targeted, where Arena sees real

potential, and the reasons why. Such competitors would then be in a position to use Arena's own information to bid against Arena and try to outbid Arena or force Arena to bid much higher to secure properties that Arena worked (and spent millions) to discover. Other oil and gas exploration companies often relinquish Gulf leases which then become available for Arena, and the highly confidential and proprietary information in Arena's virtual data room gives Arena a competitive edge in acquiring or leasing such properties. It is difficult and perhaps impossible accurately to quantify the harm Arena would suffer from a competitor gaining unrestricted access to the OGO and NESI reprocessed seismic and other information—and will suffer as a result of W&T's improper access—and from the ripple effects from competitors narrowing or eliminating Arena's informational advantage. The seismic data has significant value to third parties, who would otherwise have to expend considerable resources leasing and reprocessing the data. A competitor could not acquire the same data. It would have to spend the time and dedicate resources, including the resources of Arena's own geophysicists, to produce a similar work product. This work product is specifically proprietary to Arena.

21.     Arena's virtual data room is a competitor's dream, and allowing competitors access to the data room without a confidentiality agreement could permanently damage Arena. With access to Arena's virtual data room and without use and other restrictions, an even marginally capable competitor would be positioned to generate significant value for itself at Arena's expense by exploiting Arena's information, including Arena's proprietary methodology, reserve information, abandonment estimates, contractual information, and seismic data. W&T having access to the virtual data room without the protections of a confidentiality agreement is particularly concerning because W&T has previously offered to buy certain properties from Arena. With the information in the virtual data room, including information about the reserves for these properties,

W&T will have greater guidance on what Arena's properties are worth and what nearby properties could provide similar opportunities.

22.     That of course is one important reason why Arena—and other similarly situated sellers—requires would be bidders to sign confidentiality agreements before gaining access to a data room. Arena and Evercore required any bidder that sought access to the data room to sign a confidentiality agreement preventing such bidders from using Arena's confidential information for any purpose other than bidding on the assets. Twenty potential bidders signed substantially identical confidentiality agreements here. W&T did not. But W&T improperly gained unauthorized access anyway. And W&T kept its access secret from Arena (and from Arena's financial advisor Evercore).

C.      31 Group initiates a bid process with Arena

23.     On May 13, 2020, at the direction of Arena, Evercore sent a sales teaser to over 900 potential market participants, advertising the potential sale of Arena Energy, LP's assets. Ex. 2. W&T was one of the 900 participants that received the teaser. 31 Group was not.

24.     Even though 31 Group had not received the May 13 teaser, 31 Group's president Ken Goggans contacted Evercore and expressed interest that same day. Ex. 3 at 2. On May 22, 2020, Arena and 31 Group signed their Confidentiality Agreement. Ex. 3 at 1. On May 25, 31 Group gained access to Arena's virtual data room. On May 26, 31 Group downloaded the entire virtual data room and, on 13 subsequent occasions through July 17, 31 Group also bulk downloaded all new documents that Arena placed in the data room.

25.     31 Group was one of 72 potentially interested parties that communicated with Evercore, Arena's advisor. 31 Group was one of 27 that received a draft confidentiality agreement. And 31 Group was one of 20 that signed substantially identical confidentiality agreements with Arena and legitimately gained access to Arena's virtual data room.

26.     W&T did not sign a substantially identical confidentiality agreement with Arena, and as a result W&T was not entitled to access Arena's data or virtual data room.

27.     The Confidentiality Agreement that 31 Group signed—like the substantially identical agreements the other 19 signed—provides in § 1(a) and (b) that 31 Group shall not "use or allow the use" of the confidential data and information it received or "disclose or allow the disclosure" of the confidential data and information to "any person." Confidentiality Agreement § 1(e) requires 31 Group to "treat, and cause to be treated" the information received as "strictly confidential." Ex. 1 at 1.

28.     Confidentiality Agreement § 4 specifies that Arena "retains all rights, titles, and interests" to the confidential information and "at any time when requested in writing" 31 Group "shall promptly, but in no more than five (5) business days, return" to Arena all confidential information and destroy any notes and summaries "without retaining any copies thereof." Section 4 allows Arena to request that 31 Group "promptly provide written certification" to Arena that it has complied with section 4. Ex. 1 at 2.

D.      W&T refuses to sign a confidentiality agreement

29.     W&T reached out to Evercore on May 15 to request a copy of the confidentiality agreement, which its officers referred to throughout the process as an "NDA." Ex. 4 at 5. Evercore tried for weeks to get W&T to sign a confidentiality agreement that was substantially identical to the agreement 31 Group and the 19 other potential bidders signed, but W&T refused.

30.     On behalf of Arena, Evercore provided W&T the confidentiality agreement on May 15 and asked W&T to send back proposed changes. *Id.* at 4. W&T did not respond with proposed changes. It instead demanded additional confidential information to identify the leases at issue. *Id.* at 4. Evercore responded that "other parties have agreed to Exhibit A in the NDA" and that once W&T was in the data room, W&T would "have access to the list of leases." *Id.* at 4.

9

31.     Days passed without an agreement on the W&T confidentiality agreement. On May 26, 11 days after Evercore first sent W&T the standard confidentiality agreement, W&T sent Evercore a watered-down version of confidentiality agreement "that is acceptable to W&T." Ex. 5 at 1. W&T's proposal made substantial changes to section 8 of the standard form confidentiality agreement, which bars potential bidders from speaking with Arena's contractors, customers, suppliers, lenders, or vendors regarding Arena without prior consent. W&T struck the word "lender" from the list of entities with whom W&T could not speak and added the following sentence to the end of section 8: "Despite anything in this Agreement to the contrary, and for the avoidance of doubt, Recipient is permitted to contact any creditor of Discloser or its Affiliates and discuss any aspect of the Confidential Information or Transaction with that creditor and acquire any portion of the Discloser's or its Affiliates['] outstanding debt." *Id.* at 20.

32.     The lender communication accommodation W&T sought in its May 26 draft confidentiality agreement would have undermined the integrity of Arena's sales process. No other bidder had that right—no bidder had even requested it. For good reason. Armed with the information from Arena's lenders, W&T would have gained a tremendous and unfair advantage.

33.     If W&T (unlike the other bidders) were allowed to speak with the lenders, W&T also would be in the unique and dangerous position of being able to disrupt the marketing and restructuring process—as when it allegedly tendered to acquire a portion of the first lien debt from the Debtors' lenders on or about August 17, 2020. Arena's lenders had not agreed to forego their right to credit bid and reserved the right to acquire Arena's assets. If W&T were provided with the opportunity to engage directly with the lenders, then different bidders may have the opportunity to collude, driving down stakeholder recoveries. The prospect that bidders may collude and delay the sale process was particularly significant for Arena in light of its limited liquidity (which would

prevent Arena from extending the sales process further). Arena recognized it may need to file for chapter 11 to consummate a sale and the risk of collusion would undermine the integrity of the process. These concerns have become more salient since that time because of the weakness in the oil and gas E&P market. There is no guarantee that another sale will be possible if the plan sponsor San Juan Offshore, LLC's ("the Plan Sponsor") acquisition does not succeed. Arena needed to maintain control over the sales process to ensure no bidder disrupted it. A few hours after Evercore received W&T's draft, Evercore wrote back to W&T: "This mark-up is not acceptable for this process and is not in line with A&D processes in general. W&T will not receive any special treatment in this regard. Please execute the previous reversion if you wish to participate in the process." Ex. 6 at 4.

34.    Nonetheless, Evercore did not abandon hope of reaching a confidentiality agreement with W&T. Two days later, on May 28, Evercore tried once again to reach a resolution, writing to W&T: "As we start to schedule Dataroom Presentations, we wanted to reach out to see if we can get your team involved in the process. Please let us know if there is any room to negotiate in regards to the prior version of the NDA you submitted to the company." *Id.* at 3. Evercore even offered "another call with the Arena's General Counsel."

35.     W&T's general counsel responded with an ultimatum:



> **From:** Shahid Ghauri [mailto:sghauri@wtoffshore.com]
> **Sent:** Thursday, May 28, 2020 11:17 AM
> **To:** Suellentrop, Gregory
> **Cc:** Steve Schroeder
> **Subject:** RE: [EXTERNAL]RE: [EXTERNAL]RE: [EXTERNAL] Re: [EXTERNAL]Quick Call
>
> Greg,
>
> Happy to discuss with Arena's GC if you'd like, but we laid our position out in a letter to him last week and that position has not changed.
>
> If you want us to participate in this process,  you must not restrict our ability to engage with Arena's creditors in any way. We will not an sign any NDA which attempts to do that, and as we said in our letter, we will not consent to the disclosure of any data or information related to any fields in which we own an interest as part of this process.
>
> We are a natural buyer for these assets and are very interested in looking at them. Let's resolve this quickly so we can move into the data room.
>
> *Shahid Ghauri*
> Vice President, General Counsel and Corporate Secretary

*Id.* at 2.

36.     Evercore explained again on May 28 that this "process is no different than any other A&D or M&A process you have participated in and as such, this NDA does not allow you to communicate with a seller's lenders." Evercore emphasized that it hoped to "get aligned on a regular-way NDA." *Id.* at 2.

37.     W&T would not budge, insisting on special treatment: "We discussed this restriction at length internally and concluded that we must independently engage with Arena's lenders as a matter of due diligence." *Id.* at 1. In a May 31 email, Evercore held firm, explaining that it "cannot give W&T, or any other potential bidder, access to stakeholders at this stage," and welcomed "W&T's participation in the process subject to a regular-way NDA." *Id.*

38.     Evercore did not hear from W&T again until early July.

E.     31 Group breaches the Confidentiality Agreement and provides W&T with information from the virtual data room

39.     On June 29, 2020, Evercore received a proposed bid from 31 Group, the company that was not among the 900 to receive the marketing teaser and that had contacted Evercore, signed

Arena's standard form confidentiality agreement, and accessed and downloaded the contents of Arena's virtual data room. Ex. 7. 31 Group's president Ken Goggans emailed 31 Group's proposal letter to Evercore, which said that "cash consideration for 100% of the Company and its subsidiaries['] assets would be one hundred fifty-six million dollars ($156,000,000.00)." *Id.* at 1. The proposal letter identified as sources of financing: "31 Group, MSD and Sculptor Capital." 31 Group explained that its "vision" was to "achieve long term strategic growth through development projects in the existing GOM blocks," and that its "expectation" was that "management and employees will continue to operate the assets." *Id.* 31 Group informed Arena that "Transaction documents have been reviewed by Locke Lord counsel" and that "Locke Lord will act as counsel for 31 Group in this transaction." *Id.*[3]

40.     31 Group's proposal omits any mention of W&T.

41.     31 Group was not known to Evercore before this process.

42.     There is limited public information about 31 Group and its president Goggans. Navigating to a website (www.31grp.com) that the Confidentiality Agreement identifies as 31 Group's email domain name prompts internet browser security warnings about its expired or invalid security certificate. Continuing on to the website, according to Microsoft Edge, is "not recommended."

---

[3] Locke Lord LLP is W&T's long-time counsel. Locke Lord partner Philip Eisenberg participated on behalf of W&T in the first day hearings in this bankruptcy court proceeding. Last week on August 23, Arena's counsel at Susman Godfrey LLP sent a demand letter to W&T through Mr. Eisenberg. W&T's additional counsel at White & Case LLP responded and did not cc Locke Lord.

43.     Other oddities emerged. The Confidentiality Agreement § 14 says 31 Group should receive notice at the following address:

> 31 Group LLC
> 100 Crescent Court, 7th Floor
> Dallas, TX 75021
> Attn: Contracts Department
> Telephone: 214-273-9963
> Email: energy@31grp.com

Ex. 1 at 4. On Sunday August 23, 2020, Arena emailed 31 Group's Goggans a demand letter to "energy@31grp.com." On Monday August 24, Arena hired a messenger to hand deliver a copy of the demand letter at the notice address. The messenger reported that 31 Group was no longer located there. Ex. 9 ¶¶ 2-5.

44.     The messenger reported that the space 31 Group had apparently vacated was a coworking space. 31 Group's lessor makes the coworking space available for negotiable terms so that tenants can enjoy "all the perks of an office without the hassle of running one":



Ex. 10.

14

45.     Arena's messenger called the phone number 31 Group provided in the Confidentiality Agreement's notice provision and learned that 31 Group's office "had been closed and their mail transferred to an address she gave as 3021 Ridge Court, Rockwall, Texas." Ex. 9 ¶ 5. The messenger found that "this address is not a business office for 31 Group, but a private mailbox firm and US Postal Service contract unit called Harbor Mail." *Id.* ¶ 5. 31 Group's Rockwall "address" is shown below (in a Google Maps screenshot) located in a strip mall, adjacent to a "Gold & Silver Exchange" and bookended by a pain clinic and a drug store called "Super Drug":



Ex. 11. This is not quite what one expects of a company purporting to propose a $156 million oil and gas transaction.

46.     Back on July 7, 2020, Arena's financial advisor Evercore already had obtained some insight into the actual nature of 31 Group's involvement in the bid process. 31 Group set up a call with Evercore and, for some not previously disclosed reason, 31 Group also had W&T on the call. Evercore learned during the call that 31 Group and W&T planned to submit a joint bid. Evercore also learned during the call that 31 Group (and it seemed W&T) had done little diligence on Arena's for sale assets. 31 Group had previously declined an early June opportunity to receive a virtual data room presentation and W&T had not signed a confidentiality agreement with Arena and hence could not have had access to the data room. Ex. 12 at 1. But W&T revealed during the

July 7 call that 31 Group had provided W&T with the confidential information inside the data room.

47.     This was not necessarily alarming because the form of confidentiality agreement signed by 31 Group (and by the other 19 potential bidders) allows them to share information with a "Representative" as long as the representative has "agreed in writing prior to being given access to the Confidential Information to be bound by the terms of this Agreement to the same extent as if they were parties hereto." Ex. 1 at 2.

48.     On July 8, 31 Group and W&T submitted a joint bid for "$141,231,000 US, payable in cash at closing" subject "to the completion by Buyer of satisfactory due diligence." Ex. 13 at 2–3. 31 Group's president Goggans explained in the bid's cover letter that "We have the cash, bonding and the ability to move very quickly with Locke Lord to meet the end of the month deadline." *Id.* at 1. Then 31 Group went silent and W&T took over.

F.     W&T continues participating in the bidding process while refusing to sign a confidentiality agreement

49.     After 31 Group's submission of the July 8 joint bid, W&T took over discussions with Evercore. On July 14, W&T's CEO Tracy Krohn emailed Evercore to "be perfectly clear" that W&T could proceed without 31 Group: "We still intend to consummate this transaction along with 31 Group, but in the event there is any issue with their ability to finance, we are able to finance the entire transaction." Ex. 14. Evercore informed W&T on July 14 that a different stalking horse (the Plan Sponsor) was the lead bidder.

50.     On July 28, W&T submitted an offer for Arena's assets, this time without 31 Group, for $101 million, and W&T described its offer as "firm" and "not conditioned (as our prior one was) on any due diligence other than a routine, physical inspection of the assets." Ex. 15 at 1. That day, July 28, Evercore spoke with W&T, commenced diligence on W&T's offer, and that week

corresponded with W&T's lead bank Toronto Dominion and W&T's surety McGriff. Those communications revealed that even if W&T could finance the $101 million bid, W&T would be left with limited liquidity such that W&T would lack the finances to manage additional collateral or line of credit calls from the sureties. Evercore learned that W&T lacked a commitment to replace Arena's surety bonds.

51.     On July 29, Arena's transaction committee through its advisors emailed W&T that Arena "is prepared to engage with W&T Offshore on an expedited basis regarding its bid" notwithstanding "W&T Offshore's prior election not to execute a nondisclosure agreement." Ex. 16 at 3.

52.     On July 31, Evercore on behalf of Arena asked W&T's CEO Tracy Krohn and EVP William Williford "can you please send the joinder to the 31 Group NDA that W&T signed." *Id.*

53.     W&T responded that day and admitted "we were never provided or signed a joinder." *Id.* W&T had not signed a confidentiality agreement with Arena and now W&T revealed it had not signed a joinder to 31 Group's confidentiality agreement. W&T thus admitted that it had improperly obtained Arena's confidential information:



*Id.* W&T admitted that it improperly had obtained access to Arena's confidential information—apparently *indirectly* from 31 Group—and W&T brazenly asked for "*direct* access to the data room ASAP." (Emphasis added). Arena's advisors responded in less than two hours by sending W&T a confidentiality agreement for the Arena sales process and instructing that "In order to gain access to the VDR [virtual data room], please execute the attached document." Ex. 17 at 1. W&T did not respond. Evercore followed up by email on August 1. *Id.* W&T said it would send a redline. *Id.* W&T's redline sought to provide W&T the exclusive opportunity to speak with Arena's lenders—an opportunity the other potential bidders did not have and that Arena's form confidentiality agreement prohibited. Ex. 18 at 4-5.

54.    Arena, through its advisors, continued in August to try to get W&T to sign a confidentiality agreement that protected Arena's confidential business information and that was substantially similar to the confidentiality agreement that 31 Group and the other 19 potential bidders had signed.

55.    Arena tried to reach a compromise, even offering to allow W&T to speak to Wells Fargo, the bank that served as the administrative agent for Arena's lenders under its reserve-based loan facility. Ex. 19 at 1, 13-14. Arena had not provided this access to other bidders. W&T was not satisfied and, on August 3, W&T rejected this compromise offer because "we are not concerned with speaking to just Wells—we want to find out what each member of the banking group thinks of our proposal." Ex. 20 at 2.

56.    On August 3, W&T complained about "key issues" it had with the process. W&T expressed concern that "the data room included a few pages (pages 22–25) that appear to excerpt from the 2019 financials (as the pages titled 'Notes to Financial Statements' and include full year 2019 data) but the rest of the 2019 audited financials were not included." *Id.* at 1-2. W&T's

"concern" confirms that W&T improperly accessed and improperly (and apparently thoroughly) reviewed Arena's confidential information in the virtual data room. W&T did so without authority, without a confidentiality agreement, and without a joinder to 31 Group's or anyone else's confidentiality agreement.

57.     Negotiations with W&T stalled after August 3. On August 17, W&T tried to go around Evercore by submitting a tender offer directly to Arena's lenders. The lenders did not accept W&T's offer, and on August 19, 2020, the RSA was executed among San Juan Offshore, Arena, and a sufficient contingent of Arena's first lien lenders.

G.     <u>Arena's attorneys demand W&T and 31 Group return Arena's confidential information and destroy any copies.</u>

58.     On August 23, Arena's counsel at Susman Godfrey LLP emailed letters to each of 31 Group and W&T.

59.     In its letter to 31 Group, Arena asked 31 Group to certify in writing by 12 noon ct on Monday August 24 that 31 Group would "within no more than five business days"—the amount of time allowed by Confidentiality Agreement § 4—return the confidential information it obtained from Arena and destroy any "Derivatives" as defined in the Confidentiality Agreement, which consist of notes and other materials 31 Group made based on Arena's confidential information. Arena asked 31 Group to "provide Arena with an itemized list sufficient to identify all such items." Ex. 21 at 1. Arena asked 31 Group to cease use of Arena's confidential information and put a litigation hold in place. *Id.* at 2.

60.     On August 24—the same day Arena's messenger sought to hand deliver a copy of the emailed letter—31 Group provided the enigmatic and noncommittal response below (Ex. 23) that "I do not understand this request since Arena is now in bankruptcy."



61.     In its August 23 letter to W&T, Arena asked W&T to return or destroy the confidential Arena information that W&T obtained from or through 31 Group, destroy all notes and other materials derived from Arena's confidential information, cease use of Arena's confidential information, and implement a litigation hold. Ex. 22 at 2-3. Arena noted that it "protected and intends to continue to protect the integrity of the restructuring process" and would "not provide W&T with its confidential information unless and until W&T (like the Plan Sponsor and 19 other potential bidders) signs the substantially identical confidentiality agreement" that Arena attached to the letter. *Id.* at 3. Arena also noted, consistent with § 9.02 of the August 19, 2020 Restructuring Support and Plan Sponsor Agreement, that Arena and the Transaction

Committee "are not soliciting a proposal from W&T" but that Arena "has been and remains willing to consider unsolicited proposals from W&T and others." *Id.*

62.     On August 24 at 8:29 pm, W&T's counsel at White & Case LLP (not Locke Lord LLP) emailed back redlined proposed changes to the confidentiality agreement including what W&T already knew was the unacceptable deletion of § 8 which restricted communication with "any contractor, customer, lender or creditor" of Arena. W&T's counsel claimed in its email that "while W&T is happy to protect the Company's confidential information, this agreement should not limit W&T's ability to discuss any proposal it may submit with the Company's creditors and other stakeholders." Ex. 24 at 1.

63.     On August 26, Arena's bankruptcy counsel at Kirkland & Ellis LLP wrote W&T and again explained to W&T that Arena was willing to consider an unsolicited bid but W&T could not contact "creditors who are party to the RSA" and which are "contractually prohibited from engaging" in discussions with W&T. Ex. 25 at 4. Arena could not agree to a "form of a non-disclosure agreement that could potentially permit a third party to circumvent the value-maximizing settlement reflected in the RSA." *Id.* at 4-5.

64.     In its August 23 letter to W&T, Arena gave W&T until August 24 at 12 noon to certify in writing W&T's destruction of Arena's confidential information and derivative materials, certify that W&T and its affiliates immediately "ceased any and all use of Arena's confidential information," and certify that W&T had put a "litigation hold" in place. W&T did not meet this deadline.  Ex. 22 at 2-3. W&T did not (and as of August 28 at 5 pm still has not) provided these or similar certifications or assurances.

65.     In its August 23 letter, Arena gave 31 Group until August 24 at 12 noon to certify in writing that 31 Group will (by August 28 at 5 pm) return Arena's confidential information to

Arena and destroy all derivative materials, provide Arena with an itemized list of all such materials, certify that "31 Group and each of its 'Representatives'" immediately "ceased any and all use of Arena's confidential information," and certify that 31 Group had put a "litigation hold" in place. Ex. 21 at 1-2. 31 Group did not (and as of August 28 at 5 pm still has not) provided these or similar certifications or assurances; it simply wrote that it had "destroyed all Derivatives."

IV.
Causes of Action

Count 1 – Breach of Contract (31 Group)

66.     Arena incorporates the allegations above.

67.     Confidentiality Agreement § 19 provides that the agreement "shall be governed by, and construed in accordance with, the laws of the State of Texas, without giving effect to principles of conflict of law." Ex. 1 at 5. The Texas Supreme Court held in *Pathfinder Oil & Gas, Inc. v. Great Western Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019), that the elements of a breach of contract claim are: "(1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breaches the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach."

68.     The May 22, 2020 Confidentiality Agreement is a valid and binding contract. 31 Group is bound by its terms.

69.     Arena fully performed the contract and provided 31 Group with access to the confidential information in the virtual data room. Ex. 3.

70.     31 Group breached the Confidentiality Agreement by providing W&T with Arena's confidential information covered and protected by the Confidentiality Agreement and to which 31 Group itself obtained access by executing this agreement. 31 Group breached  Confidentiality agreement § 1(b) by disclosing Arena's confidential information to W&T, by providing W&T

22

access to Arena's confidential information, and by providing W&T access to the virtual data room. 31 Group breached § 4 when 31 Group failed per Arena's August 23 request to "promptly, but in no more than five (5) business days, return" Arena's confidential information, destroy all "Derivatives," and provide written certification that it had complied. 31 Group did not return any materials or provide a written certification of compliance with Arena's request by August 28 at 5 pm.

71.    As a proximate result of 31 Group's breaches, Arena has suffered and continues to suffer damages, including damages resulting from the loss of its confidential data and sensitive confidential competitive information. 31 Group's delivery and provision of Arena's confidential information to W&T caused Arena substantial harm. W&T is one of Arena's direct competitors.

72.    In accordance with Confidentiality Agreement § 21 and as allowed by law, Arena seeks reimbursement of all losses, costs, and expenses caused by 31 Group's disclosure. 31 Group agreed in § 21 to "indemnify and hold harmless" Arena "from and against any damage, claim, loss, obligation, liability, penalty, cost or expenses (including reasonable fees and disbursements of counsel and the cost of enforcing this indemnity) arising out of or resulting from" the improper disclosure of confidential information subject to the Confidentiality Agreement or "any other breach of, or failure to comply with, the terms" of the Confidentiality Agreement. Ex. 1 at 6.

73.    <u>Attorney's Fees</u>. Arena has retained counsel and is entitled to recover its reasonable attorney's fees and expenses under TCPRC § 38.001(8) and Chapter 38. Arena presents its claim for attorney's fees to 31 Group in accordance with TCPRC § 38.002. Confidentiality Agreement § 15 also entitles Arena to attorney's fees as it provides that 31 Group "shall reimburse [Arena] for any costs incurred including, but not limited to, attorneys' fees, costs of court, witness fees and expenses, claims, demands or liabilities arising directly or indirectly out of any such breach or

anticipated or threatened breach." Ex. 1 at 5. Confidentiality Agreement § 21 also provides that 31 Group "agrees to reimburse [Arena] promptly upon demand for all out of pocket costs and expenses reasonably incurred" by Arena "in the enforcement of its rights hereunder (including, without limitation, reasonable fees and disbursements of counsel)." Ex. 1 at 6.

74.     Arena is entitled to injunctive relief, including the return of the confidential information.

<u>Count 2 – Tortious Interference with an Existing Contract (W&T)</u>

75.     Arena incorporates the allegations above.

76.     The Texas Supreme Court held in *Prudential Insurance Co. of America v. Financial Review Services, Inc.*, 29 S.W.3d 74, 77 (Tex. 2000), that the elements of tortious interference with an existing contract are: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss."

77.     Arena's Confidentiality Agreement with 31 Group is an existing contract subject to interference.

78.     W&T willfully and intentionally interfered with the Confidentiality Agreement by among other things obtaining Arena's confidential information from 31 Group in violation of that agreement. W&T knew 31 Group had a confidentiality agreement with Arena governing 31 Group's access to the data room. Arena's advisor Evercore had provided W&T with and asked W&T to sign a substantially identical confidentiality agreement, and Evercore explained to W&T that W&T only could gain access to Arena's virtual data room and confidential information if W&T and Arena signed a confidentiality agreement. W&T is sufficiently sophisticated to already know that it had to be bound by a confidentiality agreement in order to gain access to Arena's data room and confidential information. After Evercore learned that W&T improperly and without

authority had accessed Arena's data room and confidential information, Evercore on July 31 asked W&T to send the joinder to 31 Group's NDA/confidentiality agreement that W&T signed. Ex. 16 at 1. But W&T did not do so and admitted that it had *not* signed a joinder." *Id.*

79.     W&T knew 31 Group was not permitted to send W&T the confidential information and knew that W&T had improperly obtained access to Arena's confidential information. W&T willfully and intentionally obtained access to and reviewed Arena's confidential information, and even complained on August 3 that "the data room included a few pages" of 2019 financials but not all. Ex. 20 at 1. This of course further confirms that W&T accessed and closely reviewed the confidential information in Arena's virtual data room knowing that it was not authorized and that doing so violated 31 Group's Confidentiality Agreement. Even though Arena provided W&T with multiple opportunities to sign a confidentiality agreement that was substantially identical to what the 20 other potential bidders had signed, W&T failed to do so.

80.     As a proximate result of W&T's willful and intentional interference, Arena has suffered and continues to suffer damages, including damages resulting from the loss of its confidential data and sensitive competitive information. W&T is one of Arena's direct competitors.

81.     Arena seeks and is entitled to recover exemplary damages from W&T as a result of W&T's wanton and malicious conduct. W&T acted knowingly and intentionally when it brazenly accessed, reviewed, and took Arena's confidential information from 31 Group after W&T's own negotiations with Arena over a confidentiality agreement failed. W&T belatedly admitted that it had taken Arena's confidential information without being bound by a confidentiality agreement, and did so after failing for weeks to disclose its access and misconduct. W&T has refused to sign a confidentiality agreement with Arena substantially similar to what the other bidders signed W&T

has refused to return the information to Arena, refused to destroy its copies and derivative materials, and refused to provide Arena with the requested certifications and assurances.

82.    Arena is entitled to injunctive relief, including the return of the confidential information.

Count 3 – Conversion (31 Group and W&T)

83.    Arena incorporates the allegations above.

84.    The Texas Supreme Court held in *Green International, Inc. v. Solis*, 951 S.W.2d 384, 391 (Tex. 1997), that conversion is the "wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." The Texas Supreme Court held in *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147-48 (Tex. 1997), that damages for conversion consist of the "amount necessary to compensate the plaintiff for the actual losses or injuries sustained as a natural and proximate result of the defendant's conversion" and a "conversion should not unjustly enrich either the wrongdoer or the complaining party." Exemplary damages are available for conversion where the plaintiff proves "that the defendant acted with malice." *Green International, Inc.*, 951 S.W.2d at 391.

85.    Arena had valid title and right to possess the information contained in the data room, and 31 Group agreed in Confidentiality Agreement § 4 that Arena "retains all rights, titles, and interests in and to" the confidential information. Ex. 1 at 2.

86.    W&T had no lawful right to obtain the information Arena had in the data room, and wrongfully exercised dominion and control over Arena's property when W&T improperly obtained the property from 31 Group. In an August 23, 2020 letter, Arena demanded that W&T send to Arena or destroy Arena's confidential information and cease using it. Ex. 22 at 2. As of the filing of this complaint, W&T has not agreed to send the confidential information to Arena, destroy it, or cease using it.

26

87.     31 Group lost its lawful right to obtain Arena's confidential information when Arena requested its return or destruction on August 23. Ex. 21. Confidentiality Agreement § 4 gave 31 Group five business days, until August 28 at 5 pm, to return or destroy Arena's confidential information. Ex. 1 at 2. 31 Group did not return Arena's confidential information or provide written confirmation that it had done so, as Arena requested and Confidentiality Agreement § 4 requires. Ex. 1 at 2. 31 Group also did not tell Arena that it had retrieved the confidential information it gave to its one-time co-bidder W&T. 31 Group's continued dominion and control over Arena's property after August 28 at 5 pm is wrongful.

88.     W&T's and 31 Group's wrongful exercise of dominion and control over Arena's property causes Arena substantial damages and unjustly enriches W&T. W&T is a direct competitor of Arena's.

89.     Arena seeks and is entitled to recover exemplary damages from W&T and 31 Group as a result of 31 Group's and W&T's wanton and malicious conduct. 31 Group acted knowingly and intentionally when it violated its obligations under the Confidentiality Agreement and provided confidential information to W&T and failed to return the confidential information in 31 Group's possession within five business days. W&T acted knowingly and intentionally when it brazenly accessed, reviewed, and took Arena's confidential information from 31 Group after W&T's own negotiations with Arena over a confidentiality agreement failed. W&T belatedly admitted that it had taken Arena's confidential information without being bound by a confidentiality agreement, and did so after failing for weeks to disclose its access and misconduct. W&T has refused to sign a confidentiality agreement with Arena substantially similar to what the other bidders signed W&T has refused to return the information to Arena, refused to destroy its

copies and derivative materials, and refused to provide Arena with the requested certifications and assurances.

90.     Arena is entitled to injunctive relief, including the return of the confidential information.

91.     Arena is entitled to reimbursement of attorneys' fees and costs under the Confidentiality Agreement.

<u>Count 4 – Misappropriation of Trade Secrets (31 Group and W&T)</u>

92.     Arena incorporates the allegations above.

93.     Arena seeks and is entitled to relief under the Texas Uniform Trade Secrets Act ("TUTSA"), TCPRC §§ 134A.001, et seq. Arena is a claimant under TUTSA § 134A.002(1).

94.     Information contained in Arena's virtual data room that Arena agreed to provide to 31 Group under the Confidentiality Agreement constitutes valuable trade secrets owned by Arena, from which Arena derives significant actual and potential economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure and/or use, such as Arena's competitors, including W&T.

95.     Arena has relied and relies for its commercial success on the confidential and proprietary information that it has developed over the last 20 years. Arena has invested and continues to invest significant sums into geological and geophysical mapping, petroleum engineering, proprietary exploration and drilling methods and strategy, restricted and highly valuable seismic data, reserve and field studies, and production, price and reserves information, many of which Arena made available to 31 Group under the Confidentiality Agreement.

96.     Arena's trade secrets are valuable to third parties because the information developed by Arena is not generally known and reflects Arena's investment of time and resources. These trade secrets are not readily ascertainable through proper means

97.     Arena makes reasonable efforts to protect the confidentiality and secrecy of these trade secrets, including by requiring participants in Evercore's sales process to execute Confidentiality Agreements, and by refusing to provide access to its virtual data room to potential bidders like W&T that refused to execute one.

98.     Arena's valuable competitive and proprietary information constitutes "trade secrets" within the meaning of TUTSA § 134A.002(6).

99.     31 Group and W&T knowingly acquired, disclosed and used Arena's trade secrets using improper means, without Arena's knowledge or consent and in a manner prohibited by TUTSA § 134A.002(3), including by breach or inducement of a breach of a duty to maintain secrecy and to limit use of information in Arena's virtual data room.

100.    31 Group's and W&T's misappropriation injured Arena and undermined its business. 31 Group and W&T have the ability to derive substantial economic value from the use of Arena's secrets. As a result of 31 Group's and W&T's misappropriation, Arena has been injured and suffered damages. 31 Group and W&T are liable under TUTSA for Arena's actual damages and the unjust enrichment caused by their misappropriation.

101.    W&T has failed and refused to enter into a substantially similar confidentiality agreement with Arena and failed to provide the requested certifications and assurances. 31 Group has refused to return and certify the destruction of all material it downloaded from the virtual data room and failed to provide the requested certifications and assurances. 31 Group's and W&T's conduct constitutes the threat of ongoing misappropriation, based on the substantial risk that

31 Group and W&T will continue to use Arena's trade secrets for their own economic advantage and to compete with Arena. 31 Group's and W&T's actual and threatened misappropriation of trade secrets is a continuing wrong.

102.    This ongoing misappropriation entitles Arena to injunctive relief under § 134A.003.

103.    Arena is entitled to recover damages for misappropriation and for unfair competition through that misappropriation, including the actual loss and unjust enrichment.

104.    31 Group's and W&T's conduct is willful and malicious, and they have acted in conscious disregard of Arena's rights, warranting an award of exemplary damages and attorneys' fees. *See* § 134A.004, 134A.005. 31 Group's and W&T's misappropriation was intentional and results from the conscious disregard of Arena's rights.

105.    Arena seeks permanent injunctive relief under TUTSA § 134A.003.

106.    Unless restrained and enjoined by this Court, Arena will sustain immediate and irreparable damage for which it has no adequate remedy at law. Arena asks for a preliminary and permanent injunction barring 31 Group and W&T from any further acts of misappropriation.

107.    Arena seeks and is entitled to recover its damages, attorneys' fees, costs and interest for 31 Group and W&T's violation.

<u>Count 5 – Turnover (31 Group and W&T)</u>

108.    Arena incorporates the allegations above.

109.    The United States Bankruptcy Code provides at 11 U.S.C. § 542(a) that "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of [the Bankruptcy Code], or that the debtor may exempt under section 522 of [the Bankruptcy Code], shall deliver to the trustee, and account for,

30

such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."

110.    31 Group and W&T are non-custodial entities under § 542(a) of the Bankruptcy Code.

111.    Section 541 of the Bankruptcy Code provides that a debtor's estate is comprised of, subject to certain exceptions, "all legal or equitable interests of the debtor as of the commencement of the case." 11 U.S.C. § 541(a)(1).

112.    Arena's confidential information in W&T's and 31 Group's possession constitutes property of Arena's bankruptcy estate as of the petition date pursuant to Bankruptcy Code § 541(a). W&T and 31 Group have refused to return Arena's confidential information despite Arena's requests.

113.     W&T's and 31 Group's refusal to return Arena's confidential information has caused and will continue to cause significant harm to Arena's estate.

114.    Arena seeks and is entitled to turn over of Arena's confidential information that 31 Group and W&T obtained directly or indirectly from the virtual data room including the information they obtained or accessed from Arena's virtual data room as well as any notes, copies, summaries, analyses, studies, forecasts, or other materials, information, or conclusions derived from Arena's information.

V.
Application for Temporary Restraining Order, Preliminary, and Permanent Injunction

115.    Arena incorporates the allegations above.

116.    In accordance with FRCP 65, which is incorporated in Bankruptcy Rule 7065, Arena requests entry of a temporary restraining order, followed by the entry of a preliminary injunction and a permanent injunction to (1) enjoin W&T and 31 Group from using in any way

Arena's confidential information including the information they obtained or accessed from Arena's virtual data room as well as any notes, copies, summaries, analyses, studies, forecasts, or other materials, information, or conclusions derived from Arena's information, (2) require W&T and 31 Group to return and send to Arena all confidential information that 31 Group and W&T obtained directly or indirectly from the virtual data room and destroy any notes, copies, summaries, analyses, studies, forecasts, or other materials, information, or conclusions derived from Arena's information, (3) require W&T and 31 Group to cease and desist from any and all use of Arena's confidential information, (4) require W&T and 31 Group to certify in writing to Arena that they have complied with (1-3) above, and (5) require W&T and 31 Group to identify any person or entity to whom they have disclosed the information contained in the data room or any notes, copies, summaries, analyses, studies, forecasts, or other materials, information, or conclusions derived from Arena's information.

A.    Without an injunction, Arena will suffer irreparable injury that is actual and imminent

117.    Arena will suffer an irreparable injury that is actual and imminent without an injunction. 31 Group has shown that it is willing to share Arena's confidential information with Arena's competitors, notwithstanding the Confidentiality Agreement it signed. Arena incorporates here ¶¶ 16-22 above in which Arena discusses the irreparable nature of the loss Arena will suffer if competitors (like W&T) have access to Arena's confidential information.

118.    As a direct Arena competitor, W&T's possession of Arena's proprietary and confidential information will immediately and irreparably harm Arena by permanently diminishing Arena's competitive advantage and the value of Arena's assets. Much of the information in the data room that 31 Group and W&T now possess is unique and irreplaceable, including a confidential memorandum about Arena's proprietary drilling method and OGO and NESI seismic data regarding certain plays that no other driller in the Gulf has. Arena has spent

decades and millions of dollars developing these proprietary methodologies. Arena will never be able to recover the competitive advantage it currently has in the Gulf if W&T puts Arena's confidential information to use in the field. Because W&T has refused to sign a confidentiality agreement with Arena, Arena has no assurance or protection, and W&T is unrestrained from using Arena's information and may already be doing so. That is a major and dangerous departure from the last peaceable status quo.

119.    31 Group recognized and agreed in Confidentiality Agreement § 21 that 31 Group's "breach of, or failure to comply with" the Confidentiality Agreement would result in Arena being "irreparably injured." Ex. 1 at 6. This recognition and admission bears on W&T's misconduct as well since W&T had knowledge of the Confidentiality Agreement and this provision—W&T had reviewed and redlined a substantially identical confidentiality agreement—and still induced 31 Group to breach the Confidentiality Agreement and cause Arena to suffer irreparable harm.

B.    Arena has no adequate remedy at law

120.    Arena has no adequate remedy at law. It is difficult if not impossible to calculate an amount of damages that fully can compensate Arena for the loss of its competitive advantage in the Gulf and the loss of its proprietary methodology and unique data. We may never know all the improper uses W&T makes of Arena's confidential information. There is also no remedy at law that could compensate Arena for the harm that will be caused if Arena has to assume going forward that its competitors have access to its information and could use it to outbid Arena for properties. Arena will need to include an unquantifiable premium on every bid going forward if W&T and its other competitors have access to its information. The full effects of 31 Group's unauthorized release and W&T's unauthorized access to Arena's confidential information cannot be known or quantified.

33

121.     31 Group acknowledged in the Confidentiality Agreement that there is no adequate remedy at law for its breach. 31 Group acknowledged and agreed in Confidentiality Agreement § 15 that "neither damages nor an account of profits would be an adequate remedy for any breach" by 31 Group and "that, accordingly, [Arena] shall be entitled to seek equitable relief including, but not limited to, injunctive relief and specific performance, without proof of actual damages, for any breach or anticipated or threatened breach." Ex. 1 at 5. 31 Group agreed in Confidentiality Agreement § 21 that "money damages are an inadequate remedy for an actual or threatened breach" of the Confidentiality Agreement "because of the difficulty of ascertaining the amount of damage that will be suffered by [Arena] in the event of any such breach or failure to comply." Ex. 1 at 6. 31 Group also agreed in § 21 that "Therefore, [31 Group] agrees to the granting of specific performance of this Agreement and injunctive or other equitable relief in favor of [Arena] as a remedy for any such breach or failure to comply." Ex. 1 at 6. This recognition and admission bears on W&T's misconduct as well since W&T had knowledge of the Confidentiality Agreement and this provision—W&T had reviewed redlined a substantially identical confidentiality agreement— and still induced 31 Group to breach the Confidentiality Agreement and cause Arena to suffer irreparable harm.

C.     Arena has a substantial likelihood of success on the merits

122.     Arena has a substantial likelihood of success on the merits on its claims. 31 Group breached the Confidentiality Agreement when it shared information protected by the Confidentiality Agreement in violation of § 1(b) and refused to comply with § 4. W&T interfered with 31 Group's Confidentiality Agreement when it go t Arena's confidential information and obtained access to the information in Arena's virtual data room. W&T converted Arena's confidential information when it wrongfully acquired it from 31 Group and then refused to give it back to Arena and destroy its copies and notes. W&T admitted on July 31 that it had acquired

Arena's confidential information without signing an agreement to protect the information's confidentiality. Ex. 16 at 1.

D.   The balance of hardships weighs in Arena's favor

123.   The balance of hardships weighs heavily in Arena's favor. W&T and 31 Group engaged in tortious misconduct and wrongfully obtained and used Arena's confidential information. An injunction is necessary to ensure the return of Arena's confidential information to Arena, to ensure that those without authority cease and desist from using Arena's confidential information, and to provide Arena with information Arena needs to ensure no further improper use. W&T and 31 Group have no interest or right to use another company's confidential information that they have wrongly obtained and have misused. The injunction Arena requests will not harm W&T, 31 Group, or any third parties.

E.   An injunction will not disserve the public interest

124.   The injunction Arena requests will not disserve the public interest. Arena seeks return of its confidential information and appropriate protective certifications in light of 31 Group's and W&T's misconduct. The public interest supports protecting confidential information and property rights from parties that breach contracts and convert and misuse the property of others.

F.   No Bond is Required

125.   Pursuant to Bankruptcy Rule 7065, Arena requests that no bond or security be required in connection with the issuance of the requested temporary restraining order.

126.   31 Group agreed in Confidentiality Agreement § 21 that it "waives any requirement for the securing or posting of any bond in connection with" a request for injunctive relief related to 31 Group's "actual or threatened breach" of the Confidentiality Agreement. Ex. 1 at 6. Even so,

and if the Court so requires, Arena is willing to post a bond to obtain the temporary restraining order and preliminary injunction.

## VI.
## Conditions Precedent

127.    All conditions precedent to Arena's claims for relief have been performed or have occurred.

## VII.
## Prayer for Relief

128.    Arena asks that the Court:

    a.   Set a temporary restraining order hearing, and after the hearing, enter a temporary restraining order against 31 Group and W&T as described above,

    b.   set a hearing for a preliminary injunction against 31 Group and W&T, and

    c.   after a trial on the merits, issue a permanent injunction against 31 Group and W&T.

129.    Arena asks that the Court award Arena judgment against 31 Group and W&T for the following:

    a.   Actual, consequential, and exemplary damages,

    b.   Prejudgment and post judgment interest,

    c.   Court costs,

    d.   Reasonable and necessary attorney's fees, including under Confidentiality Agreement §§ 15 and 18, and under TCPRC § 38.001(8);

    e.   All costs and expenses under Confidentiality Agreement § 21 arising out of or resulting from 31 Group's breach of the Confidentiality Agreement;

    f.   Turn over under 11 U.S.C. § 542(a) of Arena's confidential information and any notes, copies, summaries, analyses, studies, forecasts or other materials, information, or conclusions derived from the confidential information; and

g.   All other and further legal and equitable relief to which Arena justly is entitled.

Dated:  August 28, 2020

Respectfully submitted,

By:/s/ *Geoffrey L. Harrison*
    Geoffrey L. Harrison
    Attorney in charge
    gharrison@susmangodfrey.com
    TX State Bar. No. 00785947
    S.D. Admissions No. 16690
    Richard W. Hess
    TX State Bar. No. 24046070
    S.D. Admissions No. 605712
    rhess@susmangodfrey.com
    Sylvanus M. Polky
    TX State Bar. No. 24102365
    spolky@susmangodfrey.com
    SUSMAN GODFREY L.L.P.
    1000 Louisiana Street, Suite 5100
    Houston, Texas 77002-5096
    Telephone: (713) 653-7807
    Facsimile: (713) 654-6666

*Counsel for Arena Energy, LP*

Certificate of Service

I certify that on August 28, 2020, I caused a copy of this document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas. A copy of this filing also was e-mailed to W&T's counsel at White & Case LLP and at Locke Lord LLP and to 31 Group's president Ken Goggans at energy@31grp.com to alert them to the existence of this filing and the relief sought.

/s/ *Geoffrey L. Harrison*
Geoffrey L. Harrison