# Exhibit D



August 27, 2020

**CONFIDENTIAL**

Transaction Committee
Arena Energy, LP
Attn:   Mr. Anthony Horton & Mr. Dean Swick

      RE:     Offer to Acquire Arena Energy, LP's Assets

Gentlemen:

Reference is hereby made to (i) that certain Restructuring Support and Plan Sponsor Agreement, dated as of August 19, 2020 (the "RSA"), between Arena Energy, LP ("Arena") and certain of its affiliates, San Juan Offshore, LLC ("San Juan") and certain of its lenders and the RBL Facility Agent (as defined therein) and (ii) that certain Asset Purchase Agreement, dated as of August 19, 2020 (the "San Juan APA"), by and among Arena, Arena Exploration, LLC ("Arena Exploration"), Valiant Energy LLC ("Valiant"), Sagamore Hill Holdings, LP (together with Arena, Arena Exploration and Valiant, collectively, the "Arena Parties"), San Juan and, solely for the purposes set forth therein, Wells Fargo Bank, N.A. Any capitalized terms used, but not defined herein, have the meaning ascribed to them in the San Juan APA or the RSA, as applicable.

W&T Offshore, Inc. (together with its subsidiaries, "W&T") is pleased to submit this offer to purchase Arena's oil and gas properties, interests and other assets and liabilities (collectively, the "Assets"), subject to the following terms and conditions (the "Alternative Transaction"):

1.  Asset Purchase Agreement.  The Alternative Transaction will be consummated through an asset purchase agreement (the "W&T APA") between W&T and the Arena Parties that is identical to the San Juan APA except for the terms set forth herein.  A markup of the W&T APA against San Juan APA is attached as **Exhibit A** hereto.  W&T will conform the exhibits and schedules to the W&T APA to those in the San Juan APA.

2.  Purchase Price/Contingent Consideration: The Purchase Price to be set forth in Section 3.1(a) of the W&T APA will be ONE HUNDRED AND ONE MILLION DOLLARS ($101,000,000.00). The aggregate Contingent Consideration to be set forth in Section 1 of Exhibit F to the W&T APA will match that set forth in the San Juan APA: SIXTY MILLION DOLLARS ($60,000,000.00).   All other mechanics of the contingent consideration as set forth in Exhibit F to the San Juan APA will remain unchanged. W&T will also pay all administrative, priority, and general unsecured claims in full.

3. <u>Causes of Action</u>.  Just as the San Juan APA, the W&T APA will provide that W&T will acquire all of Arena's causes of action at Closing.  W&T will provide ten percent (10%) of any cash received by W&T on account of such causes of action to the first lien RBL lenders and two and one-half percent (2.5%)% of any such cash to the term loan lenders.

4. <u>Due Diligence</u>.  The Alternative Transaction is subject to Arena promptly providing access to, and W&T's satisfactory review of, (a) the Cure Costs, (b) related party Contracts (including, without limitation, those agreements with San Juan, Arena Offshore, LP, Arena Offshore Operating, LLC, White Fleet Holdings, LLC and its Subsidiaries, or Rosefield Pipeline Company, LLC and its Subsidiaries (such parties, collectively, "<u>Specified Related Parties</u>")), (c) any operating or similar agreement with Arena Offshore Operating, LLC or any other Affiliate of any Arena Party or any Specified Related Parties, and (d) copies of all executed Surety Bonds and Seller Credit Obligations, together with underlying contracts referenced in the executed Surety Bonds and Seller Credit Obligations , as applicable.  W&T is prepared to devote the necessary resources to conduct and finish such review expeditiously upon being provided the requested information.

5. <u>Operatorship</u>. At Closing, as the owner of 98% of working interests currently owned by the Arena Parties and Specified Related Parties, W&T will become the operator of the Assets that is currently operated by any of the Arena Parties, any Specified Related Parties or their respective Affiliates as of the Closing of the W&T APA.

6. <u>Bonding</u>.  W&T will obtain replacements, effective as of the Closing Date, for the Surety Bonds, Seller Credit Obligations and Specified Seller Credit Obligations as required by Section 7.7 of the San Juan APA.

7. <u>Closing:</u>  Upon timely acceptance of this offer and with full cooperation of Arena Parties, W&T is prepared to commit the necessary time and resources to close the acquisition as soon as practicable after entry of a final sale order by the bankruptcy court approving the transaction.

8. <u>Prior Offer:</u>  This offer replaces and supersedes all prior offers made by W&T, whether written or oral.

9. <u>Governing Law</u>.  This Offer shall be governed by, and construed in accordance with, the Laws of the State of Texas, without regard to the conflict of laws, rules or principles thereof (or any other jurisdiction) to the extent such rules or principles would direct a matter to another jurisdiction.

W&T believes that our offer is clearly superior to the transactions contemplated by the San Juan APA as described in the following chart:

|  | San Juan APA | W&T APA |
|---|---|---|
| Purchase Price | $64,157,079 | $101,000,000 |
| Total Potential Contingent Consideration | $60,000,000 | $60,000,000 |
| Administrative and Unsecured Claims | Paid in full | Paid in full |
| Bonding and Credit Support | To obtain by closing with private equity support | To obtain by closing and is an experienced operator in the Gulf of Mexico |
| Operatorship | Will assume operatorship or operated by its affiliates | Will assume operatorship |
| Contracts | Will assume all contracts or pay rejection damages | Will assume all contracts or pay rejection damages |
| Causes of Action | Will acquire all of Arena's causes of action | Will acquire all of Arena's causes of action and any recovery thereof will be shared 10% with RBL lenders and 2.5% with term loan lenders. |

W&T is an experienced operator in the federal offshore Gulf of Mexico and it has as of the date of this offer cash on hand, access to $130.6 million of undrawn borrowing base availability under W&T's credit agreement, and other sources of financing to consummate the transactions contemplated by this proposal. On July 29, 2020, our lead bank Toronto Dominion delivered a letter to Arena's financial advisor confirming such undrawn borrowing base available to purchase Arena's assets.

Given the extremely short timeline proposed in Arena's chapter 11 cases, we would appreciate your response to this proposal as soon as possible.


Sincerely,

W&T Offshore, Inc.


By: _____
Name: Tracy W. Krohn
Title: Chairman and Chief Executive Officer


**AGREED TO AND ACCEPTED THIS ___ DAY OF ____, 2020:**
Arena Energy, LP


By: _____
Name:
Title:

Exhibit A

W&T APA

[Attached]

**ASSET PURCHASE AGREEMENT**

**dated as of August ~~19~~[  ], 2020**

**by and among**

**ARENA ENERGY, LP,**

**ARENA EXPLORATION, LLC,**

**VALIANT ENERGY LLC,**

**SAGAMORE HILL HOLDINGS, LP,**

**collectively, as Seller,**

**~~SAN JUAN~~W&T OFFSHORE, ~~LLC~~INC.,**

**as Buyer,**

**and**

**solely for the purposes set forth herein,**

**WELLS FARGO BANK, N.A.**

# Table of Contents

Page

## ARTICLE 1
### DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Definitions | 1 |
| 1.2 | Other Definitions and Interpretive Matters | 11 |

## ARTICLE 2
### PURCHASE AND SALE

| | | |
|---|---|---|
| 2.1 | Purchase and Sale | 12 |
| 2.2 | Excluded Assets | 15 |
| 2.3 | Assumed Liabilities | 15 |
| 2.4 | Excluded Liabilities | 16 |
| 2.5 | Cure Costs | 17 |
| 2.6 | Assignment of Assets Subject to Consent Requirements | 17 |
| 2.7 | Preferential Purchase Rights | ~~19~~18 |
| 2.8 | Further Assurances | 19 |

## ARTICLE 3
### PURCHASE PRICE

| | | |
|---|---|---|
| 3.1 | Purchase Price | 19 |
| 3.2 | Deposit | 20 |
| 3.3 | Allocation of Purchase Price; Allocated Value | 20 |
| 3.4 | Withholding | 20 |

## ARTICLE 4
### CLOSING

| | | |
|---|---|---|
| 4.1 | Closing Date | 20 |
| 4.2 | Payment on the Closing Date | ~~21~~20 |
| 4.3 | Buyer's Deliveries | 21 |
| 4.4 | Seller's Deliveries | ~~22~~21 |

## ARTICLE 5
### REPRESENTATIONS AND WARRANTIES OF SELLER

| | | |
|---|---|---|
| 5.1 | Organization and Good Standing | 22 |
| 5.2 | Authority; Validity; Governmental Authority Consents | ~~23~~22 |
| 5.3 | No Conflict | 23 |
| 5.4 | Permits | 23 |
| 5.5 | Legal Proceedings | 23 |
| 5.6 | Brokers or Finders | 23 |
| 5.7 | Approved Work Programs and Budgets | ~~24~~23 |
| 5.8 | Consents and Preferential Purchase Rights | 24 |
| 5.9 | Material Assigned Contracts | 24 |
| 5.10 | Outstanding Capital Commitments; Non-Consent Operations | ~~25~~24 |
| 5.11 | Taxes | 25 |
| 5.12 | Cure Costs | 25 |
| 5.13 | Imbalances | 25 |
| 5.14 | Insurance | ~~26~~25 |

**Page**

5.15   Surety Bonds and Credit Support ........................................................................... 26

### ARTICLE 6
### REPRESENTATIONS AND WARRANTIES OF BUYER

6.1    Organization and Good Standing ........................................................................... 26
6.2    Authority; Validity; Consents ............................................................................... 26
6.3    No Conflict ............................................................................................................ 26
6.4    Availability of Funds ............................................................................................ 2726
6.5    Litigation .............................................................................................................. 27
6.6    Bankruptcy ........................................................................................................... 27
6.7    Brokers or Finders ............................................................................................... 27
6.8    Relationships[Reserved] ...................................................................................... 27
6.9    Knowledge and Experience .................................................................................. 27
6.10   Qualification to Own the Assets .......................................................................... 27

### ARTICLE 7
### ACTIONS PRIOR TO THE CLOSING DATE

7.1    Operations Prior to the Closing Date ................................................................... 2827
7.2    Reasonable Best Efforts ....................................................................................... 29
7.3    Bankruptcy Court Approval ................................................................................. 30
7.4    Updates and Amendments of Exhibits ................................................................. 3130
7.5    Commitment Letters ............................................................................................. 3130
7.6    BOEM Qualifications ........................................................................................... 31
7.7    Credit Support ...................................................................................................... 31
7.8    Access to the Properties ....................................................................................... 32
7.9    Employee Matters ................................................................................................ 33

### ARTICLE 8
### ADDITIONAL AGREEMENTS

8.1    Taxes .................................................................................................................... 33
8.2    Allocation of Purchase Price ............................................................................... 3433
8.3    Bulk Sales ............................................................................................................ 34
8.4    Assigned Contracts and Assigned Leases and Interests; Adequate Assurance and
       Performance ......................................................................................................... 34
8.5    Post-Closing Books and Records and Personnel ................................................. 3534
8.6    No Other Representations or Warranties; Disclaimers; NORM ........................... 35
8.7    Casualty ................................................................................................................ 36
8.8    Environmental Liabilities ..................................................................................... 37
8.9    Additional Agreements ......................................................................................... 37

### ARTICLE 9
### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

9.1    Accuracy of Representations ................................................................................ 38
9.2    Seller's Performance ............................................................................................ 38
9.3    No Order ............................................................................................................... 3938
9.4    Seller's Deliveries ............................................................................................... 3938
9.5    Sale Order ............................................................................................................ 3938

**Page**

9.6     Operatorship                                                                          38

**ARTICLE 10**
**CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE**

10.1    Accuracy of Representations                                                           39
10.2    Sale Order in Effect                                                                  39
10.3    Buyer's Performance                                                                   39
10.4    No Order                                                                              39
10.5    Buyer's Deliveries                                                                    ~~40~~39

**ARTICLE 11**
**TERMINATION**

11.1    Termination Events                                                                    ~~40~~39
11.2    Effect of Termination                                                                 ~~42~~41
11.3    Specific Performance                                                                  ~~42~~41
11.4    Break-Up Fee and Expense Reimbursement                                                42
11.5    Dispute Resolution                                                                    ~~43~~42

**ARTICLE 12**
**SURVIVAL AND INDEMNIFICATION**

12.1    No Survival of Seller's Representations and Warranties                                ~~44~~43
12.2    Survival of Buyer's Representations and Warranties                                    ~~44~~43
12.3    Indemnification by Buyer                                                              44
12.4    Indemnification Procedures                                                            ~~45~~44
12.5    Calculation of Liabilities                                                            45
12.6    Tax Treatments of Indemnity Payments                                                  ~~46~~45
12.7    Exclusive Remedy                                                                      ~~46~~45

**ARTICLE 13**
**GENERAL PROVISIONS**

13.1    Confidentiality                                                                       ~~46~~45
13.2    Public Announcements                                                                  ~~46~~45
13.3    Notices                                                                               46
13.4    Waiver; Waiver of Damages                                                             48
13.5    Entire Agreement; Amendment                                                           ~~49~~48
13.6    Assignment                                                                            ~~49~~48
13.7    Severability                                                                          ~~49~~48
13.8    Expenses                                                                              49
13.9    Time of the Essence                                                                   49
13.10   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver                   49
13.11   Counterparts                                                                          ~~50~~49
13.12   Parties in Interest; No Third Party Beneficiaries                                     ~~50~~49
13.13   No Recourse                                                                           50
13.14   Specific Performance                                                                  ~~51~~50
13.15   Liquidating Trustee                                                                   ~~51~~50

**Page**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of August ~~19~~[_], 2020 (the "Execution Date"), but effective for all purposes as of the Effective Time, is by and among Arena Energy, LP, a Delaware limited partnership ("Arena"), Arena Exploration, LLC, a Delaware limited liability company ("AEX"), Valiant Energy LLC, a Delaware limited liability company ("Valiant"), and Sagamore Hill Holdings, LP, a Delaware limited partnership ("Sagamore Hill" and, together with Arena, AEX and Valiant, each a "Seller Party", and collectively, "Seller"), ~~San Juan~~W&T Offshore, ~~LLC, a Delaware limited liability company~~Inc., a Texas corporation ("Buyer"), and, solely for purposes of Sections 3.1(x), 13.3, 13.4, 13.5, 13.6, 13.9, 13.10, 13.11, 13.12, 13.14 and Exhibit F, Wells Fargo Bank, N.A., a national banking association, as the initial representative for the RBL Facility Lenders pursuant to Exhibit F (the "RBL Facility Agent"). Capitalized terms used but not otherwise defined herein have the meanings set forth in Article 1. Seller and Buyer are sometimes referred to collectively herein as the "Parties" and individually as a "Party".

## RECITALS

WHEREAS, Seller is the owner of record of certain interests in oil and gas leases, oil and gas wells, and other properties located in the Gulf of Mexico;

WHEREAS, ~~concurrently with the execution of this Agreement, the Debtors, the Buyer and the Required Supporting Parties (defined below) shall enter into the Restructuring Support Agreement (defined below), pursuant to which the Debtors will, among other things, commence~~on August 20, 2020, the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, Seller desires to sell to Buyer all of the Assets, and Buyer desires to purchase from Seller all of the Assets and assume all of the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

WHEREAS, the Parties intend to effectuate the transactions contemplated by this Agreement through a chapter 11 plan and pursuant to section 1123 of the Bankruptcy Code; and

WHEREAS, Seller's ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court;

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Definitions.  For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"AAA" means the American Arbitration Association.

"AAA Rules" means the Commercial Arbitration Rules of the AAA.

"Action" means any action, suit, claim, right, cause of action, litigation, proceeding or arbitration, or any inquiry, proceeding or investigation, by or before any Governmental Authority.

"AEX" has the meaning set forth in the introductory paragraph.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly (through one or more intermediaries) Controls, is Controlled by, or is under common Control with, such specified Person; *provided*, *however*, that for purposes of this Agreement, (a) none of (i) Arena Offshore, LP, (ii) Arena Offshore Operating, LLC, (iii) White Fleet Holdings, LLC and its Subsidiaries, and (iv) Rosefield Pipeline Company, LLC and its Subsidiaries, shall be considered or deemed to be an "Affiliate" of any Seller, except for purposes of Section 5.9, or of Buyer, and (b) none of Lime Rock Management LP or any of its Affiliates (other than Buyer and its Subsidiaries) shall be considered or deemed to be an "Affiliate" of Buyer, except for purposes of Section 13.13 and (c) no member of the Buyer Group shall be considered or deemed to be an "Affiliate" of any member of the Seller Group.

"Agreement" has the meaning set forth in the introductory paragraph.

"Allocated Value" means the portion of the Purchase Price allocated to an Asset, as described on Schedule 3.3.

"Arbitrator" has the meaning set forth in Section 11.5

"Arena" has the meaning set forth in the introductory paragraph.

"Asset Taxes" means all ad valorem, property, excise, severance, production or similar Taxes based upon operation or ownership of the Assets or the production of Hydrocarbons or the receipt of proceeds therefrom (but excluding, for the avoidance of doubt, income, franchise and similar Taxes and Transfer Taxes).

"Assets" has the meaning set forth in Section 2.1(b).

"Assigned Actions" has the meaning set forth in Section 2.1(b)(xiv).

"Assigned Contracts" has the meaning set forth in Section 2.1(b)(iv).

"Assigned Leases and Interests" has the meaning set forth in Section 2.1(b)(i).

"Assignment of OIL Interests" means the Assignment of OIL Interests from Seller to Buyer, pertaining to the Assets described in Section 2.1(b)(xv)(A), substantially in the form attached to this Agreement as Exhibit E.

"Assignments" means, collectively, (i) the Assignment, Bill of Sale and Conveyance (County/Parish) from Seller to Buyer, pertaining to the Assets, substantially in the form attached to this Agreement as Exhibit D, and (ii) Assignments of Record Title Interest or Operating Rights Interest in Federal OCS Oil and Gas Lease (DOI) from Seller to Buyer, pertaining to the Assets.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Avoidance Actions" means any and all claim, right or cause of action of any Seller Party arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common law.

"Bankruptcy Case" means the case commenced by Seller under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, styled *Arena Energy LP, et al.*, and pending before the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, Sections 101 *et seq.*

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Benefit Plan</u>" means each pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off, welfare, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by Seller or its Affiliates, or under which Seller or any its Affiliates has or may have any Liability.

"<u>BOEM</u>" means the Bureau of Ocean Energy Management.

"<u>Break-Up Fee</u>" has the meaning set forth in <u>Section 11.4(a)</u>.

"<u>BSEE</u>" means the Bureau of Safety and Environmental Enforcement.

"<u>Business Day</u>" means any day, other than Saturday or Sunday, on which commercial banks are open for commercial business with the public in Houston, Texas.

"<u>Buyer</u>" has the meaning set forth in the introductory paragraph.

"<u>Buyer Group</u>" means Buyer, its Affiliates and the former, current and future partners, co-owners, direct and indirect equity holders and Representatives of each of the foregoing.

"<u>Buyer Termination Notice</u>" has the meaning set forth in <u>Section 11.1(b)(i)</u>.

"<u>Cash Collateral Order</u>" means the order or orders of the Bankruptcy Court (a) authorizing Seller to use the cash collateral of the prepetition lenders and (b) providing the prepetition lenders with adequate protection.

"<u>Casualty Loss</u>" means any loss, damage or destruction of (a) the Assets or (b) any assets owned, Controlled, maintained or otherwise operated by third parties which are covered by Seller's or its Affiliates' insurance policies, that occurs during the period between the Execution Date and the Closing for any reason, including any act of God, fire, explosion, collision, earthquake, hurricane, storm, tropical depression, windstorm, flood, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation, ordinary wear and tear, and any change in condition of the Assets for production of Hydrocarbons through normal depletion (which exclusion shall include the watering-out of any Well, collapsed casing, sand infiltration of any Well, or other reservoir changes relating to production issues).

"<u>Closing</u>" has the meaning set forth in <u>Section 4.1</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 4.1</u>.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Commitment Letters</u>" has the meaning set forth in <u>Section 7.5</u>.

"<u>Consent Deadline</u>" has the meaning set forth in <u>Section 2.6(b)</u>.

"<u>Contingent Consideration</u>" has the meaning set forth in <u>Exhibit F</u>.

"Contract" means any agreement, contract, obligation, promise or undertaking (in each case, whether written or oral), other than a Lease, that is legally binding.

"Contract Notice" has the meaning set forth in Section 2.5(b).

"Control" means the ability (directly or indirectly through one or more intermediaries) to direct or cause the direction of the management or affairs of a Person, whether through the ownership of voting interests, by contract or otherwise.

"Copyrights" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"Credit Support" has the meaning set forth in Section 5.15.

"Cure Costs" has the meaning set forth in Section 2.5.

"Customary Post-Closing Consent" has the meaning set forth in Section 2.6(a).

"Debt Contract" means any Assigned Contract that is an indenture, mortgage, loan, credit or sale-leaseback guarantee of any obligation, bonds, letters of credit or similar financial contract that will remain in effect following the Closing.

"Debtors" means Arena, AEX, Valiant and Sagamore Hill.

"Decommissioning" means and includes all of the following as may be required under the Assigned Leases and Interests, Assigned Contracts, applicable Legal Requirements and Environmental Laws:

(a)     The plugging, replugging and abandonment of the Wells.

(b)     The removal, abandonment and disposal of the Equipment and Facilities.

(c)     The clearance, reclamation, restoration and Remediation of the lands, groundwater and water bottoms covered by or subject to the Assigned Leases and Interests or the Facilities or otherwise affected by the Assets and the Remediation, restoration and reclamation of the sea floor portion of the Assigned Leases and Interests or the Facilities associated with the Assets.

(d)     Any other activity associated with those enumerated in clauses (a) through (c), above, required to comply with any applicable Legal Requirements or the Assigned Leases and Interests.

"Decommissioning Obligations" has the meaning set forth in Section 2.3(a).

"Deposit" has the meaning set forth in Section 3.2.

"Designation Deadline" means 5:00 p.m. (Central Time) on the date that is three (3) Business Days prior to the scheduled Closing Date or such later date as Buyer and Seller shall mutually agree and as the Bankruptcy Court may authorize.

"Disputed Matters" has the meaning set forth in Section 11.5

"DOI" means the United States Department of the Interior and its various U.S. government agencies responsible for management of energy resources on the Outer Continental Shelf, including the Bureau of Ocean Energy Management; Bureau of Safety and Environmental Enforcement and Office of Natural Resources Revenue, as applicable, and any of their predecessor agencies, the

4

Bureau of Ocean Energy Management, Regulation and Enforcement and the Minerals Management Service, and any successors agencies.

"Effective Time" means 12:00 a.m. Central Time on the Closing Date.

"Encumbrance" means any charge, lien, claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal (or similar right), right of setoff, easement, servitude, restrictive covenant, encroachment, encumbrance, third party interest or other restriction or limitation of any kind.

"Environmental Condition" means (a) a condition, whenever existing or occurring, with respect to the air, soil, subsurface, surface waters, ground waters and/or sediments that causes an Asset (or Seller with respect to an Asset) not to be in compliance with any Environmental Law or (b) the existence with respect to an Asset of any environmental pollution, contamination, degradation, damage or injury.

"Environmental Laws" means any and all Legal Requirements pertaining to (a) use, storage, emission, discharge, clean-up, Release, or threatened Release, manufacture, processing, distribution, treatment, storage, disposal, transportation or handling of Hazardous Materials, or (b) protection of the environment, wildlife or natural resources applicable to the Assets and in effect on or prior to the Effective Time in or for the jurisdiction in which the Assets are located, including the Clean Air Act (Air Pollution Control Act), the Clean Water Act (CWA), the Federal Water Pollution Act, the Rivers and Harbors Act, the Safe Drinking Water Act, the National Environmental Policy Act of 1969 (NEP A), the Endangered Species Act (ESA), the Fish and Wildlife Conservation Act of 1980, the Fish and Wildlife Coordination Act (FWCA), the Oil Pollution Act, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), the Superfund Amendments and Reauthorization Act of 1986 (SARA), the Resources Conservation and Recovery Act (RCRA), the Toxic Substance Control Act, the Emergency Planning and Community Right-To-Know Act (EPCRA), the Hazardous Materials Transportation Act, the Hazardous and Solid Waste Amendments of 1984 (HSWA).

"Environmental Obligations" means and includes all of the following, regardless of the sole, joint or concurrent negligence, breach of contract, breach of warranty, strict liability, regulatory liability, statutory liability, or other fault or responsibility of any Person:

      (a)     Liabilities relating to any Environmental Condition;

      (b)     Liabilities relating to Remediation;

      (c)     Liabilities resulting from injury or death to natural Persons caused by the exposure or alleged exposure to Hazardous Materials (including expenses associated with claims investigation, testing and assessment); and

      (d)     Liabilities relating to the presence, release, emission or discharge of Hazardous Materials, pollution, contaminant or other regulated substances in or into the environment.

"Equipment" has the meaning set forth in Section 2.1(b)(vi).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"Escrow Account" means the account maintained by the Escrow Agent in connection with the Escrow Agreement.

"Escrow Agent" has the meaning set forth in Section 3.2.

"Escrow Agreement" has the meaning set forth in Section 3.2.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means all Contracts of Seller other than the Assigned Contracts, including, for purposes of clarity (subject to Section 2.5), among others, those Contracts described on Schedule 2.2(g).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Records" means (a) the general corporate files and records of Seller, insofar as they relate to Seller's business generally and are not required for the future ownership or operation of the Assets, (b) all legal files and records (other than title opinions), (c) Seller's federal or state income, franchise or margin tax files and records, (d) employee files, (e) reserve evaluation information or economic projections, (f) records relating to the sale of the Assets, including competing bids, (g) proprietary data, information and data under contractual restrictions on assignment or disclosure, (h) privileged information and (i) any other files or records to the extent relating to any Excluded Assets.

"Execution Date" has the meaning set forth in the introductory paragraph.

"Expense Reimbursement" has the meaning set forth in Section 11.4(a).

"Expiration Date" has the meaning set forth in Section 12.2.

"Facilities" has the meaning set forth in Section 2.1(b)(vi).

"Final Order" means an Order issued by the applicable Governmental Authority as to which: (a) no request for stay of the Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (b) no petition for rehearing or reconsideration of the Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (c) the Governmental Authority does not have the Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (d) the Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Financing" has the meaning set forth in Section 7.5.

"Governmental Authority" means any court or tribunal (including an arbitrator or arbitral panel) in any jurisdiction (domestic or foreign) or any federal, tribal, state, county, municipal or other governmental or quasi-governmental body, agency, authority, department, board, commission, bureau, official or other authority or instrumentality.

"Governmental Authorization" means any approval, consent, license, permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"Hard Consent" has the meaning set forth in Section 2.6(a).

"Hazardous Material" means any chemical substance, product, waste or other material which is, or becomes identified, listed, published, regulated, or defined as, or which shows the characteristics of, a hazardous substance, hazardous waste, hazardous material, toxic substance or other similar regulatory term, including oil, oil waste, by-products and components, NORM,

Hydrocarbons, and Hydrocarbons waste, produced water, by-products and components, polychlorinated biphenyls, and asbestos, or which is otherwise regulated or restricted under any Environmental Law or by any Governmental Authority.

"Hydrocarbons" means oil, gas, minerals, and other gaseous and liquid hydrocarbons, or any combination of the foregoing, produced from and attributable to the Properties.

"Imbalances" means over-production or under-production or over-deliveries or under-deliveries with respect to Hydrocarbons produced from or allocated to the Properties, regardless of whether such over-production or under-production or over-deliveries or under-deliveries arise at the wellhead, pipeline (taking into account any line fill), gathering system, transportation system, processing plant, or other location, including any imbalances under gas balancing or similar agreements, imbalances under production handling agreements, imbalances under processing agreements, imbalances under the Assigned Leases and Interests, imbalances under gathering or transportation agreements, and imbalances under operating agreements.

"Indemnification Claim" has the meaning set forth in Section 12.4(a).

"Intellectual Property" means all intellectual property, including all Copyrights, Patents and Trademarks, owned, used or licensed by Seller and used or held for use exclusively in the ownership and operation of the Assets, but specifically excluding, for the avoidance of doubt, all seismic, geological, geochemical or geophysical data licensed by Seller and any of Seller's interpretations of such data.

"Knowledge" means, with respect to any matter in question, (a) in the case of Seller, the actual knowledge (without any duty of inquiry) of any of the individuals listed on Schedule 1.1(a) with respect to such matter, and (b) in the case of Buyer, the actual knowledge (without any duty of inquiry) of any of the individuals listed on Schedule 1.1(b) with respect to such matter.

"Lease" means any oil and gas lease, oil, gas and mineral lease or sublease, and other leasehold interest, and the leasehold estates created thereby, including carried interests, rights of recoupment, options, reversionary interests, convertible interests and rights to reassignment.

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"Liability" means any and all claims, rights, demands, causes of action, liabilities (including civil fines), obligations, damages, losses, fines, penalties, sanctions of every kind and character (including reasonable fees and expenses of attorneys, technical experts and expert witnesses), judgments or proceedings of any kind or character whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and whether arising or founded in law, equity, statute, contract, tort, strict liability or voluntary settlement, and all reasonable expenses, costs and fees (including reasonable attorneys' fees) in connection therewith.

~~"Lime Rock" means Lime Rock Partners VIII, L.P.~~

"Material Adverse Effect" means any change, event or occurrence that individually or in the aggregate (taking into account all other such changes, events or occurrences) has had, or would reasonably be expected to have, (1) a material adverse change in or material adverse effect on the Assets taken as a whole or (2) a material adverse effect on Seller's ability to consummate the transactions contemplated by this Agreement or to perform its obligations hereunder, but excluding (a)

any change or effect to the extent that it results from or arises out of (i) the pendency of the Bankruptcy Case; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the transactions contemplated hereby (it being understood and agreed that this clause (a)(ii) shall not apply to the term "Material Adverse Effect" as used in this Agreement to the extent related to any representation or warranty or any related condition contained in this Agreement that is intended to address the consequences of the negotiation, execution, announcement, performance or pendency of this Agreement or the consummation of the transactions contemplated hereby); (iii) changes in (or proposals to change) Legal Requirements, generally accepted accounting principles or other accounting regulations or principles; (iv) acts of God, including hurricanes, storms and other natural disasters; (v) any action required by this Agreement (other than <u>Section 7.1</u>) or taken at the written request of Buyer; (vi) actions of Governmental Authorities; or (vii) the terms and provisions of the Assigned Leases and Interests or Assigned Contracts; (b) any change or effect generally applicable to (i) the industries and markets in which Seller operates or (ii) economic or political conditions or interest rates, exchange rates, commodity prices or the securities or financial markets in any country or region; (c) any outbreak or escalation of hostilities or war or any act of terrorism; (d) the departure of officers or directors of Seller after the Execution Date; (e) any objections in the Bankruptcy Court to (i) this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby; (ii) the reorganization of Seller and any related plan of reorganization or disclosure statement; or (iii) the assumption or rejection of any Material Assigned Contract with Buyer's prior written consent; (f) any Order of the Bankruptcy Court (other than any Order that would preclude or prohibit the consummation of the transactions contemplated under this Agreement) or any actions or omissions of Seller in compliance therewith; and (g) any action taken by Seller at the written request of, or with the express written consent of, Buyer; *provided*, *however* that, in the cases of clauses (a)(iii), (a)(iv), (a)(vi), (b), and (c), if such change, inaccuracy, effect, event, result, occurrence, condition or fact has a disproportionate impact on Seller when compared to similarly situated owners or operators of oil and gas assets in the area in which the Assets are located, then such change, inaccuracy, effect, event, result, occurrence, condition or fact shall be deemed to create, cause or otherwise constitute a Material Adverse Effect for purposes hereof.

"<u>Material Assigned Contract</u>" has the meaning set forth in <u>Section 5.9(b)</u>.

"<u>Memorandum</u>" means the Memorandum between Buyer and the RBL Facility Agent, substantially in the form attached to this Agreement as <u>Exhibit H</u>.

"<u>Non-Disclosure Agreement</u>" has the meaning set forth in <u>Section 13.1</u>.

"<u>NORM</u>" means naturally occurring radioactive materials.

"<u>Oil Insurance Limited</u>" has the meaning set forth in <u>Section 2.1(b)(xv)</u>.

"<u>Order</u>" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"<u>Outside Date</u>" has the meaning set forth in <u>Section 11.1(a)(iii)</u>.

"<u>Party</u>" or "<u>Parties</u>" means, individually or collectively, Buyer and Seller.

"<u>Party Affiliate</u>" has the meaning set forth in <u>Section 13.13</u>.

"<u>Patents</u>" means United States and foreign patents and patent applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

"Permits" has the meaning set forth in Section 2.1(b)(v).

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"Petition Date" means the filing date of Seller's chapter 11 petition commencing the Bankruptcy Case.

"Plan" means the Debtors' chapter 11 plan, which shall (a) provide for the transactions contemplated under this Agreement, including the transfer to Buyer or Buyer's designee of one hundred percent (100%) of the equity interests in any applicable reorganized Seller Party as may be elected by Buyer pursuant to Section 8.9(b), and (b) be in form and substance ~~(i)~~ consistent with ~~the Restructuring Term Sheet attached as Exhibit B to the Restructuring Support~~ this Agreement~~,~~ and ~~(ii)~~ otherwise reasonably acceptable to Buyer ~~to the extent provided in the Restructuring Support Agreement~~.

"Post-Closing Covenant" has the meaning set forth in Section 12.1.

"Preferential Purchase Right" means any right or agreement that enables any Person to purchase or acquire any Asset or any interest therein or portion thereof as a result of or in connection with the execution or delivery of this Agreement or the consummation of the transactions contemplated hereby or any similar right or interest.

"Proceeding" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Properties" has the meaning set forth in Section 2.1(b)(ii).

"Purchase Price" has the meaning set forth in Section 3.1(a).

"RBL Facility Agent" has the meaning set forth in the introductory paragraph.

"RBL Facility Claims" has the meaning set forth in the Restructuring Support Agreement.

"RBL Facility Lenders" has the meaning set forth in the Restructuring Support Agreement.

"Records" has the meaning set forth in Section 2.1(b)(vii).

"Release" means the spilling, leaking, disposing, discharging, emitting, depositing, dumping, ejecting, leaching, escaping, or release of any Hazardous Materials into the environment.

"Remediation" means action taken to correct an Environmental Condition to the extent required by Environmental Law in the most cost effective manner reasonably available, consistent with applicable Environmental Laws, taking into account that taking no action, leaving the condition unaddressed and non-permanent remedies (such as mechanisms to contain or stabilize Hazardous Materials, including monitoring site conditions, natural attenuation, risk-based corrective action, institutional controls or other appropriate restrictions on the use of property, caps, dikes, encapsulation, leachate collection systems, etc.) may be the most cost effective manner reasonably available.

"<u>Representative</u>" means, with respect to a particular Person, any director, officer, member, manager, principal, partner, employee, agent, consultant, advisor, investor, shareholder, contractor, subcontractor or other representative of such Person, including legal counsel, accountants and financial advisors.

"<u>Required Supporting Parties</u>" means (a) the RBL Facility Lenders holding no fewer than two-thirds (2/3) in dollar amount and a majority in number of RBL Facility Claims and (b) the RBL Facility Agent.

"<u>Restoration Costs</u>" has the meaning set forth in <u>Section 11.1(b)(vi)</u>.

"<u>Restructuring Support Agreement</u>" means the restructuring support and plan sponsor agreement, dated as of August 18, 2020, by and among the Seller Parties, the Required Supporting Parties, and ~~Buyer, which restructuring support agreement shall provide for the Required Supporting Parties' support of, and consent to, the transactions contemplated by this Agreement.~~<u>San Juan Offshore, LLC.</u>

"<u>Sagamore Hill</u>" has the meaning set forth in the introductory paragraph.

"<u>Sale Order</u>" means the Order entered by the Bankruptcy Court authorizing the transactions contemplated under this Agreement, including the sale of the Assets under sections 365, 1123 and 1141 of the Bankruptcy Code pursuant to the Plan, in each case, in accordance with the terms of this Agreement, which Order shall be (x) the same Order as the Order confirming the Plan and (y) <u>consistent with this Agreement and otherwise</u> in form and substance <u>reasonably</u> acceptable to Buyer ~~to the extent provided in the Restructuring Support Agreement~~. For the avoidance of doubt, the Break-Up Fee and the Expense Reimbursement provided for in this Agreement shall be approved in the Sale Order.

"<u>Seller</u>" has the meaning set forth in the introductory paragraph.

"<u>Seller Credit Obligations</u>" has the meaning in <u>Section 7.7(a)</u>.

"<u>Seller Group</u>" means each of the Seller Parties, their Affiliates and the former, current and future partners, co-owners, direct and indirect equity holders and Representatives of each of the foregoing.

"<u>Seller Indemnified Parties</u>" has the meaning set forth in <u>Section 12.3(a)</u>.

"<u>Seller Party</u>" has the meaning set forth in the introductory paragraph.

"<u>Seller's Supplemented Schedules</u>" has the meaning set forth in <u>Section 7.4(b)</u>.

"<u>Seller Termination Notice</u>" has the meaning set forth in <u>Section 11.1(c)(i)</u>.

"<u>Specified Seller Credit Obligations</u>" has the meaning set forth in <u>Section 7.7(b)</u>.

"<u>Specified Surety Bonds</u>" means, collectively, that certain (a) Performance Bond (Bond No. SUR0056455), dated effective as of January 1, 2019, by and among Arena Energy, LP, as principal, Argonaut Insurance Company, as surety, and Exxon Mobil Corporation and ExxonMobil Pipeline Company, as obligees, and (b) Private Performance Bond (Bond No. B007929), dated effective as of May 1, 2013, by and among Arena Energy, LP, as principal, U.S. Specialty Insurance Company, as surety, and Apache Corporation, as obligee.

"<u>Subsidiary</u>" means any entity with respect to which a specified Person (or a Subsidiary thereof) (a) has the power, through the ownership of securities or otherwise, to elect a

majority of the directors or similar managing body or (b) owns directly or indirectly all of the outstanding equity interests therein.

"Surety Bonds" has the meaning set forth in Section 7.7(a).

"Suspense Funds" means proceeds of production and associated penalties and interest in respect of any of the Assets that are payable to third parties and are being held in suspense by Seller.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any taxes, assessments, fees, unclaimed property and escheat obligations and other charges of any kind whatsoever imposed by any Governmental Authority, including federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not and (ii) any liability in respect of any item described in clause (i) above that arises by reason of a contract (other than a contract entered into in the ordinary course of business, the primary purpose of which is not Taxes), assumption, transferee or successor liability, or operation of Legal Requirement (including by reason of participation in an affiliated, consolidated, combined or unitary Tax Return).

"Tax Allocation" has the meaning set forth in Section 8.2.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed with any Governmental Authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Term Loan Claim" has the meaning set forth in the Restructuring Support Agreement.

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names, Internet domain names and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"Transaction Documents" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"Transfer Taxes" has the meaning set forth in Section 8.1(a).

"Units" has the meaning set forth in Section 2.1(b)(i).

"Valiant" has the meaning set forth in the introductory paragraph.

"Wells" has the meaning set forth in Section 2.1(b)(ii).

"Wind Down" means the wind down and dissolution of any Debtors, the equity of which is not acquired by Buyer subject to the terms of the Plan.

"Wind Down Amount" ~~has the meaning set forth in the Restructuring Support Agreement~~means cash funded by Buyer in an amount consistent with a wind down budget with respect to the Wind Down to fund the Wind Down.

1.2     Other Definitions and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars.  Any reference in this Agreement to "$" or "dollars" means United States dollars.

(iii)     Exhibits/Schedules.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     Gender and Number.  Any reference in this Agreement to gender includes all genders, and words imparting the singular number only include the plural and vice versa.

(v)     Headings.  The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)     Herein.  Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(vii)     Including.  The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(viii)     Statute.  Unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder; *provided* that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance with, any Legal Requirement, the reference to such Legal Requirement means such Legal Requirement as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(b)     No Strict Construction.  Buyer, on the one hand, and Seller, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Seller, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE 2
## PURCHASE AND SALE

2.1     Purchase and Sale.

(a)     Upon the terms and subject to the conditions of this Agreement, on the Closing Date, and effective as of the Effective Time, Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer (or its designee), and Buyer (or its designee) shall purchase from Seller, the Assets.

(b)     The "Assets" shall include all right, title and interest of Seller in, to or under all oil and gas properties and all other assets, rights and interests owned by Seller (but excluding the Excluded Assets), including the following:

(i)     all Leases, including the Leases described in Exhibit A, together with any and all other rights, titles, and interests of Seller in and to the leasehold estates created thereby, including royalty interests, overriding royalty interests, production payments, net profits interests, farmout interests, carried interests, reversionary interests, and all other interests of any kind or character described in Exhibit A, subject to any depth restrictions described in Exhibit A, the terms, conditions, covenants, and obligations set forth in the Leases and/or Exhibit A, along with all pools and units that include all or any part of any Lease (the "Units"), including without limitation, all of Seller's right, title and interest in Hydrocarbon production from any Unit, regardless of whether such Unit production is derived from wells located on or off a Lease (collectively, the "Assigned Leases and Interests");

(ii)     all oil and gas wells (whether producing, inactive, temporarily or permanently abandoned, shut-in or otherwise) and any water injection wells located on or traversing the Assigned Leases and Interests (collectively, and including the wells set forth in Exhibit B, the "Wells", and together with the Assigned Leases and Interests, the "Properties");

(iii)     (A) all Hydrocarbons produced from or allocated to any or all of the Properties prior to, on or after the Effective Time (which have not already been sold), and all proceeds therefrom and revenues related thereto; and (B) all marketable Hydrocarbons produced from or attributable to the Properties in storage tanks, and Hydrocarbons above or below a custody transfer point, and all proceeds attributable thereto;

(iv)     all Contracts, including sales and purchase contracts, unit operating agreements, exploration agreements, development agreements, seismic licenses, balancing agreements, farmout agreements, service agreements, transportation, processing, treatment and gathering agreements, equipment leases and other contracts, agreements and instruments, including the Contracts described on Exhibit C attached hereto, in each case, insofar as they relate to any other Asset (collectively, the "Assigned Contracts"), and any rights to reimbursement due thereunder;

(v)     to the extent that they may be transferred to Buyer, whether through assignment or otherwise as contemplated under Section 8.9(b) (provided that Seller will use commercially reasonable efforts to obtain any necessary consent to assignment, without any obligation to incur any out-of-pocket cost or expense or to provide any other consideration), all permits, licenses, servitudes, easements, rights-of-way and other surface agreements used primarily in connection with

13

the ownership or operation of the Properties, including any pending applications therefor (collectively, the "Permits");

(vi)     all equipment, machinery, fixtures, and other real, personal, and mixed property, operational and nonoperational, known or unknown, located on the Properties or the other Assets described above, but excluding any such items constituting Excluded Assets (collectively, the "Equipment"); all physical assets located on the Properties or other Assets described above as of the Effective Time or covered by an Assigned Contract and used or previously used for production, mechanical separation, handling, gathering, storage, treatment, sale, disposal or other operations relating to assigned Hydrocarbons, including (a) all buildings, structures, facilities and foundations; (b) all platforms, pipelines of every form and character, including gathering lines, transfer lines, gas lines, oil lines, water lines, flowlines and production and storage facilities and (c) pipeline laterals, to the extent located on or within any of the Assigned Leases or Interests as a lease term pipeline or serving the Assets in any manner, including as a gathering line under a distinct right of way (collectively, the "Facilities");

(vii)    all of the files, records, information, and data, whether written or electronically stored, in Seller's possession and primarily relating to the Assets, including (a) land and title records (including abstracts of title and title curative documents); (b) contract files; (c) correspondence; (d) operations, environmental, production, and accounting records; (e) proprietary seismic and specific seismic lines if assignable by Seller without cost, unless Buyer has agreed to and pays the cost; and (f) facility and well records but excluding any of the foregoing items that are Excluded Assets (collectively, the "Records");

(viii)   except with respect to the Excluded Assets and the Excluded Liabilities, all claims, refunds, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses of Seller to the extent related to the Assets and arising or relating to events occurring prior to, on or after the Effective Time or related to the Assumed Liabilities, but excluding any such matters released pursuant to the Plan;

(ix)     all cash call pre-payments and other refunds due to Seller for royalty overpayments and/or future deductions as royalty offsets associated with any Asset;

(x)      all trade credits, accounts receivable, note receivables, take or pay amounts receivable, and other receivables attributable to the other Assets, with respect to any period of time;

(xi)     all proprietary rights and non-proprietary rights to all geological, geochemical, geophysical and other seismic and related technical data and information relating to the Assets, to the extent such data and information may be assigned without the payment of a fee (or, in the event a transfer fee applies, to the extent Buyer has agreed in writing to pay, or has paid, such transfer fee); *provided* that Seller will use commercially reasonable efforts to obtain any necessary consent to assignment, without any obligation to incur any out-of-pocket cost or expense or to provide any other consideration;

(xii)    all Intellectual Property;

(xiii)   the office(s) and associated office lease(s) described on Schedule 2.1(b)(xiii) and all personal computers and associated peripherals, office fixtures, office equipment and inventory located at such office(s);

14

(xiv)    any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, in each case whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively, in law, equity, or otherwise, including Avoidance Actions owned by or available to any Seller Party (such Actions, the "Assigned Actions");

(xv)    (A) all interests of any kind or character owned by Seller or any of its Affiliates in and to Oil Insurance Limited, a Bermuda company ("Oil Insurance Limited"), subject to Buyer's compliance with the applicable requirements set forth the Shareholders' Agreement of Oil Insurance Limited issued to Arena Energy, LP., and (B) subject to Section 8.7(b), all insurance policies and rights to proceeds (and rights of recovery) thereof, including all insurance policies issued by Oil Insurance Limited and rights to proceeds thereof;

(xvi)    (A) all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, letters of credit, bank accounts and other bank deposits as of the Closing Date, including the Suspense Funds (and applicable accounts therefor), and (B) all escrow accounts maintained by Seller or any of its Affiliates to secure Decommissioning Obligations or relating to the Properties (other than the Escrow Account), in each case, (x) including those accounts identified on Schedule 2.1(b)(xvi), and any and all funds and other income thereof, (y) including any retainers returned by Seller's advisors to Seller due to the fees owing to such advisors being less than the applicable retainer, and (z) excluding the Wind Down Amount;

(xvii)    all receivables related to the Assets including all expenditures incurred by Seller in connection with the ownership, operation and maintenance of the Properties (including rentals, overhead, royalties, Lease option and extension payments, Taxes and other charges and expenses billed under applicable operating agreements or applicable Legal Requirements) and billed by Seller to third party working interest owners, which remain outstanding and owed to Seller;

(xviii)    all claims, refunds, loss carry forwards, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, audit rights, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses of Seller, other than those constituting Excluded Assets or those related to any Excluded Liability or released pursuant to the Plan; and

(xix)    all rights, defenses, claims and causes of action (including rights to enforce Encumbrances, trade credits, receivables, audit rights and rights to receive indemnity, funds, reimbursements or other payments and rights under policies or agreements of insurance) except to the extent released pursuant to the Plan.

2.2    Excluded Assets.  Notwithstanding the foregoing, the Assets shall not include, and there is excepted, reserved and excluded from the transaction contemplated hereby, the following (collectively, the "Excluded Assets"):

(a)    the Purchase Price delivered to Seller pursuant to this Agreement;

(b)    all shares of capital stock or other equity interest of Seller or any of Seller's Subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of Seller or any of Seller's Subsidiaries;

(c)    all minute books, stock ledgers, corporate seals and stock certificates of Seller;

15

(d)     all Excluded Records;

(e)     any rights, claims or causes of action of Seller against Buyer under this Agreement or any other Transaction Document;

(f)     documents prepared or received by Seller with respect to (i) lists of prospective purchasers for such transactions compiled by Seller, (ii) bids submitted by other prospective purchasers of the Assets, (iii) analyses by Seller of any bids submitted by any prospective purchaser, (iv) correspondence between or among Seller, its respective representatives, and any prospective purchaser other than Buyer, (v) internal valuations or economic models prepared in connection with the transactions contemplated in this Agreement and (vi) correspondence between Seller or any of its respective representatives with respect to any of the bids, the prospective purchasers, or the transactions contemplated in this Agreement;

(g)     all Excluded Contracts;

(h)     all Benefit Plans and any assets associated with or attributable thereto;

(i)     the Wind Down Amount; and

(j)     all rights to the use of deposits and retainers to the extent held and applied by Seller's professionals on or before sixty (60) days after the earlier to occur of (i) the effective date of a plan of reorganization or liquidation, (ii) the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or (iii) the dismissal of the Bankruptcy Case by the Bankruptcy Court; *provided*, *however*, any right to deposits or retainers in excess of the fees owing to such advisors shall constitute Assets.

2.3     Assumed Liabilities.   Upon the terms and subject to the conditions of this Agreement, and other than the Excluded Liabilities, on the Closing Date, Buyer shall assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), all Liabilities associated with the Assets, whether such Liabilities arise prior to, at, or after the Effective Time (collectively, the "Assumed Liabilities"), including the following:

(a)     Decommissioning Obligations.   Any obligations or Liabilities associated with Decommissioning, whether incurred under any of the Assigned Leases and Interests, Assigned Contracts or under any Legal Requirement, judgment, decree, or other obligation, and including any residual liability for anticipated or necessary continuing insurance, maintenance and monitoring costs, whether such Liabilities arise prior to, at or after the Effective Time (collectively, the "Decommissioning Obligations").

(b)     Assigned Contracts.   All of Seller's Liabilities under the Assigned Contracts, whether such Liabilities arise prior to, at or after the Effective Time.

(c)     Properties.   All of Seller's Liabilities arising out of the ownership or operation of the Properties (including the terms of the applicable Permits and Assigned Contracts), whether such Liabilities arise prior to, at or after the Effective Time.

(d)     Cure Costs.   All Cure Costs and all rejection damages incurred by Seller due to the rejection by Seller of any Excluded Contract.

(e)     Suspense Funds.   All Suspense Funds, together with any escheatment obligations related thereto.

(f)     Buyer Taxes.   All Taxes imposed on or attributable to the Assets, other than income, franchise and similar Taxes of any Seller Party (except any Seller Party that is directly or indirectly acquired by Buyer pursuant to Section 8.9(b)), or any of such Seller Party's direct or indirect owners or any affiliated, combined, consolidated or unitary group with respect to Taxes of which any of the foregoing is or was a member.

(g)     Transfer Taxes.   All Transfer Taxes.

(h)     Environmental Liabilities.   All Environmental Obligations and Liabilities under Environmental Law arising from, related to or associated with the Assets (including the performance of all related salvage, site clearance, and surface restoration operations), whether such Liabilities arise prior to, at or after the Effective Time.

(i)     Other Assets.   To the extent not already described in Section 2.3(a) through (h) above, all Liabilities arising from, related to or associated with the Assets, whether such Liabilities arise prior to, at or after the Effective Time.

(j)     Employment Liabilities.   Any employment-related liability expressly assumed under Exhibit G, as well as any Liability with respect to which Liability may be imposed on any current or former officer, director, or employee of Seller or its Subsidiaries on the basis of any so-called "responsible person" statutes, including any wage payment statute, that cannot ultimately be discharged by the Bankruptcy Code.

The assumption by Buyer of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

2.4     Excluded Liabilities.   Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge the following Liabilities of Seller (the "Excluded Liabilities"); for the avoidance of doubt, the sale of Assets to Buyer shall be effectuated free and clear of any and all Excluded Liabilities:

(a)     all indebtedness for borrowed money of Seller and all hedging obligations of Seller;

(b)     (i) any income, franchise or similar Taxes imposed on any Seller Party (other than any Seller Party that is directly or indirectly acquired by Buyer pursuant to Section 8.9(b)), any of such Seller Party's direct or indirect owners or any affiliated, combined, consolidated or unitary group with respect to Taxes of which any of the foregoing is or was a member, and (ii) any Taxes attributable to the Excluded Assets;

(c)     all Liabilities of Seller to any owner or former owner of capital stock or warrants, or holder of indebtedness for borrowed money; and

(d)     all Liabilities related to the Excluded Assets.

2.5     Cure Costs.

(a)     On or prior to the Closing, Buyer shall pay any and all cure costs or expenses that must be paid or otherwise satisfied to cure any monetary defaults required to be cured under section 365 of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption or assumption and assignment to Buyer or its designee of the Assigned Contracts and Assigned Leases and Interests, in each case as such amounts are determined by the Bankruptcy Court (the "Cure Costs").

(b)     At any time prior to the Designation Deadline, Buyer shall have the right, which may be exercised in Buyer's sole discretion, to provide written notice to Seller (each such notice, a "Contract Notice") of Buyer's election to designate any Contract (including any Contract that is an Assigned Contract immediately before such designation) (A) as an Excluded Contract and upon such designation such Contract shall constitute an Excluded Contract and, if applicable, shall cease to constitute an Assigned Contract or (B) to the extent not already rejected with Buyer's prior written consent, as an Assigned Contract and upon such designation such Contract shall constitute an Assigned Contract and shall cease to constitute an Excluded Contract.  Notwithstanding anything to the contrary in this Section 2.5, if, at any time after the Designation Deadline, the Cure Costs fixed by the Bankruptcy Court for any Assigned Contract are (i) greater than the amount set forth on the initial schedule of Cure Costs filed by Seller with the Bankruptcy Court prior to the Designation Deadline and (ii) are not consented to by Buyer, then Buyer shall be permitted, no later than five (5) Business Days after entry of an order by the Bankruptcy Court setting such Cure Costs, to provide Seller a Contract Notice of Buyer's election to revoke its designation of any such Contract as an Assigned Contract and thereupon such Contract shall be deemed to be an Excluded Contract.

(c)     If Buyer exercises its rights in Section 2.5(b) above to designate any Contract (including a Contract that was an Assigned Contract immediately before such designation) as an Excluded Contract, then, there shall be no reduction in the Purchase Price as a result of such designation or change in designation, and Buyer shall bear all rejection damages incurred by Seller due to the rejection by Seller of such Excluded Contract.

(d)     In the event that Seller identifies (whether before or after the Designation Deadline) any additional Contracts capable of being assumed or rejected that were not previously identified as such, Seller shall promptly notify Buyer of (i) such Contracts and (ii) Seller's good faith estimate of the amount of the Cure Costs payable in respect of each such Contract.  For the avoidance of doubt, Buyer may designate each such additional Contract described in the immediately preceding sentence as an Assigned Contract or Excluded Contract pursuant to this Section 2.5, notwithstanding the passage of the Designation Deadline.

2.6     Assignment of Assets Subject to Consent Requirements.

(a)     If prior to the Closing Date any consent to assignment applicable to the transactions contemplated hereby (other than approvals by BOEM and other governmental consents or approvals customarily (and legally permitted to be) obtained post-Closing (each such consent or approval, a "Customary Post-Closing Consent")) (i) has not been obtained, waived or satisfied, and (ii) has not been determined to be inapplicable to the transactions contemplated hereby by reason of any Order of the Bankruptcy Court, and further, failure to obtain such third party consent or waiver may result in either the termination of a Lease, including causing such to be void or voidable, or the inability to transfer or assign a Contract or the imposition of, or obligation to pay, a financial or other penalty (each such consent, a "Hard Consent"), the Properties affected by such third party Hard Consent shall be excluded from the Assets conveyed at Closing; *provided*, that there shall be no adjustments to the Purchase Price for such excluded Asset.

(b)     If, after Closing, a Hard Consent that was not obtained, waived or otherwise satisfied at Closing is obtained by Seller, waived by the applicable consentholder or otherwise satisfied on or before December 1, 2020 (the "Consent Deadline"), or, at Buyer's sole discretion and election, Buyer waives the requirement that such Hard Consent be obtained, waived or otherwise satisfied, then, in any such case, the Property affected by such Hard Consent and excluded at the Closing will be conveyed to Buyer within ten (10) Business Days after such Hard Consent has been obtained, waived by the applicable consentholder or Buyer or otherwise satisfied, and the Liabilities for such Property excluded at Closing to the extent arising from such Hard Consent not having been obtained, waived or

otherwise satisfied shall constitute Assumed Liabilities from and after the applicable subsequent closing. At such subsequent closing, Seller shall assign, transfer and convey to Buyer, and Buyer shall acquire and accept from Seller, such excluded Assets (or portions thereof). For the avoidance of doubt, if the Hard Consent for a Property excluded from the Assets conveyed at Closing pursuant to Section 2.6(a) is not obtained by Seller, waived by the applicable consentholder or otherwise satisfied or Buyer does not waive the requirement that such Hard Consent be obtained, waived or otherwise satisfied, in each case, upon the expiration of the Consent Deadline, then the applicable Assets excluded at Closing shall be deemed to be Excluded Assets for all purposes hereunder, including for purposes of Section 24.

(c)     Except for Hard Consents, if any consents to the assignment of any Asset are not obtained prior to Closing, then with respect to each affected Asset, the affected Assets shall nevertheless be sold and conveyed to Buyer at the Closing and Buyer shall pay for the affected Asset(s) at Closing in accordance with this Agreement as though the consent had been obtained. In the case of licenses, certificates, approvals, authorizations, Leases, Contracts and other commitments included in the Assets (A) that cannot be transferred or assigned without the Hard Consent of third parties, which Hard Consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Seller shall, following the Closing, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, cooperate with Buyer in all reasonable respects to provide to Buyer the benefits thereof in some other manner, or (B) that are otherwise not transferable or assignable (after giving effect to the Sale Order and the Bankruptcy Code), Seller shall, following the Closing, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with Buyer to provide to Buyer the benefits thereof in some other manner (including the exercise of the rights of Seller thereunder); *provided* that nothing in this Section 2.6 shall (1) require Seller to make any expenditure or incur any obligation on its own or on behalf of Buyer for which funds in the full amount of such expenditure or obligation are not provided to Seller by Buyer in advance in cash or (2) prohibit Seller from ceasing operations or winding up its affairs following the Closing.

(d)     With respect to Customary Post-Closing Consents, Buyer and Seller shall use commercially reasonable efforts after Closing to obtain all Customary Post-Closing Consents from, and make all filings with, all Governmental Authorities that may be required by applicable Legal Requirements or under the terms of an Assigned Lease and Interest. Until the earlier to occur of (i) the date on which such Customary Post-Closing Consent is obtained and (ii) the expiration of the Consent Deadline, Seller shall continue to hold record title to the applicable Assets as nominee for Buyer and Seller shall only be authorized to act, with respect to such Assets, upon and in accordance with Buyer's specific instructions. Buyer shall indemnify, defend and hold harmless Seller for all Liabilities to the extent solely related to or arising from Seller's obligation to hold record title to the applicable Assets from and after Closing, in accordance with this Section 2.6(d).

2.7     Preferential Purchase Rights.

(a)     With respect to each Preferential Purchase Right set forth on Schedule 5.8, within five (5) Business Days after the Petition Date, Seller shall send to the holder of each such Preferential Purchase Right a notice reasonably satisfactory to Buyer (i) containing a copy of the Plan and this Agreement, and (ii) to the extent that the Sale Order does not preclude the exercise of such rights, informing such holder that it must submit a notice to Seller such holder's intent to exercise or not exercise its Preferential Purchase Right prior to the date of the hearing regarding the entry of the Sale Order.

(b)     With respect to each Preferential Purchase Right that is not set forth on Schedule 5.8 but is discovered by Seller prior to Closing, Seller shall send to the holder of each such

Preferential Purchase Right a notice reasonably satisfactory to Buyer (A) containing a copy of the Plan and this Agreement, and (B) to the extent that the Sale Order does not preclude the exercise of such rights, informing such holder that it must submit a notice to Seller of such holder's intent to exercise or not exercise its Preferential Purchase Right, as soon as reasonably practicable after discovery of any such Preferential Purchase Right (but in no event later than two Business Days thereafter).  Seller shall promptly provide Buyer with copies of all notices delivered to and received from holders of Preferential Purchase Rights hereunder.  Any Preferential Purchase Right that is not precluded by the Sale Order or determined to be inapplicable to the transactions contemplated by this Agreement by reason of any Order of the Bankruptcy Court must be exercised subject to all terms and conditions set forth in this Agreement, and the consideration payable under this Agreement and the Sale Order for the purposes of all Preferential Purchase Right notices shall be the Allocated Value of the applicable Asset.

(c)     If, prior to Closing, any holder of a Preferential Purchase Right notifies Seller that it intends to consummate the acquisition of the Assets to which its Preferential Purchase Right applies or if the time for exercising such Preferential Purchase Right has not expired (and the holder of such right has not waived such right), then, unless the Bankruptcy Court has entered an order providing that such Preferential Purchase Right is not enforceable or is not required to be complied with, in either case, as such Preferential Purchase Right relates to the sale of the affected Assets to Buyer under this Agreement, Buyer shall be responsible for complying with such Preferential Purchase Right, and the affected Asset shall be included in the Assets conveyed to Buyer at Closing.  If the Closing occurs, Buyer shall be entitled to all consideration given by any Person exercising a Preferential Purchase Right, and there shall be no adjustment to the Purchase Price for any exercised (or unexercised Preferential Purchase Rights).

(d)     All Assets for which any applicable Preferential Purchase Right has not been exercised (and the sale and assignment of such affected Asset has been consummated prior to the Closing) shall be sold to Buyer at Closing pursuant to the provisions of this Agreement and Buyer shall be deemed to have assumed any and all Liabilities with respect to such Preferential Purchase Right as part of the Assumed Liabilities hereunder and Buyer shall have no claim against, and hereby releases and indemnifies the Seller Indemnified Parties from any Liability with respect to such Preferential Purchase Right.

2.8     Further Assurances.  The Parties agree to (a) furnish upon request to each other such further information, (b) execute, acknowledge and deliver to each other such other documents and (c) do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction Documents; *provided* that nothing in this Section 2.8 shall prohibit Seller from ceasing operations or winding up its affairs following the Closing.

# ARTICLE 3
# PURCHASE PRICE

3.1     Purchase Price.  The purchase price for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Assets shall consist of (x) the Contingent Consideration (as defined in Exhibit F) if any, payable to the RBL Facility Lenders in accordance with Exhibit F, and (y) the following:

(a)     cash in an amount equal to ~~Sixty-Four Million~~ One Hundred ~~Fifty-Seven Thousand Seventy-Nine~~One Million and No/100 Dollars ($~~64,157,079.00~~101,000,000.00) (the "Purchase Price"); and

(b)     the assumption of the Assumed Liabilities.

3.2     Deposit.  Prior to the execution of this Agreement, Buyer has paid (or shall have caused to be paid) to Citi Private Bank ("Escrow Agent"), pursuant to that certain escrow agreement by and among Seller, Buyer and Escrow Agent (the "Escrow Agreement") into the Escrow Account, a deposit in the amount of ~~Six~~Ten Million ~~Four~~One Hundred ~~Fifteen~~ Thousand ~~Seven Hundred Seven~~ and ~~90~~No/100 Dollars ($~~6,415,707.90~~10,100,000.00) (the "Deposit"), such amount representing ten percent (10%) of the Purchase Price.  At Closing, the Parties shall cause the Escrow Agent to release the Deposit to Seller, and the Deposit shall be credited against the amount required to be paid by Buyer to Seller at Closing.  If this Agreement is terminated by Seller prior to Closing pursuant to Section 11.1(c)(i), then, subject to Section 11.2(b), the Parties shall cause the Escrow Agent to release the Deposit to Seller within two (2) Business Days of such termination, and such amount shall constitute liquidated damages (and not a penalty).  If this Agreement is terminated prior to Closing for any other reason, then the Parties shall cause the Escrow Agent to release the Deposit to Buyer or its designee within two (2) Business Days of such termination.

3.3     Allocation of Purchase Price; Allocated Value.  Buyer and Seller agree that (a) the unadjusted Purchase Price shall be allocated among the Assets as set forth in Schedule 3.3 and (b) the Allocated Values, shall be used by the Parties as the basis for reporting asset values and other items for purposes of this Section 3.3.

3.4     Withholding.  Buyer shall be entitled to deduct and withhold from the consideration otherwise payable to any Person pursuant to this Agreement such amounts as may be required to be deducted and withheld with respect to Taxes under applicable law; provided, however, other than with respect to any withholding as a result of a Seller Party's failure to provide the forms described in Section 4.4(d), Buyer shall provide at least five Business Days' written notice to the Seller Parties if Buyer intends to withhold any amounts under this Section 3.4.  To the extent that amounts are so withheld and paid over to the appropriate taxing authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made by Buyer.  The Parties shall cooperate in good faith to minimize or establish an exemption from, to the extent permissible under applicable Law, any deduction or withholding.

## ARTICLE 4
## CLOSING

4.1     Closing Date.  Upon the terms and subject to the conditions hereof, the closing of the sale of the Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the office of Kirkland & Ellis, LLP, at 609 Main Street, Suite 4500, Houston, Texas 77002 (or at such other location as the Parties may mutually agree), if all conditions to Closing in Article 9 and Article 10 have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), no later than three (3) Business Days following the date on which the conditions set forth in Article 9 and Article 10 have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions); provided, however, that in no event will the Closing occur prior to October 1, 2020 without Buyer's prior written consent.  The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date."

4.2     Payment on the Closing Date.  Subject to satisfaction or (if permissible) waiver of the conditions set forth in Article 9 and Article 10, at the Closing, (a) Buyer shall pay (or cause to be paid) the cash components of the Purchase Price (less the amount of the Deposit) by wire transfer of immediately available funds to an account specified in writing by Seller prior to the Closing Date, and

(b) the Parties shall cause the Escrow Agent to release the Deposit to Seller, in accordance with Section 3.2.

4.3     Buyer's Deliveries.  At the Closing, Buyer shall deliver or cause to be delivered to Seller (or such other Persons where so designated):

(a)     the cash consideration referenced in Section 3.1(a) (less the amount of the Deposit) to Seller in accordance with Section 4.2;

(b)     the appropriate DOI forms (including without limitation, as applicable, Form BOEM-1017, Form BOEM-1019 and Form BOEM-1022) to reflect Buyer as the designated applicant for oil spill financial responsibility purposes for the Leases (or portions thereof) and shall deliver to Seller such other evidence that Buyer is qualified with the applicable Governmental Authorities to succeed Seller as the designated applicant of the Assets for oil spill financial responsibility purposes;

(c)     transfers and assignments, on appropriate forms (including Form BOEM-0150, Form BOEM-0151 and corresponding designation of operator form (Form BOEM-1123), as applicable) and as may be required by any Governmental Authority in order to transfer the Assets from Seller to Buyer pursuant to the terms of this Agreement;

(d)     all instruments necessary to become a party to and assume obligations in the unit operating agreements applicable to the Assets;

(e)     each other Transaction Document to which Buyer is a party, duly executed (and acknowledged, where applicable) by Buyer, including the Assignments, Assignment of OIL Interests, letters-in-lieu of transfer orders, change of operator forms to be prepared by Seller, change of operator notices required under applicable operating agreements, and any other applicable forms and declarations required by federal and state agencies relative to Buyer's assumption of operations and plugging and abandonment Liabilities with respect to all of the Assets;

(f)     the certificates of Buyer to be received by Seller pursuant to Sections 10.1 and 10.3;

(g)     such forms or documents (including evidence of satisfaction of all applicable insurance requirements) as may be required (or otherwise may be reasonably requested by Seller) to demonstrate that Buyer is qualified with the applicable Governmental Authorities and pursuant to any applicable operating agreement to succeed Seller as the owner of the Assets;

(h)     evidence of all Surety Bonds and replacement of (i) the Specified Surety Bonds and (ii) all Seller Credit Obligations (other than the Specified Seller Credit Obligations) required to obtained by Buyer pursuant to this Agreement or written evidence that Buyer is not required to obtain such Surety Bond or replacements for such Seller Credit Obligations;

(i)     the Memorandum (in sufficient counterparts to facilitate recording in the necessary recording offices), duly-executed and acknowledged by Buyer; and

(j)     such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Assumed Liabilities to Buyer.

4.4     Seller's Deliveries.  At the Closing, Seller shall deliver to Buyer:

(a)     (i) the Assignments and each other Transaction Document to which Seller is a party (including letters-in-lieu of transfer orders and change of operator forms), and (ii) the

Assignment of OIL Interests, in each case, duly executed (and acknowledged, where applicable) by Seller and Oil Insurance Limited, as applicable;

(b)      a certified copy (which may be in .pdf format) of the Sale Order;

(c)      the certificates of Seller to be received by Buyer pursuant to <u>Sections 9.1</u> and <u>9.2</u>;

(d)      a non-foreign affidavit from each Seller Party dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Code §1445, stating that such Seller Party (or its regarded owner, if such Seller Party is disregarded as separate from its owner for U.S. federal income tax purposes) is not a "<u>foreign person</u>" for purposes of Sections 1445 and, if applicable, 1446(f) of the Code;

(e)      transfers and assignments, on appropriate forms (including Form BOEM-0150, Form BOEM-0151 and corresponding designation of operator form (Form BOEM-1123), as applicable) and as may be required by any Governmental Authority in order to transfer the Assets from Seller to Buyer <u>and designate Buyer as the operator thereof</u> pursuant to the terms of this Agreement;

(f)      the Memorandum (in sufficient counterparts to facilitate recording in the necessary recording offices), duly-executed and acknowledged by the RBL Facility Agent;

(g)      duly-executed, recordable releases (in sufficient counterparts to facilitate recording in the applicable counties where the Assets are located) in form reasonably acceptable to Buyer of any mortgages or security interest covering the Assets, in each case, securing indebtedness for borrowed money of Seller or their respective Affiliates; *provided*, *however*, in lieu of such releases, Seller may deliver certified copies of the Sale Order to satisfy this obligation;

(h)      consents, notices, transfers or other documentation required by the financial institutions with respect to the bank accounts of any Seller Party, in each case, in order to (i) transfer the bank accounts of such Seller Party to Buyer pursuant to the terms of this Agreement; and (ii) cancel and/or terminate any Seller Representative's authority, access and/or control with respect to such account; and

(i)      such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Seller in, to or under any or all the Assets or to evidence that Seller retains the Excluded Liabilities.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLER

Each Seller Party represents and warrants to Buyer, as of the Execution Date and the Closing Date, the following:

5.1      <u>Organization and Good Standing</u>. Such Seller Party is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Such Seller Party has the requisite corporate power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted. Such Seller Party is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

5.2     Authority; Validity; Governmental Authority Consents.   Such Seller Party has, subject to requisite Bankruptcy Court approval, the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which such Seller Party is a party and to consummate the transactions contemplated hereby and thereby, and, subject to requisite Bankruptcy Court approval, the execution, delivery and performance of this Agreement and such other Transaction Documents by such Seller Party and the consummation by such Seller Party of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate action.   This Agreement has been duly and validly executed and delivered by such Seller Party and each other Transaction Document required to be executed and delivered by such Seller Party at the Closing will be duly and validly executed and delivered by such Seller Party at the Closing.   Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents constitute, with respect to Seller, the legal, valid and binding obligations of such Seller Party, enforceable against such Seller Party in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Legal Requirements affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such principles are considered in a proceeding at law or in equity.   Subject to requisite Bankruptcy Court approval, except for (a) entry of the Sale Order, (b) notices, filings and consents required in connection with the Bankruptcy Case, (c) any applicable notices, filing, consents or approvals under any applicable antitrust, competition or trade regulation Legal Requirements and (d) any notices, filings and consents customarily obtained post-Closing, such Seller Party is not required to give any notice to, make any filing with or obtain any consent from any Governmental Authority in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.3     No Conflict.   Except as set forth on Schedule 5.3, and assuming the receipt of all consents (including any Hard Consent) and the waiver of all Preferential Purchase Rights (in each case) applicable to the transactions contemplated hereby, execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of such Seller Party under (a) any agreement, indenture, or other instrument to which such Seller Party is bound, (b) the certificate of incorporation, bylaws or other governing documents of such Seller Party, (c) any Order or (d) any Legal Requirement, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.4     Permits.   To Seller's Knowledge, as of the Execution Date, (a) Seller has not received written notice of default under any Permit and (b) no violations exist in respect of such Permits, except for such non-compliance and such facts, conditions or circumstances, the existence of which would not constitute a Material Adverse Effect.

5.5     Legal Proceedings.   Except for the Bankruptcy Case and any adversary proceedings or contested motions commenced in connection therewith, there is no Proceeding or Order pending, outstanding or, to Seller's Knowledge, threatened against Seller that seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.6     Brokers or Finders.   Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar

payments in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable, except to the extent that such fees, commissions and other similar payments constitute Assumed Liabilities.

5.7     Approved Work Programs and Budgets.  Complete and correct copies of the work programs and budgets that have been approved by Seller, or deemed to have been approved, under and in accordance with the Assigned Leases and Interests or Assigned Contracts, have been provided to Buyer for review at or prior to Buyer's execution of this Agreement.

5.8     Consents and Preferential Purchase Rights.  Except as set forth on Schedule 5.8, none of the Assets is subject to any (i) Preferential Purchase Rights or (ii) any consent to assignment, in each case, applicable to the transactions contemplated hereby (other than governmental consents or approvals customarily obtained post-Closing).

5.9     Material Assigned Contracts.

(a)     Except as set forth on Schedule 5.9(a), Seller, in any material respect, is not in breach of, or default under the terms of, and, to the knowledge of Seller, no other party to any Material Assigned Contract is, in any material respect, in breach of, or default under the terms of, any Material Assigned Contract, and to the knowledge of Seller, no event or omission has occurred that would constitute such a breach or default (whether by lapse of time or notice or both) under any Material Assigned Contract.

(b)     Schedule 5.9(b) sets forth a correct and complete list *(provided, however, that such list shall be deemed correct and complete as long as the Assigned Contracts applicable to any of items (i)-(x) below are listed on the Schedule)*, as of the Execution Date, of the following Assigned Contracts that are included in the Assets and binding on the assigned Hydrocarbons, to the extent following the Closing same would be binding on the Assets, or any portion thereof, or on Seller (collectively, the "Material Assigned Contracts"):  (i) any Assigned Contract involving payments individually or in the aggregate in excess of Five Million Dollars ($5,000,000.00) net to Seller's interest, or that constitutes a lease under which Seller or any Affiliate of Seller is the lessor or the lessee of any real or personal property which is to be included in the sale of the Assets hereunder (including equipment and real property, but not including any of the Assigned Leases and Interests or Wells) which lease (A) is not cancelable without material penalty on less than ninety (90) days' prior written notice and (B) involves an annual base rental of more than Two Million Dollars ($2,000,000.00); (ii) any Assigned Contract for the sale, transportation, exchange, or other disposition of Hydrocarbons produced from or attributable to Seller's interest in the Assets that is (1) not cancelable without penalty on less than ninety (90) days' prior written notice (2) and that contains a call upon or options to purchase or any dedication or delivery commitment of production; (iii) any material Assigned Contract (executory or otherwise) to sell, lease, farmout, or otherwise dispose of any interest in the Assets after the Effective Time, other than conventional rights of reassignment arising in connection with Seller's surrender or release of any of the Assets; (iv) joint operating agreements, unit operating agreements, area of mutual interest agreements, farmout agreements, joint venture agreements, development agreements, participation agreements, partnership agreements or similar Assigned Contract (other than tax partnership agreements) that will remain in effect following the Closing; (v) any Debt Contract; (vi) any Assigned Contract that provides for a power of attorney with respect to the Assets that will not be terminated prior to the Closing Date; (vii) any purchase and sale agreements to which Seller or its Affiliates (directly or indirectly) acquired the Assets that contain indemnity obligations that will be binding on Buyer following Closing; (viii) any Assigned Contract that includes non-competition restrictions, non-solicitation or no-hire obligations binding on Buyer or the Assets after Closing or any settlement agreements pursuant to which obligations remain in the amount of more than One Million Dollars ($1,000,000.00) or that contain behavior commitments or restrictions that must continue to be

performed after Closing; (ix) any Assigned Contract with any Affiliate of Seller; and (x) any Assigned Contract, the primary purpose of which is to provide indemnity rights or indemnity obligations.

(c)      Each Material Assigned Contract is valid and binding on Seller, and, to the knowledge of Seller, each other party thereto, and is in full force and effect in accordance with its terms, except for terminations or expirations at the end of the stated term.  Further, except as disclosed on <u>Schedule 5.9(c)</u>, Seller has disclosed correct and complete copies of the Material Assigned Contracts (including any and all amendments and supplements thereto and written waivers thereof) to Buyer.

5.10    <u>Outstanding Capital Commitments; Non-Consent Operations</u>.   As of the Execution Date, except as set forth on <u>Schedule 5.10</u>, there is no individual outstanding authority for expenditure which is binding on the Assets, the value of which Seller reasonably anticipates exceeds One Million Dollars ($1,000,000.00) chargeable to Seller's interest participating in the operation covered by such authority for expenditure after the Effective Time.   Seller has not declined to participate in any operation or activity proposed by a third party operator with respect to the Assets that has resulted or could result in Seller's interest in any Assets becoming subject to a penalty or forfeiture as a result of such election not to participate in such operation or activity.

5.11    <u>Taxes</u>.   All Tax Returns required to be filed by any Seller Party with respect to Asset Taxes have been timely filed and each such Tax Return is true, correct and complete in all material respects.   All Asset Taxes that are required to be paid by any Seller Party that are or have become due and payable have been timely paid.   No Tax audits or administrative or judicial proceedings are being conducted, are presently pending or have been threatened in writing against any Seller Party, in each case, with respect to Asset Taxes.   There are no Encumbrances on any of the Assets attributable to Taxes other than statutory liens for Taxes that are not yet due and payable.   No Seller Party or any its Affiliates has received written notice of any pending claim with respect to Asset Taxes, and there is no assessment, deficiency, or adjustment (in each case which remains unresolved) that has been asserted in writing, proposed in writing or, to the Knowledge of each Seller Party, threatened in writing with respect to such Asset Taxes.   No Asset is subject to any tax partnership agreement or provisions requiring a partnership income Tax Return to be filed under subchapter K of the Code. With respect to any Seller Party that is acquired by Buyer pursuant to <u>Section 8.9(b)</u>, (a) all income and other material Tax Returns required to be filed by such Seller Party have been timely filed and each such Tax Return is true, correct and complete in all material respects; (b) all income and other material Taxes that are required to be paid by such Seller Party that are or have become due and payable have been timely paid; (c) such Seller Party has withheld and timely paid all material Taxes required to have been withheld and paid by it and all such payments have been properly reported to Governmental Authorities in accordance with applicable Law; (d) there is not in force any extension of time with respect to the due date for the filing of any Tax Return of or with respect to such Seller Party (other than any extension entered into in the ordinary course of business) or any waiver or agreement for any extension of time for the assessment or payment of any Tax of or with respect to such Seller Party and no request for any such extension or waiver is currently pending; (e) no Tax audits or administrative or judicial proceedings are being conducted, are presently pending or have been threatened in writing against such Seller Party; (f) such Seller Party has not received written notice of any pending claim with respect to Taxes, and there is no assessment, deficiency, or adjustment (in each case which remains unresolved) that has been asserted in writing, proposed in writing or, to the Knowledge of such Seller Party, threatened in writing with respect to such Taxes, and (g) such Seller Party is, and at all times since formation has been, properly treated as a partnership or disregarded entity for U.S. federal and applicable state income Tax purposes.   Notwithstanding any other provision

in this Agreement, the representations and warranties in this <u>Section 5.11</u> are the only representations and warranties of Seller in this Agreement with respect to Tax matters.

5.12    <u>Cure Costs</u>.  <u>Schedule 5.12</u>, which shall be completed ten (10) Business Days prior to the Bankruptcy Court hearing to approve the Sale Order, sets forth Seller's good faith estimate of Cure Costs with respect to all Assigned Contracts and Assigned Leases and Interests, as of such date.

5.13    <u>Imbalances</u>.  To the Knowledge of Seller as of the Execution Date, <u>Schedule 5.13</u> sets forth all Imbalances associated with the Assets as of the Effective Time.

5.14    <u>Insurance</u>.  To the Knowledge of Seller, (a) <u>Schedule 5.14</u> sets forth a list of all insurance policies maintained by or for the benefit (in each case, directly or indirectly) of Seller or its Affiliates with respect to the Assets, (b) all premiums due on such insurance policies have either been paid or, if not yet due, accrued, (c) all such insurance policies are in full force and effect and enforceable in accordance with their terms and (d) Seller and its Affiliates are not in default under, and has not otherwise failed to comply with, any material provision contained in any such insurance policy.

5.15    <u>Surety Bonds and Credit Support</u>.  <u>Schedule 5.15</u> sets forth a true and complete list of all Surety Bonds and Seller Credit Obligations currently maintained, posted or otherwise provided by or on behalf of Seller or any of its Affiliates with respect to the Assets (including with respect to the ownership, operation, development or use thereof) or the Assumed Liabilities (collectively, the "<u>Credit Support</u>").  True and complete copies of all such Credit Support have been made available to Buyer prior to the Execution Date.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller, as of the Execution Date and the Closing Date, as follows:

6.1    <u>Organization and Good Standing</u>.  Buyer is a ~~limited liability company~~corporation, duly organized, validly existing and in good standing under the laws of the State of ~~Delaware~~Texas.  Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.  Buyer is duly qualified or licensed to do business in the State(s) where the Assets are located.

6.2    <u>Authority; Validity; Consents</u>.  Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof.  This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing.  This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Legal Requirements affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such principles are considered in a proceeding at law or in equity.  Buyer is not or will not be required to give any notice to, make any filing with, or obtain any consent or approval from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to

which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, filings, consents and approvals, the failure of which to provide, make or obtain, would not, individually or in the aggregate, have a material adverse effect on Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.3     No Conflict.  When the consents and other actions described in Section 6.2 have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture or other instrument to which it is bound, (b) the description of organization documents of Buyer, as applicable, (c) any Order or (d) any Legal Requirement.

6.4     Availability of Funds.  Pursuant to the Financing, Buyer has access to sufficient cash in immediately available funds to pay the Purchase Price, all costs, fees and expenses to be paid by Buyer that are necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, and assume the Assumed Liabilities.  Buyer's ability to consummate the transaction contemplated hereby is not contingent upon its ability to secure financing or to complete any public or private placement of securities prior to or upon Closing.

6.5     Litigation.  There are no Proceedings or Orders pending or, to the Knowledge of Buyer, threatened against Buyer, that seek to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that would, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.6     Bankruptcy.  There are no bankruptcy, reorganization or arrangement proceedings pending, being contemplated by, or to the Knowledge of Buyer, threatened against Buyer or any of its Affiliates.

6.7     Brokers or Finders.  Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable.

6.8     Relationships[Reserved].  As of the Closing Date, those Persons listed on Schedule 6.8, (a) have not directly contributed more than fifty percent (50%) of the capital of Buyer and (b) are not entitled to directly participate in more than fifty percent (50%) of the profits of Buyer until the other members of Buyer that contributed capital on the Closing Date have received aggregate distributions from Buyer equal to the amount of capital contributed by such other members plus a return.

.

6.9     Knowledge and Experience.  Buyer (a) is engaged in the business of exploring for and producing Hydrocarbons as an ongoing business and (b) is purchasing the Assets for its own account for investment purposes and not with the intent to resell the Assets in violation of any federal or state securities laws.  Buyer is an experienced and knowledgeable investor in oil and gas properties, is knowledgeable with respect to the tax ramifications associated therewith and herewith, has the financial and business expertise to fully evaluate the merits and risks of the transaction covered by this Agreement and has relied solely upon the basis of its own independent investigation of the Assets for all

purposes (including the geologic and geophysical characteristics of the Assets, the estimated Hydrocarbon reserves recoverable therefrom, and the price and expense assumptions applicable thereto). In acquiring the Assets, Buyer is acting in the conduct of its own business and not under any specific contractual commitment to any third party, or any specific nominee agreement with any third party, to transfer to, or to hold title on behalf of, such third party, with respect to all or any part of the Assets. Buyer acknowledges that it has had the opportunity to seek the advice of persons it deemed appropriate concerning the consequences of the provisions of this Agreement and hereby waives any and all rights to claim that it is an unsophisticated investor in oil and gas properties.

6.10    Qualification to Own the Assets. At Closing, Buyer is qualified to own the Assets in all jurisdictions where the Assets are located, and the consummation of the transactions contemplated by this Agreement will not cause Buyer to be disqualified as such an owner. To the extent required by the applicable state, tribal and federal Governmental Authorities, Buyer currently has, and will continue to maintain, lease bonds, area-wide bonds or any other surety bonds or insurance policies as may be required by, and in accordance with, any Governmental Authorities with jurisdiction over the ownership of such Assets or any operating agreement. Buyer acknowledges that (i) Seller is not the operator of the Assets, and (ii) Seller is not transferring, and, except as set forth in Section 9.6, shall not be required to transfer, operatorship of any of the Assets to Buyer pursuant to this Agreement.

## ARTICLE 7
## ACTIONS PRIOR TO THE CLOSING DATE

7.1    Operations Prior to the Closing Date. Seller covenants and agrees that, after the Execution Date and prior to the Closing Date, except (w) as expressly contemplated by this Agreement, (x) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), (y) as otherwise required by Legal Requirements and (z) as required by Order of the Bankruptcy Court or restrictions or limitations under the Bankruptcy Code on chapter 11 debtors:

(a)    Seller shall:

(i)    use commercially reasonable efforts, taking into account Seller's status as debtor in possession, to maintain the Assets or cause such Assets to be operated as a reasonably prudent operator in the ordinary course of business;

(ii)    maintain books, accounts and records relating to the Assets in accordance with past custom and practice;

(iii)    maintain (A) insurance coverage on the Assets in the amounts and types described in Schedule 5.14, and (B) all Permits; and

(iv)    subject to Section **Error! Reference source not found.**, maintain all Credit Support.

(b)    Seller shall not:

(i)    abandon any Asset (except any abandonment of Leases to the extent any such Leases terminate pursuant to their terms);

(ii)    commence, propose, or agree to participate in any single operation with respect to the Wells or Assigned Leases and Interests with an anticipated cost in excess of One Million Dollars ($1,000,000) net to the interest of Seller, except for emergency operations taken in the face of risk to life, injury, property or the environment, operations scheduled under applicable

authorities for expenditures, or operations required by any Governmental Authority (including with respect to Decommissioning Obligations);

(iii)     terminate, cancel, or materially amend or modify any Assigned Contract or Assigned Lease and Interest;

(iv)     sell, lease, encumber, or otherwise dispose of all or any portion of any Assets, except sales of Hydrocarbons in the ordinary course of business, or as otherwise contemplated in this Agreement;

(v)     enter into any contract or agreement that if entered into on or prior to the Execution Date, would be required to be listed on Schedule 5.9;

(vi)     settle or compromise any material suit or litigation or waive any material claims;

(vii)     terminate, cancel, or materially amend or modify any license or agreement relating to seismic, geological, geochemical or geophysical data;

(viii)     (A) other than in accordance with the agreed budget attached to the Cash Collateral Order or the Restructuring Support Agreement, declare, set aside or pay any dividends on, or make any other distributions (whether in cash, stock or property or any combination thereof) in respect of any equity interests, debt securities or other instruments (or options, warrants or other rights to acquire equity interests, debt securities or other instruments) of any Seller Party or any RBL Facility Claim or Term Loan Claim, (B) purchase, redeem or otherwise acquire, or offer to purchase, redeem or otherwise acquire, any equity interests, debt securities or other instruments (or options, warrants or other rights to acquire equity interests, debt securities or other instruments) of any Seller Party, or (C) make a prepayment under any debt securities or other instruments to which any Seller Party is a party or subject; or

(ix)     enter into any agreement or commitment to take any action prohibited by this Section 7.1(b).

7.2     Reasonable Best Efforts.

(a)     Seller, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using reasonable best efforts to accomplish the following:  (i) the taking of all reasonable acts necessary to cause the conditions precedent set forth in Article 9 and Article 10 to be satisfied, (ii) the obtaining, at the earliest practicable date, of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, and (iii) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.  Buyer shall, as soon as reasonably practicable after the Closing Date, deliver to the applicable operator of each Property a copy of the recorded Assignment(s) evidencing the conveyance of Seller's interest in such Property to Buyer, as well as any other documentation reasonably requested by such operator to evidence such conveyance.

(b)     Seller, on the one hand, and Buyer, on the other hand, (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the

transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto. In addition, neither of the Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Party in advance and, to the extent permitted by any such Governmental Authority, gives the other Party the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable Legal Requirements, each of Buyer, on the one hand, and Seller, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and its respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting non-disclosure agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

(c)     Subject to the terms and conditions of this Agreement, Buyer shall take any and all steps necessary to avoid or eliminate any impediments under any applicable antitrust, competition or trade regulation laws that may be asserted by any Governmental Authority with respect to the transactions contemplated hereby so as to enable the Closing to occur as soon as reasonably possible, including proposing, negotiating, committing to and effecting, by consent decree or otherwise, the sale, divestiture or disposition of such assets or businesses of Buyer or any of its Subsidiaries as may be required in order to avoid the entry, or to effect the dissolution, of any injunction, temporary restraining order or other order in any suit or proceeding, which would otherwise have the effect of preventing, delaying or restricting the consummation of the transactions contemplated in this Agreement.

7.3     Bankruptcy Court Approval.

(a)     Seller and Buyer acknowledge that this Agreement and the sale of the Assets and the assumption and assignment of the Assigned Contracts and Assigned Leases and Interests are subject to Bankruptcy Court approval. Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Assets, and that such demonstration shall include giving notice of the transaction contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and (ii) Buyer must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to each Assigned Contract and Assigned Lease and Interest.

(b)     As soon as reasonably practicable following the date of this Agreement and the commencement of the Bankruptcy Cases, Seller shall, subject to the Restructuring Support Agreement, seek entry of the Sale Order by the Bankruptcy Court in accordance with the terms and conditions of this Agreement and the Restructuring Support Agreement. Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assigned Contracts and to determine the amount of the Cure Costs. Seller agrees that all pleadings and other materials relating to this Agreement, the transactions contemplated hereunder, the Assets, Buyer or its Affiliates, the Sale Order or the Plan shall be provided to Buyer no later than three (3) Business Days prior to filing or otherwise

as soon as reasonably practicable prior to being filed with the Bankruptcy Court and shall be reasonably acceptable to Buyer to the extent provided in the Restructuring Support Agreement.

(c)     Subject to ~~Section 13.03(c) of the Restructuring Support Agreement~~Seller's fiduciary duties, from and after the Execution Date and prior to the Closing or the termination of this Agreement in accordance with Section 11.1, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the termination, reversal, voiding, modification or staying of the ~~Restructuring Support Agreement, the~~ Sale Order or this Agreement.  In the event an appeal is taken from (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or reargument shall be filed with respect to) the Sale Order, Seller shall (i) promptly notify Buyer of such appeal, petition or motion, and promptly provide Buyer with a copy of the related notice thereof, and with written notice of any motion or application filed in connection with any of the foregoing and (ii) use commercially reasonable efforts to defend such appeal, petition or motion.  Seller shall waive its rights to appeal (or file any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or reargument) with respect to the Sale Order, and such waiver shall be explicitly set forth in the Sale Order.

7.4     Updates and Amendments of Exhibits.

(a)     Until Closing and subject to Section 7.1, Seller shall have the right to amend, modify and/or supplement Exhibit A and Exhibit C, in each case, as applicable, in order to reflect any new Contracts or Leases taken by Seller.

(b)     Prior to Closing, Seller has the right to supplement, correct or amend its Schedules relating to the representations and warranties set forth in Article 5 with respect to any matters first occurring subsequent to the Execution Date ("Seller's Supplemented Schedules"); *provided* that any disclosure in a Seller's Supplemented Schedule shall not be deemed to have been included in Seller's representations and warranties for any purpose under this Agreement. Notwithstanding the foregoing, in the event that Closing occurs, then such Seller's Supplemented Schedules shall be deemed to have been included in Seller's representations and warranties for all purposes of this Agreement and Buyer shall be deemed to have waived the matters relating to such schedules in regard to Buyer's obligation to close this transaction pursuant to Section 11.1(b)(i).

7.5     Commitment Letters.  Prior to the execution of this Agreement, Buyer has delivered to Seller true and complete, fully-executed copies of the ~~equity~~debt commitment letters by and between Buyer and ~~Lime Rock~~Toronto Dominion (Texas) LLC and including all exhibits, schedules, annexes and amendments to such agreements in effect as of such date of delivery (the "Commitment Letters"), pursuant to which and subject to the terms and conditions thereof each of the parties thereto (other than Buyer), has severally agreed and committed to provide to Buyer the ~~equity~~debt financing set forth therein ("Financing").  As of the Closing Date, the Commitment Letters shall have not been amended, restated or otherwise modified or waived subsequent to the date of delivery to Seller and the respective commitments contained in the Commitment Letters shall have not been withdrawn, modified or rescinded in any respect.  There shall be no conditions precedent to the funding of the full amount of the Financing, other than as expressly set forth in the Commitment Letters.  There shall be no other agreements, side letters or arrangements that would permit the parties to the Commitment Letters to reduce the amount of the Financing or that would otherwise affect the availability of the Financing.  The Commitment Letters provide Buyer with binding financial commitments that, when funded at Closing, will provide it with sufficient funds to pay the Purchase Price and to pay any other amounts required to be paid by it in connection with the consummation of the transactions contemplated by this Agreement.  On or before the Closing Date, Buyer shall use

commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and obtain the Financing on the terms and conditions described in the Commitment Letter. Buyer acknowledges and agrees that the consummation of, and receipt of proceeds from, any Financing is not a condition to Buyer's obligations hereunder.

7.6     BOEM Qualifications.  Prior to Closing, and only to the extent that any such qualification is required by applicable laws to own the Assets, Buyer shall (i) become qualified with the BOEM to hold oil and gas leases, rights-of-way, and rights-of-use and easements on the U.S. Outer Continental Shelf under 30 CFR 550 and 30 CFR 556.35 and to meet any other requirements under Legal Requirement to receive and hold such assets and properties, (ii) become qualified with each applicable Governmental Authority to hold all state oil and gas leases, state rights-of-way and state right-of-use easements included in the Assets, and (iii) provide Seller evidence of such qualification, including copies of all filings and correspondence submitted to or received from the BOEM, BSEE (in either case, if any) and such other Governmental Authorities to obtain such registration and qualification, including all applicable BOEM approval letters and issuance of Company Number for Buyer.

7.7     Credit Support.

(a)     Buyer acknowledges that none of the bonds, letters of credit and guarantees posted by Seller or its Affiliates with Governmental Authorities relating to the Assets (collectively, the "Surety Bonds") or Seller Credit Obligations will be transferred to Buyer.  Without limiting the provisions of Section 8.4(a), Buyer further acknowledges that Seller has no duty to maintain any bonds, letters of credit, guarantees, cash deposits and insurance to secure performance or payment under any Assigned Contracts or Assigned Leases and Interests (collectively, "Seller Credit Obligations") after the Closing.

(b)     As of the Execution Date, Buyer has provided Seller (i) subject to Section 7.7(b)(ii), evidence of binding commitments to obtain bonds, letters of credit and guarantees necessary to substitute or otherwise effectively replace the Surety Bonds and substantially all of the Seller Credit Obligations as required pursuant to Section 7.7(c) and applicable law, to be effective as of Closing, except for those Surety Bonds or Seller Credit Obligations that cannot be obtained until BOEM approves assignment of the Assets (to the extent any such approval is necessary), as further provided in Section 7.7(c), and (ii) evidence in the form of surety bond riders that substitute Buyer, or an Affiliate of Buyer, as named principal, with respect to those certain Seller Credit Obligations for which the obligee(s) (and, if applicable, co-obligee(s)) applicable thereto must consent in writing to such substitution of the named principal under such Seller Credit Obligation, which are set forth and described on Schedule 7.7(b) (collectively, the "Specified Seller Credit Obligations").

(c)     In addition, on or before the Closing Date, or, with respect to those Surety Bonds that cannot be obtained until the assignment of the Assets has been approved by the BOEM (to the extent any such approval is necessary) or the Specified Seller Credit Obligations, as soon after the Closing Date as possible, Buyer shall (i) use commercially reasonable efforts to obtain, or cause to be obtained in the name of Buyer and effective as of the Closing Date, replacements for such Surety Bonds (in each case, as may be required by applicable laws) and replacements (or an equivalent thereto) for such Specified Seller Credit Obligations and take any other actions required by any Governmental Authority or reasonably requested by any other third party to the extent such replacements or actions are necessary (A) for Buyer's ownership of the Assets and (B) to permit the cancellation of the Surety Bonds and, if applicable, substitution of Buyer, or an Affiliate of Buyer, as named principal therein, with respect to the Specified Seller Credit Obligations posted by Seller and/or its Affiliates with respect to the Assets; (ii) reasonably cooperate with Seller in Seller's efforts to cause

Seller's obligations arising under all Credit Support (other than the Specified Seller Credit Obligations) posted by Seller and/or its Affiliates with respect to the Assets to be cancelled on or before the Closing; and (iii) satisfy any requirements and obligations of any Governmental Authority or pursuant to contracts with respect to any Decommissioning Obligations related to any of the Assets. In addition, at or prior to Closing, or, with respect to those Surety Bonds that cannot be obtained until the assignment of the Assets has been approved by the BOEM (to the extent any such approval is necessary), as soon after the Closing Date as possible, Buyer shall deliver to Seller evidence of the posting of bonds or other security with all applicable Governmental Authorities meeting the requirements of such authorities to own the Assets. If any Seller Credit Obligation (including any Specified Seller Credit Obligation) remains outstanding as of the Closing Date, Buyer shall indemnify each member of the Seller Group and hold them harmless against any Liabilities that the Seller Group may incur under any such Seller Credit Obligations (including any Specified Seller Credit Obligation) to the extent attributable to the period from and after the Effective Time and not attributable to any acts or omissions of any member of the Seller Group that are inconsistent with any Seller Party's obligations under this Agreement.

### 7.8    Access to the Properties.

(a)    Buyer or its Affiliates may propose to visit or access the Assets or the premises of Seller for the purpose of transition planning and coordination, or production operations review after the Execution Date and prior to Closing. Buyer shall provide to Seller at least forty-eight hours written notice prior to the date of the visit, setting forth the purpose for the visit, the proposed visitation date(s), the names of Buyer's personnel who will be visiting, and a designated Buyer's Representative, with Buyer supervisory responsibility for the visit, with accompanying contact information including name, title, electronic mail address, and office and cell phone number. Buyer's notice may be submitted by electronic mail but must be followed up with a confirming phone call to Seller's contact representative. Seller will provide, or will cause Arena Offshore, LP to provide, Buyer, and its representatives, with access to the Assets which Arena Offshore, LP operates subject to the prior execution by such parties of Seller's and Arena Offshore, LP's standard access or boarding agreement and shall use commercially reasonable efforts to arrange for Buyer's, and its agent's, access to the Assets not operated by Arena Offshore LP.

(b)    Buyer's or its Representative's access must be conducted in such a manner as not to interfere with the operation of the Assets. Buyer shall abide by Seller's, Arena Offshore, LP's, and any third party operator's safety rules, regulations, search and seizure policies, and operating policies during Buyer or its Representative's access, and any Buyer or its Representatives' access must at Buyer's sole cost and expense. Buyer's review of the Assets shall not include any operation of equipment, sampling, testing, monitoring or any invasive environmental review or investigation commonly referred to as a Phase II without the prior written consent of Seller, which consent may be withheld by Seller in its sole discretion.

(c)    Buyer, on behalf of itself and the Buyer's Representatives, hereby releases and agrees to indemnify, defend and hold harmless Seller Group, Arena Offshore, LP and the other owners of interests in the Assets from and against any and all Liabilities, losses, costs and expenses (including court costs, expert fees and reasonable attorneys' and engineers' fees) arising out of or relating to any and all access to the Assets and the Records (and other related information) by Buyer and its Representatives, and any related activities by Buyer or its Representatives, **EVEN IF CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY INDEMNIFIED PERSON EXCLUDING, HOWEVER, ANY CLAIMS,**

LIABILITIES, LOSSES, COSTS OR EXPENSES CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY INDEMNIFIED PERSON.

(d)     Any Seller, in its sole discretion, has the right to suspend or terminate any Buyer or Buyer's Representatives access at any time for any violation of this Section 7.8 or any action or omission by Buyer personnel that such Seller determines, in its sole discretion, may create a risk of harm, damage or Liability of any type.

7.9     Employee Matters.  With respect to employee matters, the Parties agree to the provisions set forth in Exhibit G.

## ARTICLE 8
## ADDITIONAL AGREEMENTS

8.1     Taxes.

(a)     Any transfer, documentary, sales, use, stamp, registration and other similar Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the transfer of the Assets to Buyer pursuant to this Agreement and not exempted under the Sale Order, by Section 1146(a) of the Bankruptcy Code or applicable state or municipal law ("Transfer Taxes") shall be borne by Buyer.  Buyer will, at its own expense, file all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and, if required by applicable law, the Parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.  Seller and Buyer will cooperate in good faith to minimize, to the extent permissible under applicable law, the amount of any such Transfer Taxes.

(b)     Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax; *provided*, *however*, that neither Buyer nor Seller shall be required to disclose the contents of its income Tax Returns to any Person.  Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(b) shall be borne by the Party requesting it.

8.2     Allocation of Purchase Price.  Buyer and Seller shall use commercially reasonable efforts to agree to an allocation of the Purchase Price (but including Assumed Liabilities only to the extent such liabilities are required to be included for federal income Tax purposes and the fair market value of the Contingent Consideration (as of the Closing Date)) to the extent necessary to allocate the Purchase Price (but including Assumed Liabilities only to the extent such liabilities are required to be included for federal income Tax purposes) among the asset classes listed on Internal Revenue Service Form 8594, which shall be in accordance with Code §1060 and the regulations thereunder (and any similar provision of state, local, or non-U.S. law, as appropriate) by the date that is sixty (60) days after the Closing Date (the "Tax Allocation").  If Seller and Buyer reach an agreement with respect to the Tax Allocation pursuant to the foregoing sentence, Seller and Buyer each agree to report, and to cause their respective Affiliates to report, the federal, state, and local income and other Tax consequences of the transactions contemplated herein, and in particular to report the information required by Code §1060(b), and to jointly prepare Internal Revenue Service Form 8594 (Asset Acquisition Statement under Code §1060) in a manner consistent with the Tax Allocation, as may be revised to take into account subsequent adjustments to the Purchase Price, including any adjustments pursuant to the Agreement to determine the Purchase Price, and shall not take any position for U.S. federal, state or local income tax purposes inconsistent therewith upon examination of any Tax return,

in any refund claim, in any tax litigation, investigation or otherwise, unless required to do so by a "determination" (as defined in Code §1313(a)(1)), or with such other Party's prior consent; *provided*, *however*, that nothing contained herein shall prevent Buyer or Seller from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Tax Allocation, and neither Buyer nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority challenging the Tax Allocation.  If Seller and Buyer do not reach an agreement with respect to the Tax Allocation under this Section 8.2, Seller and Buyer shall be free to file their own asset allocation statements and shall not be subject to the reporting requirements of this Section 8.2.  Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 8.2 shall survive the Closing without limitation.

        8.3    Bulk Sales.  Buyer and Seller hereby waive compliance with all "bulk sales," "bulk transfer" and similar laws that may otherwise be applicable with respect to the sale and transfer of any or all of the Assets to Buyer.

        8.4    Assigned Contracts and Assigned Leases and Interests; Adequate Assurance and Performance.

        (a)    With respect to each Assigned Contract and Assigned Lease and Interest, Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of each such Assigned Contract or Assigned Lease and Interest.  Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts and the Assigned Leases and Interests, such as furnishing timely requested and factually accurate affidavits and other documents or information for filing with the Bankruptcy Court and making Buyer's and Seller's employees and Representatives available to testify before the Bankruptcy Court.  Notwithstanding the foregoing, Seller shall have no obligation under this Agreement (including, for the avoidance of doubt, pursuant to Section 7.2 or this Section 8.4(a)) to provide any assistance with respect to the preparation of any financial information.

        (b)    From and after Closing, Buyer shall pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

        8.5    Post-Closing Books and Records and Personnel.  For three (3) years after the Closing Date (or such longer period as may be required by any Governmental Authority or ongoing claim), (a) Buyer shall not dispose of or destroy any of the Records received by Buyer as Assets and (b) Buyer shall allow Seller (including, for clarity, any trust established under the Plan or any other successors of Seller) and any of its directors, officers, employees, counsel, representatives, accountants and auditors reasonable access during normal business hours, at Seller's sole expense and upon reasonable advance notice, to all employees and files of Buyer and its respective Subsidiaries and any Records included in the Assets for purposes relating to the Bankruptcy Case, the wind-down of the operations of Seller, the functions of any such trusts or successors, or other reasonable business purposes, and Seller (including any such trust or successors) and such directors, officers, employees, counsel, representatives, accountants and auditors shall have the right to make copies of any such files, books, records and other materials.  Until the closing of the Bankruptcy Case or the liquidation and winding up of Seller's estate, Seller shall preserve and keep the Records and, at Buyer's sole expense, shall make such Records, records, and Seller's personnel available to Buyer as may be reasonably required by Buyer in connection with, among other things, any insurance claims by, Proceedings, Actions or Tax audits against, or governmental investigations of, Buyer or any of its Affiliates or in order to enable Buyer to comply with its obligations under this Agreement and each other Transaction Document.  In the event any Party desires to destroy any such Records during or after the time during

which they must be maintained pursuant to this Section 8.5, such Party shall first give ninety (90) days prior written notice to the other Party and such other Party shall have the right at their option and expense, upon prior written notice given within such ninety (90) day period to the Party desiring to destroy such Records or records, to take possession of the Records within one hundred and eighty (180) days after the date of such notice, or such shorter period as the liquidation and winding up of Seller's estate shall permit.

### 8.6    No Other Representations or Warranties; Disclaimers; NORM.

(a)    Notwithstanding anything to the contrary contained in this Agreement, except as and to the extent expressly set forth in this Agreement, the certificate delivered by Seller pursuant to Section 4.4(c), the Assignments, and in the Transaction Documents, Seller makes no representations or warranties whatsoever, and disclaims all liability and responsibility for any representation, warranty, statement or information made or communicated (orally or in writing) to Buyer (including any opinion, information, or advice that may have been provided to Buyer by any respective Affiliate or Representative of Seller or by any investment bank or investment banking firm, any petroleum engineer or engineering firm, Seller's counsel, or any other agent, consultant, or Representative of Seller). Except as and to the extent expressly set forth in this Agreement, the certificate delivered by Seller pursuant to Section 4.4(c), the Assignments, and in the Transaction Documents, Seller further makes no representation, covenant or warranty, express or implied, as to the accuracy or completeness of any files, records or data heretofore or hereafter furnished in connection with the Assets, or as to the quality or quantity of Hydrocarbon reserves (if any) attributable to the Assets, or the ability of the Assets to produce Hydrocarbons.   Any and all such files, records and data furnished by Seller is provided as a convenience, and any reliance on or use of the same shall be at Buyer's sole risk. Without limiting the generality of the foregoing, except as and to the extent expressly set forth in Article 5, the certificate delivered by Seller pursuant to Section 4.4(c), the Assignments, and the Transaction Documents, Seller expressly disclaims and negates any representation or warranty, express, implied, at common law, by statute, or otherwise, relating to (a) the title to any of the Assets, (b) the condition of the Assets (including any implied or express warranty of merchantability, fitness for a particular purpose, or conformity to models or samples of materials), it being distinctly understood that the Assets are being sold "As Is," "Where Is," and "With All Faults As To All Matters," (c) freedom from hidden or redhibitory defects or vices (d) any infringement by Seller of any patent or proprietary right of any third party, (e) any information, data, or other materials (written or oral) furnished to Buyer by or on behalf of Seller (including without limitation, in respect of any seismic data, the existence or extent of Hydrocarbons or the mineral reserves, the recoverability of such reserves, any product pricing assumptions, and the ability to sell Hydrocarbon production after the Closing), and (f) the environmental condition and other condition of the Assets and any potential liability arising from or related to the Assets.

(b)    Waiver of consumer and other rights:  Buyer waives its rights under the Texas Deceptive Trade Practices-Consumer Protection Act, specifically including section 17.41 et seq., Vernon's Texas Code Annotated, Business and Commerce, a law that gives consumers special rights and protections, or any similar state or federal law.  After an opportunity to consult with an attorney of its own selection, Buyer acknowledges that the disclaimers and waivers given in and under this Agreement shall be considered material and integral parts of this Agreement, with consideration given therefor, and acknowledges that all disclaimers and waivers are "conspicuous" and, have been brought to the attention of Buyer, and that Buyer has voluntarily and knowingly consented to all disclaimers and waivers.

(c)    Buyer acknowledges and affirms that it has made its own independent investigation, analysis, and evaluation of the transactions contemplated hereby and the Assets

(including Buyer's own estimate and appraisal of the extent and value of Seller's Hydrocarbon reserves attributable to the Assets and an independent assessment and appraisal of the environmental risks associated with the acquisition of the Assets). Buyer acknowledges that in entering into this Agreement, it has relied on the aforementioned investigation and the terms and conditions of this Agreement. Buyer hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim, or commencing, instituting, or causing to be commenced, any Proceeding of any kind against Seller or its Affiliates or Subsidiaries, alleging facts contrary to the foregoing acknowledgment and affirmation.

(d) **BUYER ACKNOWLEDGES THAT THE ASSETS HAVE BEEN USED FOR EXPLORATION, DEVELOPMENT AND PRODUCTION OF OIL, GAS AND WATER AND THAT THERE MAY BE PETROLEUM, PRODUCED WATER, WASTES OR OTHER HAZARDOUS MATERIALS LOCATED ON, UNDER OR ASSOCIATED WITH THE ASSETS AND THE ASSETS MAY ALSO CONTAIN PREVIOUSLY PLUGGED AND ABANDONED WELLS, BURIED PIPELINES, STORAGE TANKS, AND OTHER EQUIPMENT, WHETHER OR NOT OF A SIMILAR NATURE, THE LOCATIONS OF WHICH MAY NOT BE KNOWN BY SELLER OR BE READILY APPARENT BY A PHYSICAL INSPECTION OF THE ASSETS. EQUIPMENT AND SITES INCLUDED IN THE ASSETS MAY CONTAIN NORM. NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS AND EQUIPMENT AS SCALE, OR IN OTHER FORMS; THE WELLS, MATERIALS AND EQUIPMENT LOCATED ON OR INCLUDED IN THE ASSETS MAY CONTAIN NORM AND OTHER WASTES OR HAZARDOUS MATERIALS; AND NORM CONTAINING MATERIAL AND OTHER WASTES OR HAZARDOUS MATERIALS MAY HAVE BEEN BURIED, COME IN CONTACT WITH THE SOIL OR OTHERWISE BEEN DISPOSED OF ON OR AROUND THE ASSETS. SPECIAL PROCEDURES MAY BE REQUIRED FOR THE REMEDIATION, REMOVAL, TRANSPORTATION OR DISPOSAL OF WASTES, ASBESTOS, HAZARDOUS MATERIALS, INCLUDING HYDROGEN SULFIDE GAS AND NORM FROM THE ASSETS. FROM AND AFTER THE CLOSING, BUYER SHALL ASSUME RESPONSIBILITY FOR THE CONTROL, STORAGE, HANDLING, TRANSPORTING AND DISPOSING OF OR DISCHARGE OF ALL MATERIALS, SUBSTANCES AND WASTES FROM THE ASSETS (INCLUDING PRODUCED WATER, HYDROGEN SULFIDE GAS, DRILLING FLUIDS, NORM, HAZARDOUS MATERIALS AND OTHER WASTES) IN A SAFE AND PRUDENT MANNER AND IN ACCORDANCE WITH ALL APPLICABLE ENVIRONMENTAL LAWS**.

8.7 Casualty.

(a) If, after the Execution Date and prior to the Closing, (i) a part of the Assets or (ii) a part of any assets owned, Controlled, maintained or otherwise operated by third parties which are covered by Seller's or its Affiliates' insurance policies, in each case, suffers a Casualty Loss or is taken in condemnation or under the right of eminent domain or if proceedings for such purposes are pending or threatened, Seller shall promptly give Buyer written notice of such occurrence, including reasonable particulars with respect thereto, and, subject to Section 11.1(b)(vi), this Agreement shall remain in full force and effect notwithstanding any such Casualty Loss.

(b) With regard to a Casualty Loss occurring after the Execution Date through the Closing, without limitation of Section 11.1(b)(vi), at Closing, Seller shall pay (or cause to be paid) to Buyer all sums paid to Seller or its Affiliates by third parties by reason of such Casualty Loss. In addition, Seller shall seek to recover, and transfer (or cause to be transferred) to Buyer, at the Closing, all of the right, title and interest of Seller and its Affiliates' in and to any insurance claims, unpaid awards or other proceeds and any other rights against third parties arising out of such Casualty Loss, including any such rights under insurance policies owned or maintained (directly or indirectly) by third parties on behalf of Seller or its Affiliates covering the Assets or any assets owned, Controlled, maintained or otherwise operated by third parties which are covered by Seller's or its Affiliates' insurance policies; *provided*, *however*, that Seller shall reserve and retain all rights, title and interests

and claims against third parties for the recovery of Seller's costs and expenses incurred prior to the Closing in pursuing or asserting any such insurance claims with respect to any such Casualty Loss.

(c)       Notwithstanding anything to the contrary in this Agreement and subject to Section 11.1(b)(vi), (i) at the Closing, the Assets affected by a Casualty Loss or condemnation shall be included in the Closing and Buyer shall pay the full Allocated Value therefor, subject to any applicable adjustments under this Agreement, and (ii) Buyer's recourse with respect to a Casualty Loss shall be limited to the proceeds of Seller's or its Affiliates' applicable insurance coverage or any other insurance policies owned or maintained (directly or indirectly) by third parties on behalf of Seller or its Affiliates covering the Assets in respect thereof or other sums paid to Seller or its Affiliates by third parties (or an assignment of claims related thereto), which proceeds or other sums shall be payable to Buyer only upon or after the Closing of the transaction contemplated hereby, and subject to Seller's retention of its recovery as contemplated by the last sentence of Section 8.7(b).  Seller shall have no other liability or responsibility to Buyer with respect to a Casualty Loss, **EVEN IF SUCH CASUALTY LOSS SHALL HAVE RESULTED FROM OR SHALL HAVE ARISEN OUT OF THE SOLE OR CONCURRENT NEGLIGENCE, FAULT, OR VIOLATION OF A LEGAL REQUIREMENT, EXCEPT TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SELLER OR ANY MEMBER OF SELLER GROUP**.

8.8     Environmental Liabilities.   Buyer hereby releases, indemnifies, defends and holds harmless Seller from and against any and all liabilities (including any personal injury, death or loss or damage of property) to the extent arising out of, resulting from or relating to any office visit, field visit, environmental property assessment or other due diligence activity conducted by Buyer or Buyer's environmental consultant with respect to the Assets, **EVEN IF SUCH LIABILITIES ARISE OUT OF OR RESULT FROM, IN WHOLE OR IN PART, THE SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF SELLER, EXCEPTING ONLY LIABILITIES TO THE EXTENT ACTUALLY RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SELLER**.

8.9     Additional Agreements.

(a)       Restructuring Support Agreement.   ~~Seller shall provide Buyer a copy of the Restructuring Support Agreement at or prior to the execution of this Agreement.   Seller shall notify Buyer (x) if at any time after the date hereof, the parties to the Restructuring Support Agreement do not constitute the Required Supporting Parties and (y) of any default thereunder, termination thereof or amendment thereto reasonably promptly upon becoming aware of any such default, termination or amendment, including any such amendment under consideration, and shall promptly provide to Buyer a copy of any default notice, termination notice or amendment (including any drafts thereof).~~[Reserved].

(b)       Chapter 11 Plan.   The Plan shall include a provision that allows Buyer, at Buyer's reasonable discretion, or any designee of Buyer, to receive the equity in one or more reorganized legal entities comprising Seller to facilitate the transfer of any Asset or Contract to the extent determined necessary or desirable by Buyer at no additional cost to Buyer.  For the avoidance of doubt, any provisions in the Plan that would affect such equity transfer or any reorganized Seller entity which is to be transferred shall be subject to Buyer's prior written approval (such approval not to be unreasonably withheld), including any provisions relating to the discharge of the reorganized Seller and any provisions affecting any remaining assets or liabilities held by any such Seller entity.  For the avoidance of doubt, neither Buyer nor any designee of Buyer shall acquire any Excluded Assets or Excluded Liabilities in connection with receipt of any such reorganized Seller equity.

(c)       Revenues.   After the Closing, any proceeds (including proceeds held in suspense or escrow), receipts, credits and income attributable to the Assets (or otherwise earned with

respect thereto or in connection therewith) received by any Seller Party shall be paid by such Seller Party to Buyer within thirty (30) days after such Seller Party's receipt of such amounts.

**ARTICLE 9**
**CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE**

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions; *provided* that Buyer may not rely on the failure of any condition set forth in this Article 9 to be satisfied if such failure was primarily caused by Buyer's failure to act in good faith or to use its commercially reasonable efforts to cause the Closing to occur; *provided further* that if Seller obtains knowledge that any of the following conditions precedent will not be satisfied at or prior to Closing, then Seller shall provide written notice thereof to Buyer:

9.1     Accuracy of Representations.   The representations and warranties of each Seller Party set forth in this Agreement shall be true and correct in all respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (*provided* that representations and warranties which are expressly confined to a specified date shall speak only as of such date); *provided*, *however*, that in the event of a breach of or inaccuracy in the representations and warranties of a Seller Party set forth in this Agreement (which shall be determined without giving effect to any limitation or qualification as to materiality, Material Adverse Effect or similar qualification), the condition set forth in this Section 9.1 shall be deemed satisfied unless the effect of all such breaches of or inaccuracies in such representations and warranties taken together for all Seller Parties results in a Material Adverse Effect; *provided*, *further*, *however*, that Buyer shall not be entitled to assert that the condition set forth in this Section 9.1 has not been satisfied with respect to any breach of or inaccuracy in the representations and warranties of a Seller Party if such breach or inaccuracy was actually known to any of Buyer's Knowledge persons set forth on Schedule 1.1(b) as of the Execution Date.   In addition, Buyer shall have received a certificate of each Seller Party to such effect signed by a duly authorized officer thereof.   If Buyer determines that there has been a breach of or inaccuracy in any of the Seller Parties' representations and warranties on which it will rely for purposes of asserting the condition set forth in this Section 9.1 is not satisfied, it shall provide Seller with notice of such breach or inaccuracy as promptly as reasonably practicable after the determination thereof.

9.2     Seller's Performance.   Each covenant and agreement that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects (except that those covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions shall have been duly performed and complied with in all respects), and Buyer shall have received a certificate of Seller to such effect signed by a duly authorized officer thereof.

9.3     No Order.   No Governmental Authority shall have enacted, issued, promulgated or entered any Order or other Legal Requirement which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or could cause any of such transactions to be rescinded following the Closing.   No suit, action, or other proceeding instituted by any Person (other than Buyer or any Affiliate of Buyer) shall be pending before any Governmental Authority seeking to restrain, prohibit, enjoin, or declare illegal, or seeking substantial damages in connection with the transactions contemplated by this Agreement.

9.4     Seller's Deliveries.   Seller shall have delivered (or shall deliver at the Closing) each of the deliveries required to be made to Buyer pursuant to Section 4.4.

9.5     Sale Order.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be final, binding, non-appealable and in full force and effect.

9.6     Operatorship.  At Closing, Buyer will be designated the operator of the Assets that is currently operated by any of Seller's Affiliates (for sole purpose of this Section 9.6, without giving effect to the proviso thereof) and including, for the avoidance of doubt, Arena Offshore, LP, and Arena Offshore Operating, LLC.

## ARTICLE 10
## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE

Seller's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions; *provided* that no Seller Parties may rely on the failure of any condition set forth in this Article 10 to be satisfied if such failure was primarily caused by any of the Seller Party's failure to act in good faith or to use its commercially reasonable efforts to cause the Closing to occur; *provided further* that if Buyer obtains knowledge that any of the following conditions precedent will not be satisfied at or prior to Closing, then Buyer shall provide written notice thereof to Seller:

10.1     Accuracy of Representations.  The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as to materiality or similar expressions shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (*provided* that representations and warranties which are expressly confined to a specified date shall speak only as of such date); *provided*, *however*, that in the event of a breach of or inaccuracy in the representations and warranties of Buyer set forth in this Agreement (which shall be determined without giving effect to any limitation or qualification as to materiality, material adverse effect or similar qualification), the condition set forth in this Section 10.1 shall be deemed satisfied unless the effect of all such breaches of or inaccuracies in such representations and warranties taken together results in a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.  In addition, Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.  If Seller determines that there has been a breach of or inaccuracy in any of Buyer's representations and warranties on which it will rely for purposes of asserting the condition set forth in this Section 10.1 is not satisfied, it shall provide Buyer with notice of such breach or inaccuracy as promptly as reasonably practicable after the determination thereof.

10.2     Sale Order in Effect.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and shall not be subject to a stay pending appeal.

10.3     Buyer's Performance.  The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects (except that those covenants and agreements that are qualified as to materiality or similar expressions shall have been duly performed and complied with in all respects), and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

10.4     No Order.  No Governmental Authority shall have enacted, issued, promulgated or entered any Order or other Legal Requirement which is in effect and which has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or could cause any of such transactions to be rescinded following the Closing.  No suit, action, or other proceeding instituted by any Person (other than Seller or any Affiliate of Seller) shall be pending

before any Governmental Authority seeking to restrain, prohibit, enjoin, or declare illegal, or seeking substantial damages in connection with the transactions contemplated by this Agreement.

10.5    Buyer's Deliveries.  Buyer shall have delivered (or shall deliver at the Closing) each of the deliveries required to be made to Seller pursuant to Section 4.3.

# ARTICLE 11
# TERMINATION

11.1    Termination Events.  Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

(a)    by either Seller or Buyer:

(i)    if a Governmental Authority issues a Final Order or any Legal Requirement is enacted prohibiting the transactions contemplated hereby; *provided*, *however*, that (1) Buyer shall be permitted to terminate this Agreement pursuant to this Section 11.1(a)(i) only if Buyer is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, and (2) Seller shall be permitted to terminate this Agreement pursuant to this Section 11.1(a)(i) only if Seller is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein;

(ii)    by mutual written consent of Seller and Buyer;

(iii)    if the Closing has not occurred by the close of business on October 31, 2020 (the "Outside Date"); *provided*, *however*, that (1) Buyer shall be permitted to terminate this Agreement pursuant to this Section 11.1(a)(iii) only if Buyer is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, and (2) Seller shall be permitted to terminate this Agreement pursuant to this Section 11.1(a)(iii) only if Seller is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein; *provided*, *further*, that a Party may not terminate pursuant to this Section 11.1(a)(iii) if the Closing has not occurred due to the failure of such Party to satisfy a condition set forth in Article 9 and Article 10 (as applicable) that is within the reasonable control of such Party;

(iv)    if the Bankruptcy Court enters an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Seller under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case; *provided however*, that neither Buyer nor Seller shall be permitted to terminate this Agreement pursuant to this Section 11.1(a)(iv) to the extent that such Order was requested, encouraged or supported by such Party; or

(b)    by Buyer:

(i)    in the event of any breach by Seller (or any Seller Party's) of any of Seller's (or any Seller Party's) agreements, covenants, representations or warranties contained herein (*provided* such breach would result in the failure of a condition set forth in Section 9.1 or Section 9.2 to be satisfied on the Closing Date), and the failure of Seller to cure such breach within ten (10) days after receipt of the Buyer Termination Notice; *provided*, *however*, that (A) Buyer is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, (B) Buyer notifies Seller in writing (the "Buyer Termination Notice") of its intention to exercise its rights under this Section 11.1(b)(i) as a result of the breach, and (C) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant or agreement contained herein or in the Sale

Order of which Seller is allegedly in breach and a reasonably detailed description of the factual circumstances to support the allegation;

(ii)     if the Bankruptcy Court enters an Order that precludes the consummation of the transactions contemplated by this Agreement on terms and conditions set forth herein;

(iii)     there is a termination of the right to use cash collateral under the Cash Collateral Order, if such termination is not cured within five (5) Business Days thereafter;

(iv)     if Seller ~~(A)~~ enters into one or more agreements to sell, transfer or otherwise dispose of any material portion of the Assets in a transaction or series of transactions other than in the ordinary course of business with one or more Persons other than Buyer ~~or (B) terminates the Restructuring Support Agreement pursuant to Section 13.03(c) of the Restructuring Support Agreement~~;

(v)     if the Bankruptcy Court has not entered the Sale Order on or before 40 days from the Petition Date or the Sale Order ceases to be in full force and effect or shall have been stayed, reversed, modified or amended in any material respect in a manner adverse to Buyer without the prior written consent of Buyer;

(vi)     if the aggregate sum of all costs and expenses (calculated in accordance with Section 11.5) to fully repair, restore, replace and/or otherwise Remediate any Assets affected by one or more Casualty Losses ("Restoration Costs") is equal to or in excess of an amount equal to twenty percent (20%) of the Purchase Price (and, for the avoidance of doubt, the Restoration Costs of any Asset may exceed the Allocated Value of such Asset);

(vii)     ~~(A) if the Restructuring Support Agreement (x) is terminated or (y) is supplemented, amended, waived or otherwise modified, in a manner inconsistent with the Restructuring Support Agreement, or (B) if at any time after the date hereof the parties to the Restructuring Support Agreement do not constitute the Required Supporting Parties; or~~[Reserved]; or

(viii)     if Seller (A) withdraws or seeks authority to withdraw (x) the Sale Order at any time after the entry thereof or (y) any notice or motion seeking entry thereof at any time prior to the entry thereof (it being agreed and understood by Buyer and Seller that the filing of a revised or amended form of the Sale Order with the consent of Buyer shall not constitute a withdrawal of the Sale Order, as applicable), or (B) announces any standalone plan of reorganization or liquidation that does not contemplate the sale of the Assets in accordance with the Sale Order, in each case with respect to the Assets.

(c)     by Seller:

(i)     in the event of any breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein (*provided* such breach would result in the failure of a condition set forth in Section 10.1 or Section 10.3 to be satisfied) or (if such breach is material) in the Sale Order, and the failure of Buyer to cure such breach within ten (10) days after receipt of the Seller Termination Notice; *provided*, *however*, that Seller (A) is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein or in the Sale Order, (B) notifies Buyer in writing (the "Seller Termination Notice") of its intention to exercise its rights under this Section 11.1(c)(i) as a result of the breach, and (C) specifies in the Seller Termination Notice the representation, warranty, covenant or agreement contained herein or in the Sale Order of

43

which Buyer is allegedly in breach and a reasonably detailed description of the factual circumstances to support the allegation; or.

(ii) if Seller terminates the Restructuring Support Agreement pursuant to Section 13.03(e) of the Restructuring Support Agreement.

11.2    Effect of Termination.

(a)    In the event of termination of this Agreement by Buyer or Seller pursuant to this Article 11, all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party; *provided*, *however*, that, subject to Section 11.2(b), nothing herein shall relieve any Party from Liability for such Party's (or its Representatives') breach of this Agreement prior to such termination.  The provisions of this Section 11.2, Section 11.4 and Section 3.2 (and, to the extent applicable to the interpretation or enforcement of such provisions, Article 1), shall expressly survive the termination of this Agreement.

(b)    In the event that Seller has the right to terminate this Agreement pursuant to Section 11.1(c)(i), notwithstanding Sections 13.4 and 13.14, Seller shall be entitled, as its sole and exclusive remedy, to (i) terminate this Agreement pursuant to Section 11.1(c)(i) and retain the Deposit as liquidated damages (and not as a penalty) for such termination, free and clear of any claims thereon by Buyer (and the Parties shall give joint written instructions to the Escrow Agent to release the Deposit to Seller pursuant to Section 3.2), or (ii) if applicable, enforce specific performance in accordance with Section 11.3.  The Parties agree that, should Seller have the right to terminate this Agreement pursuant to Section 11.1(c)(i), the foregoing described liquidated damages are reasonable considering all of the circumstances existing as of the Execution Date and constitute the Parties' good faith estimate of the actual damages reasonably expected to result from such termination of this Agreement by Seller.

11.3    Specific Performance.  In the event that Seller has the right to terminate this Agreement pursuant to Section 11.1(c)(i), in lieu of seeking the Deposit as a remedy in accordance with Section 11.2(b), as its sole remedy under this Agreement, Seller shall be entitled to specific performance of this Agreement, it being specifically agreed that monetary damages will not be sufficient to compensate Seller, and this right shall include the right of Seller to cause the closing of the transactions contemplated hereby to be consummated in accordance with the terms of this Agreement. Seller shall not be required to provide any bond or other security in connection with seeking an injunction or injunctions to enforce specifically the terms and provisions of this Agreement.  The Parties hereto further agree that (a) by seeking the remedies provided for in this Section 11.3, Seller shall not in any respect waive its right to seek any other form of relief in law or in equity that may be available to it and (b) nothing set forth in this Section 11.3 shall require Seller to institute any Proceeding for (or limit Seller's right to institute any Proceeding for) specific performance under this Section 11.3 prior to, or as a condition to, exercising any termination right under this Article 11. Notwithstanding anything contained herein to the contrary, (x) if Seller elects to receive the Deposit as liquidated damages in accordance with Section 11.2(b), then Seller shall not be entitled to seek specific performance of this Agreement and, without limitation of the foregoing, shall be deemed to have waived all of its rights to seek specific performance under this Agreement, and (y) if Seller elects to seek specific performance of this Agreement, Seller shall not be entitled to receive the Deposit under Section 11.2(b); *provided that* if Seller withdraws its claim for specific performance or is unable to enforce specific performance and is entitled to receive the Deposit pursuant to the terms hereof, it may elect to receive the Deposit as its sole remedy.  For the avoidance of doubt, Seller's determination pursuant to this Section 11.3 shall be at the sole discretion of Seller's transaction committee.

11.4    Break-Up Fee and Expense Reimbursement.

(a)    In the event that this Agreement is terminated pursuant to Sections 11.1(b)(i) (solely for purposes of clause (ii) below), 11.1(b)(ii), 11.1(b)(iii), 11.1(b)(iv), ~~11.1(b)(vii),~~or 11.1(b)(viii), ~~or 11.1(c)(ii), Lime Rock~~Buyer shall be entitled to payment by Seller of (i) a termination fee equal to two and four-tenths percent (2.4%) of the Purchase Price (the "Break-Up Fee") and Buyer ~~and Lime Rock~~ shall be entitled to payment by Seller of (ii) an amount equal to the lesser of (A) an amount equal to one and one-half percent (1.5%) of the Purchase Price and (B) Buyer's ~~and Lime Rock's~~ actual out-of-pocket fees and expenses incurred (directly or indirectly) in connection with this Agreement and other agreements, pleadings, documents, hearings, discovery, and transactions related hereto (including attorneys' and advisors' fees) (the "Expense Reimbursement").

(b)    Seller's obligation to pay the Break-Up Fee and the Expense Reimbursement shall survive termination of this Agreement. Seller shall pay the Break-up Fee to ~~Lime Rock (and not to Buyer or any of its managers, directors, or officers)~~Buyer and Seller shall pay the Expense Reimbursement to ~~Lime Rock and/or~~ Buyer ~~(as applicable)~~ within ten (10) Business Days after the termination of this Agreement~~; provided that if this Agreement is terminated pursuant to Sections 11.1(b)(iv), or 11.1(c)(ii), such payment shall be due within ten (10) Business Days after the termination of the Restructuring Support Agreement pursuant to Section 13.03(c) of the Restructuring Support Agreement.~~.

(c)    ~~Lime Rock's~~Buyer's right to payment of the Break-Up Fee and ~~Lime Rock's and~~ Buyer's ~~(as applicable)~~ right to payment of the Expense Reimbursement shall constitute an administrative expense in the Bankruptcy Case pursuant to Section 503 and 507 of the Bankruptcy Code.

(d)    Each Party acknowledges that the agreements contained in this Section 11.4 are an integral part of this Agreement and that, without these agreements, the other Party would not enter into this Agreement.

(e)    Buyer represents to Seller that this Section 11.4 is a condition precedent to Buyer's execution of this Agreement and is necessary to ensure that Buyer will continue to pursue the proposed acquisition of the Assets, and Seller acknowledges that the Break-Up Fee and Expense Reimbursement, if payable hereunder, (i) constitute actual and necessary costs and expenses of preserving Seller's estates, within the meaning of Section 503(b) of the Bankruptcy Code, (ii) are of substantial benefit to Seller's estates by, among other things, establishing a bid standard or minimum for other bidders and placing estate property in a sales configuration mode attracting other bidders to a potential auction, (iii) are reasonable and appropriate, including in light of the size and nature of the sale of the Assets by Seller to Buyer contemplated hereby and the efforts that have been or will be expended by Buyer ~~and Lime Rock~~, notwithstanding that such sale is subject to higher and better offers, and (iv) was negotiated by the Parties at arm's-length and in good faith.

11.5    Dispute Resolution. Buyer and Seller shall attempt to agree as to whether the combined value of the matters described in Section 11.1(b)(vi) is less than the percentage of the Purchase Price described therein prior to the Closing Date (any disagreements between the Parties as to such matters, collectively, the "Disputed Matters"). If Seller and Buyer are unable to agree by the Closing Date, the Disputed Matters shall be exclusively and finally resolved by arbitration pursuant to this Section 11.5; provided, however, the Parties will resolve all such Disputed Matters under this Section 11.5 prior to Closing or termination, as applicable. There will be a single arbitrator who will be an attorney with at least 15 years' experience in matters involving oil and gas producing properties in the Gulf of Mexico, as selected by the mutual agreement of Buyer and Seller (the "Arbitrator"). Notwithstanding the foregoing, the Bankruptcy Court may serve as the Arbitrator upon the mutual

agreement of the Parties. If the Parties do not mutually agree upon the Arbitrator in accordance with this <u>Section 11.5</u>, the Houston, Texas office of the AAA shall appoint such Arbitrator under such conditions as the AAA in its sole discretion deems necessary or advisable. The place of arbitration shall be Houston, Texas, and the arbitration shall be conducted in accordance with the AAA Rules, to the extent such rules do not conflict with the terms of this <u>Section 11.5</u>. Each of Buyer and Seller shall submit to the Arbitrator, with a simultaneous copy to the other Party, a single written statement of its position on the Disputed Matters in question, together with a copy of this Agreement and any supporting material that such Party desires to furnish, as soon as reasonably practicable, but not later than the tenth (10th) Business Day after appointment of the Arbitrator. The Parties shall instruct the Arbitrator to make a determination, choosing either Seller's position or Buyer's position with respect to the Disputed Matters in question, with such determination to be made within twenty (20) days after the end of such ten (10) Business Day period after the submission of the Disputed Matters and shall be final and binding upon both Parties, without right of appeal. In making his determination, the Arbitrator shall make a determination of the Disputed Matters submitted based solely on the single written submissions of Seller and Buyer (and without any additional or supplemental submittals by any Party, except to the extent the Arbitrator requests additional information from either Party), shall be bound by the rules set forth in this <u>Section 11.5</u> and, subject to the foregoing, may consider such other legal and industry matters as in the opinion of the Arbitrator are necessary or helpful to make a proper determination. The Arbitrator shall act as an expert for the limited purpose of determining specific Disputed Matters submitted by either Party and may not award damages, interest or penalties to either Party with respect to any matter, except as otherwise provided in the following sentence. The costs of the Arbitrator (and the AAA, if applicable) and the reasonable legal costs and expenses incurred by the Parties in connection with the arbitration shall be borne by the Party whose position is not selected by the Arbitrator.

## ARTICLE 12
## SURVIVAL AND INDEMNIFICATION

12.1 <u>No Survival of Seller's Representations and Warranties</u>. The representations and warranties of Seller contained herein and in any certificate or other Transaction Document delivered by Seller pursuant to this Agreement shall terminate upon and not survive the Closing and there shall be no liability thereafter in respect thereof. Each of Seller's covenants and other agreements contained in this Agreement shall terminate upon the Closing, except the covenants and agreements of Seller in <u>Sections 2.6</u>, <u>2.7</u>, <u>2.8</u>, <u>7.2(a)</u>, <u>7.2(b)</u>, and <u>8.2</u> (each a "<u>Post-Closing Covenant</u>"), which shall survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or, (b)(i) if time for performance of such Post-Closing Covenant is specified in this Agreement, sixty (60) days following the expiration of the time period for such performance or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such Post-Closing Covenant; *provided* that if a written notice of any claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-Closing Covenant shall survive until, but only for purposes of, the resolution of such claim by Final Order or settlement.

12.2 <u>Survival of Buyer's Representations and Warranties</u>. The representations and warranties of Buyer contained in <u>Article 6</u> of this Agreement (other than the representations and warranties contained in <u>Section 6.8</u>) shall survive the Closing through and including the date that is twelve (12) months after the Closing Date (the "<u>Expiration Date</u>"); *provided*, *however*, that any obligations to indemnify and hold harmless shall not terminate with respect to any Liabilities as to which a Seller Indemnified Party shall have given notice to Buyer in accordance with <u>Section 12.4(a)</u> on or before the Expiration Date. The representations and warranties of Buyer contained in <u>Section 6.8</u>

shall terminate upon and not survive the Closing and there shall be no Liability thereafter in respect thereof.

### 12.3   Indemnification by Buyer.

(a)   Subject to <u>Section 12.2</u>, from and after Closing, Buyer hereby agrees to indemnify and hold Seller and each member of the Seller Group (collectively, the "<u>Seller Indemnified Parties</u>") harmless from and against any all Liabilities to the extent based upon, attributable or resulting from:

(i)   the breach of any representation or warranty of Buyer set forth in <u>Article 6</u> hereof, or any representation or warranty contained in any certificate delivered by or on behalf of Buyer pursuant to this Agreement;

(ii)   the breach of any covenant or other agreement on the part of Buyer under this Agreement; and

(iii)   the Assumed Liabilities.

(b)   Notwithstanding anything contained herein to the contrary, any Seller Indemnified Party making an Indemnification Claim under <u>Section 12.3</u> must give notice to the indemnifying Party of any such Indemnification Claim in writing on or prior to the Expiration Date.

### 12.4   Indemnification Procedures.

(a)   In the event that any Actions shall be instituted or that any claim or demand shall be asserted by any Seller Indemnified Party in respect of which payment may be sought under <u>Section 12.3</u> (an "<u>Indemnification Claim</u>"), the Seller Indemnified Party shall reasonably and promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by this indemnity to be forwarded to the indemnifying Party; *provided* that a Seller Indemnified Party need not wait until an Action has been instituted or demand has been asserted before delivering written notice of an Indemnification Claim to the indemnifying Party.  The indemnifying Party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the Seller Indemnified Party, and to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Liabilities indemnified against hereunder.  If the indemnifying Party elects to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Liabilities indemnified against hereunder, it shall within thirty (30) days (or sooner, if the nature of the Indemnification Claim so requires) notify the Seller Indemnified Party of its intent to do so.  If the indemnifying Party elects not to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Liabilities indemnified against hereunder, the Seller Indemnified Party may defend against, negotiate, settle or otherwise deal with such Indemnification Claim.  If the indemnifying Party shall assume the defense of any Indemnification Claim, the Seller Indemnified Party may participate, at his or its own expense, in the defense of such Indemnification Claim; *provided*, *however*, that such Seller Indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying Party if (a) so requested by the indemnifying Party to participate or (b) in the reasonable opinion of counsel to the Seller Indemnified Party a conflict or potential conflict exists between the Seller Indemnified Party and the indemnifying Party that would make such separate representation advisable; and *provided*, *further*, that the indemnifying Party shall not be required to pay for more than one such counsel for all Seller Indemnified Parties in connection with any Indemnification Claim.  The Parties agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim.  Notwithstanding anything in this <u>Section 12.4</u> to the contrary, neither the indemnifying Party nor any Seller Indemnified Party shall, without the written consent of the other,

settle or compromise any Indemnification Claim or permit a default or consent to entry of any judgment unless the claimant and such party provide to such other party an unqualified release from all liability in respect of the Indemnification Claim. If the indemnifying Party makes any payment on any Indemnification Claim, the indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the Seller Indemnified Party to any insurance benefits or other claims of the Seller Indemnified Party with respect to such Indemnification Claim.

(b) After any final decision, judgment or award shall have been rendered by a Governmental Authority of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Seller Indemnified Party and the indemnifying Party shall have arrived at a mutually binding agreement with respect to an Indemnification Claim hereunder, the Seller Indemnified Party shall forward to the indemnifying Party notice of any sums due and owing by the indemnifying Party pursuant to this Agreement with respect to such matter.

12.5    Calculation of Liabilities.    The amount of any Liabilities for which indemnification is provided under this Article 12 shall be net of any amounts actually recovered by the Seller Indemnified Party under insurance policies with respect to such Liabilities.

12.6    Tax Treatments of Indemnity Payments.    The Parties agree to treat any indemnity payment made pursuant to this Article 12 as an adjustment to the Purchase Price for federal, state, local and foreign income tax purposes. Any indemnity payment under this Article 12 shall be treated as an adjustment to the value of the Asset upon which the underlying Indemnification Claim was based, unless a final determination (which shall include the execution of a Form 870-AD or successor form) with respect to the Seller Indemnified Party causes any such payment not to be treated as an adjustment to the value of the asset for United States federal income tax purposes.

12.7    Exclusive Remedy.    If Closing occurs, the indemnities in this Article 12 are the sole and exclusive remedy for any Liabilities based upon or relating to the Assets or this Agreement, regardless of the manner in which any Liability is characterized or pleaded, including rights to contribution under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, and any other Environmental Law. For the avoidance of doubt, nothing contained in this Section 12.7 shall limit the RBL Facility Lenders' rights in respect of a breach of Buyer's obligations set forth on Exhibit F.

### ARTICLE 13
### GENERAL PROVISIONS

13.1    Confidentiality.    Notwithstanding anything in the Non-Disclosure Agreement to the contrary, the Parties agree that ~~the~~a non-disclosure agreement, to be entered into by them and their Affiliates~~, dated effective as of June 11, 2020~~ permitting Buyer to receive the information Buyer previously requested on a confidential basis, restricting Buyer from discussing this Agreement or the transactions contemplated by this Agreement with any party to the Restructuring Support Agreement so long as it is effective but not any other Person, and setting forth such other terms and conditions reasonably agreed to by Buyer and Seller (the "Non-Disclosure Agreement"), shall continue in full force and effect notwithstanding the execution and delivery by the Parties of this Agreement; *provided, however*, that (a) disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto shall not constitute a breach of such Non-Disclosure Agreement, and (b) disclosures permitted under this Agreement shall not constitute a breach of such Non-Disclosure Agreement. In addition, if Closing should occur, the terms of the Non-Disclosure Agreement shall terminate as to Buyer.

13.2    Public Announcements.  Buyer, on the one hand, and Seller, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transaction contemplated hereby or the activities and operations of the other Party, and shall not issue any such release or make any such statement without the prior written consent of the other Party (such consent not to be unreasonably withheld or delayed). Notwithstanding the foregoing, prior to or after the Closing, if Buyer (including any of its parent entities), on the one hand, or Seller (including any of its parent entities), on the other is required to make any statement, declaration or public announcement regarding this Agreement or the transaction contemplated hereunder pursuant to (a) any Legal Requirement, (b) applicable rules or regulations of any national securities exchange, or (c) the terms of such Party's (including such Party's respective parent entities) indentures, loan agreements, credit agreements or other similar debt agreements or financial instruments, then the same may be made without the approval of the other Party, but, in the case of disclosures made by Buyer, only to the extent the name of Seller is omitted from such statement, declaration or announcement if permitted by the applicable Legal Requirements.

13.3    Notices.  All notices, consents, waivers and other communications under this Agreement must be in writing (with a copy delivered to the RBL Facility Agent) and shall be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by email (with read receipt requested, with the receiving Party being obligated to respond affirmatively to any read receipt requests delivered by the other Party), (c) received by the addressee, if sent by a delivery service (prepaid, receipt requested) or (d) received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses and representatives (if applicable) set forth below (or to such other addresses and representatives as a Party may designate by notice to the other Parties):

(i)    If to Seller, then to:

Arena Energy, LP
2103 Research Forest Drive, Suite 400
The Woodlands, Texas 77380
Attn:  Ed Menger
E-mail:  EMenger@arenaenergy.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:  Brian E. Schartz, P.C.
Phone:  (212) 446-5932
E-mail:  brian.schartz@kirkland.com

Kirkland & Ellis LLP
609 Main Street, 45th Floor
Houston, Texas 77002
Attn:    Rahul D. Vashi, P.C.
         Kim Hicks, P.C.
Phone:  (713) 836-3639
         (713) 836-3529
E-mail:  rahul.vashi@kirkland.com
         kim.hicks@kirkland.com

(ii)    If to Buyer:

~~San Juan~~W&T Offshore, ~~LLC~~Inc.
~~2000 Hughes Landing Blvd.~~Nine Greenway Plaza, Suite ~~781~~300
~~The Woodlands~~Houston, TX ~~77380~~70046
Attn:  ~~Michael J. Minarovic~~[_____]
E-mail:  ~~mike@sanjuanoffshore.com~~[_____]

with a copy (which shall not constitute notice) to:

~~Lime Rock Partners VIII, L.P.~~
~~1111 Bagby Street, Suite 4600~~
~~Houston, TX 77002~~
~~Attn:  J McLane~~
~~E-mail:  jm@lrpartners.com~~

White & Case LLP
111 S Wacker Dr. Suite 5100
Chicago, Illinois 60606
Attn: Jason Zakia
Phone:  (312) 881 5403
E-mail:  jzakia@whitecase.com

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020-1095
Attn: Andrew Zatz
Phone:  (212) 819 8504
E-mail:  azatz@whitecase.com

~~Willkie Farr & Gallagher~~White & Case LLP
~~600 Travis~~609 Main Street, ~~Suite 2100~~29th Floor
Houston, Texas 77002
Attn:  ~~Michael De Voe Piazza~~Mingda Zhao
Phone:  (713) 496 9657
E-mail:  ~~mpiazza@willkie~~mingda.zhao@whitecase.com

~~Willkie Farr & Gallagher~~Locke Lorde LLP
600 Travis Street, Suite ~~2100~~2800
Houston, Texas 77002
Attn:  ~~Jennifer Hardy~~Phil Eisenberg
Phone:  (713) 226 1304
E-mail:  ~~jhardy2@willkie~~peisenberg@lockelorde.com

~~Davis Polk & Wardwell LLP~~
~~450 Lexington Avenue~~
~~New York, NY 10017~~
~~Attn:  Brian Resnick~~
~~E-mail:brian.resnick@davispolk.com~~

~~Davis Polk & Wardwell LLP~~
~~450 Lexington Avenue~~
~~New York, NY 10017~~

~~Attn:  Harold Birnbaum~~
~~E-mail:  harold.birnbaum@davispolk.com~~

(iii)     If to the RBL Facility Agent:

> Wells Fargo Bank, N.A.
> 1000 Louisiana St., Ninth Floor
> Houston, Texas 77002
> Attn:  Oleg Kogan
> E-mail:  Oleg.Kogan@wellsfargo.com

> with a copy (which shall not constitute notice) to:

> Haynes and Boone, LLP
> 1221 McKinney Street, Suite 4000
> Houston, Texas 77010

> Attn:     Austin Elam
>           Ellen Conley
>           Frasher Murphy

> E-mail:   austin.elam@haynesboone.com
>           ellen.conley@haynesboone.com
>           frasher.murphy@haynesboone.com

13.4     Waiver; Waiver of Damages.   No waiver of any of the provisions of this Agreement or rights hereunder shall operate as a waiver unless it is in writing and signed by the Party ("Party" and "Parties," for purposes of Exhibit F and any other provision of this Agreement that expressly runs to the benefit of the RBL Facility Agent, shall be deemed to include the RBL Facility Agent) against whom enforcement of such waiver is sought.  Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege shall preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO PARTY SHALL BE LIABLE TO THE OTHER FOR SPECIAL, INDIRECT, EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES ARISING OUT OF, ASSOCIATED WITH, OR RELATING TO THIS AGREEMENT (INCLUDING LOSS OF PROFIT OR BUSINESS INTERRUPTIONS, HOWEVER THE SAME MAY BE CAUSED) AND THE PARTIES HEREBY WAIVE ALL CLAIMS FOR ANY SUCH DAMAGES, EXCEPT TO THE EXTENT ANY SELLER INDEMNIFIED PARTY SUFFERS SUCH DAMAGES TO AN UNAFFILIATED THIRD PARTY IN CONNECTION WITH A FINALLY ADJUDICATED THIRD PARTY CLAIM, IN WHICH CASE SUCH DAMAGES SHALL BE RECOVERABLE (TO THE EXTENT RECOVERABLE UNDER ARTICLE 12) WITHOUT GIVING EFFECT TO THIS SECTION 13.4.

13.5     Entire Agreement; Amendment.   This Agreement (including the Schedules and the Exhibits) and the other Transaction Documents supersede all prior agreements between (a) Buyer, on the one hand, and Seller, on the other hand, and (b) solely with respect to Exhibit F, Buyer, on the one hand, and the RBL Facility Lenders, on the other hand, in each case, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between (x)

Buyer, on the one hand, and Seller, on the other hand, and (y) solely with respect to Exhibit F, Buyer, on the one hand, and the RBL Facility Lenders, on the other hand, in each case, with respect to their subject matter. This Agreement may not be amended, waived or otherwise modified except by a written agreement executed by all of the Parties and, with respect to any amendments, waivers or other modifications affecting the holders of RBL Facility Claims (in the reasonable discretion of the RBL Facility Agent), reasonably consented to by the RBL Facility Agent.

13.6    Assignment.    This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties and, to the extent provided in Exhibit F, the consent of the RBL Facility Agent, as applicable (which consents may be granted or withheld in the sole discretion of such other Party and, if applicable, the RBL Facility Agent). Notwithstanding the foregoing, Buyer shall have the right to assign any or all of its rights or obligations hereunder, in each case to one or more Affiliates of Buyer prior to the Closing by providing written notice to Seller and each such designated Affiliate shall be deemed to be Buyer for all purposes hereunder and under the Transaction Documents, except that no such assignment shall relieve Buyer of any of its obligations hereunder.

13.7    Severability.    The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

13.8    Expenses.    Except as otherwise specifically provided in this Agreement, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby.

13.9    Time of the Essence.    Time shall be of the essence with respect to all time periods and notice periods set forth in this Agreement.

13.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Texas applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding; *provided*, *however*, that, if the Bankruptcy Case is closed, all Actions and Proceedings arising out of or relating to this Agreement shall be heard and determined in a Texas state court or a federal court sitting in the state of Texas, and the Parties hereby irrevocably submit to the exclusive

jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding. The Parties consent to service of process by mail (in accordance with Section 13.3) or any other manner permitted by law.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLER, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

13.11   Counterparts.  This Agreement and any amendment hereto may be executed in two (2) or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Notwithstanding anything to the contrary in Section 13.3, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

13.12   Parties in Interest; No Third Party Beneficiaries.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Except for Section 11.4 and Section 13.13, this Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind, except that (a) the RBL Facility Lenders are express third-party beneficiaries of Buyer's obligations set forth in Exhibit F and shall have the right to directly enforce such obligations of Buyer in any manner that Seller is otherwise permitted to enforce the same in a manner consistent with this Agreement, and (b) if at any time Seller liquidates or otherwise has a trustee or other representative appointed by the Bankruptcy Court, then such trustee or other representative shall be entitled to enforce Seller's rights under this Agreement.  Notwithstanding anything contained herein to the contrary, in no event shall the RBL Facility Agent or RBL Facility Lenders have any Liability for the representations, warranties, covenants, agreements or other obligations of Seller hereunder or in any of the certificates, notices or agreements delivered pursuant hereto and, from and after Closing, no default or breach by Seller shall affect or diminish Buyer's obligations set forth on Exhibit F.

13.13   No Recourse.  Notwithstanding anything that may be expressed or implied in this Agreement or any Transaction Document, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Parties shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any Transaction Documents or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future Affiliate, incorporator, controlling Person, fiduciary, Representative, co-owner or equity holder of any Party (or any of their successors or permitted assignees) (each, a "Party Affiliate"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such Person against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable Legal Requirement, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Person under this Agreement or the transaction contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral

representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

13.14    Specific Performance.    The Parties acknowledge that irreparable damage would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Buyer further agrees that, in addition to any other remedy that Seller may have under law or equity, without posting bond or other undertaking, except as set forth in Section 11.2(b), Seller hereto shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement.  In the event that any such action is brought in equity to enforce the provisions of this Agreement, no Party will allege, and each Party hereby waives the defense or counterclaim, that there is an adequate remedy at law.  The Parties further agree that (i) by seeking any remedy provided for in this Section 13.14, a Party shall not in any respect waive its right to seek any other form of relief that may be available to such Party under this Agreement and (ii) nothing contained in this Section 13.14 shall require any Party to institute any action for (or limit such party's right to institute any action for) specific performance under this Section 13.14 before exercising any other right under this Agreement.

13.15    Liquidating Trustee.    If at any time Seller liquidates or otherwise has a trustee or other representative appointed by the Bankruptcy Court, then such trustee or other representative shall be entitled to exercise the rights of Seller under this Agreement.  Any successor or assign of Seller or any liquidation or other trust established by the Plan or any other chapter 11 plan with respect to Seller shall, without any further approval by or notice to any court, Person, or entity, shall succeed in all respects to the rights of Seller under this Agreement.

[*Signature page follows.*]

**I**N **W**ITNESS **W**HEREOF, the Parties and the RBL Facility Agent (solely for purposes of Sections 3.1(x), 13.3, 13.4, 13.5, 13.6, 13.9, 13.10, 13.11, 13.12, 13.14 and Exhibit F of this Agreement) have caused this Agreement to be executed and delivered by their duly authorized representatives, ~~all~~ as of the day and year first above written.

ARENA ENERGY, LP


By: _____

Name:  Anthony R. Horton
Title:  Authorized Person

ARENA EXPLORATION, LLC


By: _____
Name:  Anthony R. Horton
Title:  Authorized Person

VALIANT ENERGY LLC


By: _____

Name:  Anthony R. Horton
Title:  Authorized Person

SAGAMORE HILL HOLDINGS, LP


By: _____
Name:  Anthony R. Horton
Title:  Authorized Person

SAN JUAN OFFSHORE, LLC

W&T Offshore, Inc.

By: _____

Name:  ~~Michael J..Minarovic~~
Title:  ~~Chief Executive Officer~~

WELLS FARGO BANK, N.A.

By: _____

Name: _____

Title: _____

| Summary report: Litera® Change-Pro for Word 10.10.0.103 Document comparison done on 8/27/2020 5:10:38 PM | |
|---|---|
| **Style name:** One Line Additions | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** San Juan Asset Purchase Agreement.docx | |
| **Modified filename:** Asset Purchase Agreement (WC Draft 8-27-20).docx | |
| **Changes:** | |
| Add | 120 |
| Delete | 135 |
| Move From | 2 |
| Move To | 2 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 259 |